1

2

3

4

5

6                                    UNITED STATES DISTRICT COURT

7                                     EASTERN DISTRICT OF CALIFORNIA

8

9    CHAY'IM BEN-SHOLOM                    )    Case No. 1:93-CV-05531 AWI
     a.k.a. Ryan Michael Marshall,         )
10                                         )    DEATH PENALTY CASE
                         Petitioner,       )
11                                         )    MEMORANDUM DECISION AND ORDER
             vs.                           )    FOLLOWING EVIDENTIARY HEARING
12                                         )    GRANTING PETITION FOR WRIT OF
     ROBERT L. AYERS, JR., as Warden       )    HABEAS CORPUS AS TO PETITIONER'S
13   of San Quentin State Prison,*         )    SENTENCE AND DENYING ALL CLAIMS
                                           )    AS TO HIS CONVICTION AND DEATH
14                       Respondent.       )    ELIGIBILITY
     _____ )
15

16

17

18

19

20

21

22

23

24

25

26

27   * Robert L. Ayers is substituted for his predecessor, Jeanne S. Woodford, as Warden of San Quentin
     State Prison pursuant to Federal Rule of Civil Procedure 25(d).
28

Table of Contents

I.      Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

II.     Procedural Overview. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

III.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

IV.     Ineffective Assistance of Counsel During Penalty Proceedings (Claim 19). . . . . . . . . . . . .   6

        A.      Summary of the Relevant Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

                1.      Pre-Trial Interrogations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

                        a.      Ben-Sholom's First Custodial Interview. . . . . . . . . . . . . . . . . . . . . . .   7

                        b.      Ben-Sholom's Second Custodial Interview. . . . . . . . . . . . . . . . . . .   8

                2.      Pre-Trial Mental Health Assessments. . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

                        a.      Dr. Richmond's Summary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

                        b.      Dr. Kleist's Reports. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

                        c.      Dr. Glenn's Report. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

                        d.      Dr. Geshuri's Report. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

                        e.      Dr. Rienzi's Report. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

                3.      Pre-Trial, Trial, and Post-Trial Proceedings. . . . . . . . . . . . . . . . . . . . . . . .   20

                        a.      Summary of Testimony at the Suppression Hearing Regarding Ben-Sholom's Inderal Use. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

                                (1)     Ben-Sholom's Testimony. . . . . . . . . . . . . . . . . . . . . . . . .   21

                                (2)     Phyllis Marshall's Testimony. . . . . . . . . . . . . . . . . . . . . .   21

                        b.      Mr. Alexander's Guilt Phase Opening Statement. . . . . . . . . . . . . . .   21

                        c.      Mr. Alexander's Guilt Phase Summation. . . . . . . . . . . . . . . . . . . .   22

                        d.      Pre-Penalty Phase Discussions. . . . . . . . . . . . . . . . . . . . . . . . . . .   23

                        e.      Mr. Alexander's Penalty Phase Opening Statement. . . . . . . . . . . . .   24

                        f.      Penalty Phase Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

                                (1)     Phyllis Marshall. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

                                (2)     Faye Muldworf. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

                                (3)     Isaac Hull. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

1          (4)      Judy Mayora. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

2          (5)      Henry Bethany. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

3          (6)      Ben-Sholom. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

4     g.   Penalty Phase Stipulated Evidence. . . . . . . . . . . . . . . . . . . . . . .   29

5     h.   Mr. Alexander's Penalty Phase Summation. . . . . . . . . . . . . . . . .   29

6     i.   Penalty Phase Deliberations. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31

7     j.   Ben-Sholom's Motion for Modification of the Death Verdict. . . . .   31

8   4.   Evidence Presented by Ben-Sholom at the Evidentiary Hearing. . . . . . . . .   33

9     a.   Roger Alexander. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

10    b.   Anthony Casillas. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   39

11    c.   Gary Wynbrandt, M.D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42

12    d.   Phyllis Marshall. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

13    e.   Beth Rienzi, Ph.D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   47

14    f.   Neil Pereira. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   51

15    g.   Phillip Cherney. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   51

16   5.   The Warden's Response to Ben-Sholom's Evidence. . . . . . . . . . . . . . . . . .   58

17    a.   Yosef Geshuri, Ph.D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   59

18    b.   James Richmond, M.D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   64

19   6.   Ben-Sholom's Rebuttal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   70

20    a.   Dr. Wynbrandt. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   70

21    b.   Mr. Park. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   74

22   7.   The Warden's Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   77

23    a.   Report and Declaration of Roger Alexander. . . . . . . . . . . . . . . . . .   78

24    b.   Prosecution Trial Exhibit Photographs. . . . . . . . . . . . . . . . . . . . . .   80

25    c.   Request for Judicial Notice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   80

26          (1)      *Frierson* Order. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   81

27          (2)      *Baranyi* Transcript. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   81

28   8.   Ben-Sholom's Post Evidentiary Hearing Motion to Augment the Record. .   82

a.   Dr. Froming's Declaration in Response to the Warden's Request for Judicial Notice.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   82

b.   Defense Trial Exhibit Photographs. . . . . . . . . . . . . . . . . . . . . . . . .   83

B.   Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   83

1.   Performance.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   84

a.   Inadequate Investigation of Substantial Domination, Severe Mental and Emotional Disturbance, and Mental Disease or Defect.  . . . . . . . . .   85

b.   Failure to Provide Mental Health Experts with Social History Information Necessary to Secure a Competent Psychological Evaluation.  . . . . .   90

c.   Failure to Request Expert Opinions about Statutory Mitigating Factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   93

d.   Failure to Present Non-Expert Testimony Supporting Possible Statutory Mitigating Factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   94

e.   Failure to Present Expert Testimony to Explain Mitigating Factors and Concepts to the Jury.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   96

f.   Failure to Request Jury Instructions on Statutory Mitigating Factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   99

g.   Failure to Present a Cogent Penalty Phase Summation.  . . . . . . . .  101

2.   Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  103

V.   Trial Error for Failure to Instruct, Sua Sponte, on the Substantial Domination Sentencing Factor under Penal Code § 190.3(g) (Claim 16). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  115

VI.   Juror Misconduct for Prejudging the Penalty (Claim 22). . . . . . . . . . . . . . . . . . . . . . . . .  116

A.   Summary of the Relevant Facts.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  116

1.   Trial Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  116

2.   Pre-Evidentiary Hearing Offers of Proof.  . . . . . . . . . . . . . . . . . . . . . . .  116

3.   Evidence Adduced at the Evidentiary Hearing. . . . . . . . . . . . . . . . . . . .  118

B.   Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  120

VII.   Juror Misconduct for Receipt and Consideration of Extrinsic Evidence (Claim 23). . . . .  121

VIII.   Disproportionality of the Death Sentence (Claim 27). . . . . . . . . . . . . . . . . . . . . . . . . . . . .  122

IX.   Challenge to Fair-Cross Section Requirement (Claim 14)  . . . . . . . . . . . . . . . . . . . . . . . .  122

X.   Order. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  124

93dp05531.OFollEvidHrg.Ben.wpd                     iii

**I.      Factual Background.**

This case involves the tragic murder of Silva Teague, a middle-aged homemaker in rural Visalia. Mrs. Teague was shot to death in her home on Wednesday, January 23, 1985 during a burglary-robbery of weapons by Petitioner Chay'im Ben-Sholom[1] ("Ben-Sholom") and two companions.  It is undisputed that Ben-Sholom fired four bullets into the base of Mrs. Teague's skull as she lay face down in her bathroom.  At the time, Ben-Sholom was about six weeks shy of his 19th birthday.[2]  It is further undisputed that Ben-Sholom, at the time of the killing was involved in what he perceived as a "military mission" with the ultimate purpose of obtaining weapons he and his companions would use as members of the Karen National Liberation Army in the country of Burma (now Myanmar).  Ben-Sholom's companions were John Calhoun, a young man of Ben-Sholom's age, and Christopher Seaman, who was a few years older.  According to Ben-Sholom's account of the offense, Seaman was the "commander" of the "mission," Calhoun was next in command, and Ben-Sholom was the "point-man" who was to "take any shells" that might be fired from the house and carry out the orders. Seaman was in charge of the "mission" because he knew where the guns were kept in the Teague residence.  The break-in was planned for mid-afternoon because no one was supposed to have been home.  Ben-Sholom's understanding was that the order to kill Mrs. Teague emanated from Seaman and was communicated to him by Calhoun.  Ben-Sholom shot Mrs. Teague in the manner he did to ensure her death would be painless and instantaneous.

The three young men left with five weapons taken from the Teague residence.  They planned to go to Mexico and from there to El Salvador or somewhere in South America where they then would proceed to Asia.   The were apprehended in Needles, California, near the Arizona state line at approximately 1 p.m. on Thursday, January 24, 1985.  Shortly after his booking, Ben-Sholom was transported to an area hospital emergency room by local authorities for treatment of high blood pressure. The anti-hypertensive medication, Inderal, was administered.

---

[1] Known as Ryan Michael Muldworf until his parents married in 1972 (when he was 7 1/2 years old), his name was changed to Ryan Michael Marshall thereafter.  He changed his name legally to Chay'm Ben-Sholom after being committed to San Quentin State Prison for the present offense.  In this Memorandum Order he is referred to by his legal name, Chay'm Ben-Sholom.

[2] His date of birth is March 11, 1966.

1    Investigative questioning of the three young men commenced late that same night, after Sheriff's
2    deputies from Tulare County arrived in San Bernardino County.  Of the three suspects, Ben-Sholom was
3    last to be questioned.  His interrogation began at 1:15 a.m. on Friday, January 25, 1985, after he was
4    awakened from his sleep.  During the tape-recorded interview, Ben-Sholom described the offense in
5    terms of a military mission and expressed regret in having been prevented from going to Burma to fight
6    the Communists has he had planned.  Later that day, during business hours, Tulare County officials
7    obtained and served arrest warrants on the three suspects, who were then transferred to the main San
8    Bernardino County Jail where they remained until a Tulare County Sheriff's van came to collect them.
9    The van was dispatched from Tulare on Sunday, January 27, 1985.  On Monday, January 28, 1985, the
10   suspects were returned to Visalia, the county seat for Tulare County.

11   On that day, however, they were not arraigned.  Instead, each was re-interviewed by Sheriff's
12   investigators.  In Ben-Sholom's second custodial statement, which again was tape-recorded, he
13   recounted how the robbery plan was conceived and what the plans were.  He also graphically explained
14   how he shot Mrs. Teague.  That same day, Monday, January 28, 1985, the District Attorney's Office
15   hired psychiatrist James R. Richmond, M.D. to interview Ben-Sholom.  Dr. Richmond was retained by
16   Deputy District Attorney Patrick O'Hara to determine whether Ben-Sholom would be able to pursue a
17   psychiatric defense at trial.

18   At trial, and to a much greater extent on federal habeas, Ben-Sholom is portrayed as a lost soul,
19   who, as the result of severely abusive treatment at the hands of his father, Lonnie Marshall, and
20   abandonment by his mother, Phyllis Marshall,[3] had no real will or sense of identity of own.  Initially
21   raised by his Jewish and rather permissive mother, his authoritarian and anti-Semitic father did not
22   become a sustained part of his life until Ben-Sholom was seven and a half years old, when his parents
23   married.[4]

24

25

26   [3] Phyllis Marshall has remarried and now uses the name Phyllis Pilant.  This Memorandum Order
27   refers to her as Phyllis Marshall or Ms. Marshall.

28   [4] Prior to this time, Ben-Sholom and his mother went to live with Mr. Marshall in Louisiana for
a four month period beginning when he (Ben-Sholom) was 17 months old.

1    Ben-Sholom's childhood was turned upside down almost immediately.  Mr. Marshall exerted

2    his control and dominion over his wife and son by moving the family to an isolated small town,

3    subjecting them both to physical violence, and persisting in psychological cruelty.  The abuse was

4    pervasive and constant.  In response, Ben-Sholom began running away from home when he was in junior

5    high school.  There also is evidence that Ben-Sholom began hurting (mutilating and killing) animals as

6    an expression of his rage at his father's abusive treatment of him.  The record reflects that about this

7    time, Ben-Sholom began psychological counseling at Kings View Mental Health Center in Visalia. The

8    therapy, however, did not ameliorate Mr. Marshall's abusive treatment of his son, and Ben-Sholom

9    continued to run away from home.

10    When Ben-Sholom turned 17, he finally was able to pursue his dream of enlisting in the United

11    States Army.  As a result of an ankle injury he sustained on one occasion when he ran away from home,

12    however, he was unable to continue with the rigors of boot camp.  The ankle injury and ensuing arthritis

13    created an insurmountable disability.  He was honorably discharged based on his adverse medical

14    condition.  When he returned to Visalia after his discharge, he drifted aimlessly, looking for something

15    to belong to and fantasizing about becoming a mercenary.  His companions at this time have been

16    described as a "rough crowd."  In February of 1984, a month before his 18th birthday, Ben-Sholom

17    burglarized his mother's house.  The juvenile court adjudication found that he had committed second

18    degree burglary and released him to the custody of his father (with whom he was living at the time).

19    Prior to the adjudication, he spent five nights in Juvenile Hall.  It was at this time that Ben-Sholom met

20    and befriended John Calhoun.  Later, Calhoun introduced him to Chris Seaman, who like Ben-Sholom

21    was interested in guns and being a mercenary.

22    During this period following the juvenile adjudication, Ben-Sholom also experienced extreme

23    hypertension and in July 1984, was placed on high blood pressure medication, Inderal.  In September

24    of that year, he accepted a dare and jumped off the roof of the Sequoia Mall, badly breaking his wrist

25    in the process.  In December, about a month before the offense, he tried to commit suicide by ingesting

26    an entire bottle of Inderal.

27    Examiners have documented that Ben-Sholom gravitated toward widely divergent types of peer

28    groups.  On the one hand, he "hung out" with teenagers who used drugs and engaged in undisclosed

types of "delinquent" behavior, while on the other, he expressed an interest in being part of traditionally wholesome family type groups.  He disclosed early and frequent heterosexual relations as well as one broken engagement, said to have had a devastating effect.  One of his examiners, however, disputes the significance of the engagement breakup.  In contrast, she found Ben-Sholom had developed an interest in and was experimenting with homosexuality.  His pre-offense depression was said to be exacerbated by the ending of a homosexual relationship.

## II.     Procedural Overview.

On October 5, 2001, the Court ordered a limited evidentiary hearing to explore Ben-Sholom's allegations of ineffective assistance of counsel during penalty phase proceedings (Claim 19) and juror misconduct for prejudging the penalty (Claim 22).  The hearing was conducted on February 4, 5, 6, 7, 11, and 12, 2003, with evidence presented by both Ben-Sholom and Respondent Robert L. Ayers, Jr., as Warden of San Quentin State Prison, (the "Warden").[5]  Specific issues were reserved pending the evidentiary hearing, notably, juror misconduct for the receipt and consideration of extrinsic evidence (Claim 23) and the impropriety of the death sentence in light of mitigating evidence which could have, but was not presented (Claim 27).  Ben-Sholom also raises the trial court's error for not sua sponte instructing on the substantial domination sentencing factor (Claim 16) as a reserved claim.  The claims on which an evidentiary hearing was granted and the reserved issues, including Claim 16, are now before the Court.  One additional claim, challenging the systematic exclusion of Hispanics from Ben-Sholom's venire (Claim 14), also is reviewed in this Memorandum Order due to the withdrawal of a Ninth Circuit decision previously relied on by the Court in denying relief on the claim.

## III.    Standard of Review.

Ben-Sholom commenced this federal habeas action on August 10, 1993 by filing an application for appointment of counsel.  He filed his initial petition on October 12, 1995.[6]  Under controlling United States Supreme Court precedent, it is the filing of "an application for habeas relief seeking adjudication on the merits of petitioner's claims" that triggers applicability of the Anti-terrorism and Effective Death

---

[5]At the time of the ruling on the evidentiary hearing request, the Warden was Jeanne S. Woodford.  The current occupant of the Warden's position is Warden Robert L. Ayers, Jr.

[6] Ben-Sholom's operative petition was filed August 15, 1997 (hereafter the "Petition").

Penalty Act of April 24, 1996 ("AEDPA").  *Woodford v. Garceau*, 538 U.S. 202, 207 (2003).  Since

Ben-Sholom's October 12, 1995 petition, which constitutes a substantive pleading seeking adjudication

on the merits, was filed before the enactment of AEDPA, pre-AEDPA law, under former 28 U.S.C. §

2254, is controlling.  *Id.*

Former 28 U.S.C. § 2254(d) directs that *written* state findings are presumed correct:

> In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit –
>
> (1)  that the merits of the factual dispute were not resolved in the State court hearing;
>
> (2)  that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;
>
> (3)  that the material facts were not adequately developed at the State court hearing;
>
> (4)  that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;
>
> (5)  that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;
>
> (6)  that the applicant did not receive a full, fair, and adequate hearing in the State court proceedings; or
>
> (7)  that the applicant was otherwise denied due process of law in the State court proceeding;
>
> (8)  or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record.

Both mixed questions of law and fact and pure questions of law are reviewed *de novo*.  *See Thompson

v. Borg*, 74 F.3d 1571, 1573 (9th Cir. 1996).  A state court's determination of lack of prejudice is a

mixed question of law and fact, because although historical facts found by state courts are entitled to a

presumption of correctness under (former) § 2254(d), when state courts apply legal standards to

historical facts, those decisions are not factual findings, and accordingly are subject to *de novo* review. *Id*.

## IV.    Ineffective Assistance of Counsel During Penalty Proceedings (Claim 19).

In deciding to explore further the issue of ineffective assistance of penalty phase counsel, the Court reviewed the trial evidence (guilt and penalty), the argument of counsel (guilt and penalty), and numerous offers of proof.  Review of these materials revealed that although Ben-Sholom's trial counsel, Roger Alexander, consulted with five mental health experts during trial preparation, he presented no expert testimony at penalty proceedings.  At the evidentiary hearing, the Court considered evidence to explore whether Mr. Alexander's decision not to present expert testimony was the result of reasonable strategic planning.  In addition the Court considered the evidence which Ben-Sholom claims should have and could have been presented at his penalty phase trial to convince the jury not to sentence him to death.  The Warden countered Ben-Sholom's evidence with his own experts, and Ben-Sholom presented rebuttal evidence.  The Warden also presented his own evidence partially presented at the evidentiary hearing and partially in a request for judicial notice.  Ben-Sholom responded with a request to augment the record.

### A.    Summary of the Relevant Facts.

Although the Court previously has set out a comprehensive summary of trial proceedings and post-conviction declarations presented on federal habeas, *see* Part V.A., October 5, 2001 Order at pp. 10-79, selected pre-trial interrogations, pre-trial mental health assessments, and trial proceedings (including some not previously summarized) are summarized (and in some cases re-summarized) to give context to the evidentiary hearing testimony and relevant documentary evidence.

#### 1.    Pre-Trial Interrogations.

Ben-Sholom's custodial interviews were the first indications that he believed the crime to be a necessary part of a larger plan to join the Karen National Liberation Army and fight Communists in Burma.  His intensity and sincerity prompted both the prosecutor and defense counsel, Mr. Alexander, to arrange for mental health assessments.

### a.     Ben-Sholom's First Custodial Interview.

Regarding the overall "mission," Ben-Sholom explained that Chris Seaman told John Calhoun and him of "this place [the Teague residence] and coerced us pretty much to do it. . . . [t]o go in and remove the weapons from the house [where] there wasn't supposed to be anybody home."  Exhibit 16 to Petition.  He recounted that the incident took place at approximately "1500 hours" based on a plan that was conceived a pizza restaurant that same afternoon.  The purpose of the "mission" was to obtain weapons so the three young men could go to Burma and join the Karen National Liberation Army to assist with the effort of the indigenous people to obtain independence from Communist oppression. Ben-Sholom stated he had been planning to go to Burma on a March 16th flight out of Los Angeles International Airport.[7]  Seaman intervened in his plans so they would leave from Central America instead.

Ben-Sholom arrived at the Teague residence on his motorcycle while Calhoun and Seaman arrived in Seaman's jeep.  Ben-Sholom was given Seaman's .357 magnum and was told to go into the house first.  The others were to follow.  Ben-Sholom knocked on the door and Mrs. Teague answered. She tried to close the door on him, but he forced it open.  He then waited for Calhoun to enter.  While Calhoun was collecting weapons, Ben-Sholom kept guard over Mrs. Teague.  It was Seaman who told Calhoun and Ben-Sholom where the weapons, belonging to Alva Teague, Mrs. Teague's son, would be located.

After the weapons were collected, Calhoun "gave the order" for Ben-Sholom to take Mrs. Teague into the bathroom and shoot her.  Ben-Sholom did so, shooting her in the base of the skull as she was lying face down in the bathroom.  He did not strike her in any way.  He stated that Seaman was "commanding the mission."  The whole incident, from entry, killing Mrs. Teague, loading the stolen weapons in Seaman's jeep, and departing took about 7 to 8 minutes.

Ben-Sholom reiterated during the interview that Mrs. Teague was not supposed to have been there and that there was no contingency plan in the event someone was home.  He stressed that Seaman came up with the idea for the mission.  He also stated that he believed Seaman knew Mrs. Teague was

---

[7] There was no evidence that Ben-Sholom had purchased a ticket or even made a reservation for this flight.

killed because "he was the one who told John [Calhoun]" and then Calhoun told him.  Ben-Sholom then agreed with the interrogating officer that the reason Mrs. Teague was "eliminated" was because she was a witness.

After the incident, Seaman and Calhoun left in Seaman's jeep.  Ben-Sholom left on his motorcycle.  Ben-Sholom then sold the motorcycle for $150.  He described the sales transaction as having occurred at "1600 hours."  Afterwards, Ben-Sholom and his companions proceeded south on highway 99 to highway 58 and spent the night in Tehachapi because the jeep had mechanical problems.

Ben-Sholom displayed irrational sincerity about his military and political goals to his interrogator:

> Q. Do you affiliate yourself with any organization outside of this country?
> A. At this point in time, no.
> Q. Okay, have you ever affiliated yourself with any organization within this country?
> A. I cannot divulge this information at this time or anytime in the future.
> Q. Okay, okay.  Have you ever affiliated yourself with any organization outside of this country?
> A. I can't answer that question.

On the subject of remorse, Ben-Sholom related his primary regret was in being permanently prevented from going to Burma.  With respect to Mrs. Teague, he responded that he did feel remorse, but that "she's at peace at last."

**b.       Ben-Sholom's Second Custodial Interview.**

Ben-Sholom's second interview was conducted three days after the first, after he and his companions had been transported back to the Tulare County Sheriff's station in Visalia.  Exhibit 17 to Petition.  He revealed that the first conversation about taking weapons from the Teague residence occurred at the pizza restaurant the night before the crime.  Seaman came up with the idea.  As far as the actual execution of the "mission," Ben-Sholom and Calhoun were to go into the residence to collect the weapons in places Seaman said they would be found.  Seaman stayed outside.  The theft was to occur about "1500 hours."  He explained he didn't know why they didn't all travel to the Teague residence in the jeep and why he was directed to take his motorcycle.

During this interview, he stated that before going into the house, the three young men discussed the possibility that someone might be home.  Ben-Sholom agreed with his interrogator that there was "a commitment" among the three young men that if anyone was home that person would be

1    "eliminated."  Ben-Sholom stated he didn't know why, but guessed, in answer to the interrogator's

2    questions, it was because they didn't want any witnesses.

3          When Calhoun entered the house, Mrs. Teague was sitting on the couch, where Ben-Sholom told

4    her to sit.  Calhoun then directed that she should lay down in the hallway.  Then, he instructed Ben-

5    Sholom to take Mrs. Teague in the bathroom.  Ben-Sholom explained, "That's what he told me and I

6    just, that's what I did," but he guessed it was a matter of convenience so Calhoun didn't have to walk

7    over her in the hallway while he was collecting weapons.  Ben-Sholom explained that the signal from

8    Calhoun for him to kill Mrs. Teague was conveyed by Calhoun drawing his index finger across his

9    throat.

10         Ben-Sholom described shooting Mrs. Teague graphically: "I put a flash suppressor to the base

11   of the skull and I tilted it back just a little back for the angle so I'd come through right about the bridge

12   of the nose, so I'd get a clear trajectory through her brain."  He explained he did it in this manner

13   because: "I didn't want to hurt her, I didn't want her to feel any pain, I wanted it to be over before she

14   even knew it happened, so I made sure that I had a clear, the bullet had a clear trajectory through the

15   brain."  He stated he was sure he killed her after the first shot, but that he fired off three or four more

16   rounds to make sure.  On further explanation he explained that the manner in which he shot Mrs. Teague

17   was "a variation of the move that [he] was taught to kill, with a knife."  He explained, "you bring a

18   person's skull back like this, using your pinky at the base of the eyebrow, you bring it back and insert

19   the blade in sideways and then twist to the right and to the left and pull it out."  He said he learned this

20   "move" in private training "received from other groups of people."[8]

21         After the shooting, Ben-Sholom and Calhoun gathered up the weapons, except a couple of air

22   rifles and the .22 rifle used to kill Mrs. Teague.  He explained these weapons were left behind because

23   they would be of no use in the jungle.  When they stopped in Tehachapi, they did not celebrate; they ate

24   and slept.  They didn't feel like they had accomplished anything. During the interview Ben-Sholom

25

26         [8] This excerpt was omitted from presentation to the jury in both the tape recording and the
27   (redacted) transcript of the tape. Also withheld from the jury were the reasons he and his companions
     did not engage in a shoot out with authorities when they were apprehended, the fact that when they were
28   in the San Bernardino jail, they felt they were at risk from other inmates, safe when together, and  the
     dialogue with his interrogator about whether he had ever killed before.

stated he felt a "little unsure" mentally, but was not delusional.  When they were apprehended, they had only a quarter of tank of gas and no gas cans.  They were still 300 miles from the Mexican border.

He was questioned about remorse:

> Q. The other night I asked you if you felt any remorse or any regret for your actions. How do you feel now[?]
> A. Very disturbed.
> Q. Meaning that you do regret. . .
> A. Yeah, it's beginning to bother me really bad.
> Q. Do you feel bad now that the lady died?
> A. Yes, I do.
> Q. Do you feel badly that you killed her?
> A. Yes, I do.
> Q. Okay, if you had it to do over again, would it happened the same way?
> A. No.
> Q. Okay, if you had it to do over again, would you even commit the theft?
> A. No, it wasn't, it wasn't definitely not, nothing is worth a person's life.

Ben-Sholom confirmed, however, that at the time he killed Mrs. Teague he was fully aware of what he was doing.

### 2.    Pre-Trial Mental Health Assessments.

Prior to Ben-Sholom's trial, he was interviewed by seven doctors.  Five of those doctors were retained to assess Ben-Sholom's mental state.  The first doctor to examine Ben-Sholom was Dr. Richmond, on January 28, 1985, at the request of the prosecution.  The second evaluation was requested by Mr. Alexander and conducted by psychiatrist/ neurologist Frank W. Kleist, M.D. on February 26, 1985.  Dr. Kleist re-interviewed Ben-Sholom on March 18, 1985.  The next mental health assessment was conducted by psychiatrist/ neurologist, Trevor D. Glenn, M.D. on September 17, 1985.  Dr. Glenn's assessment was followed by two additional interviews, by clinical psychologists Yosef Geshuri, Ph.D. on October 6, 1985, and by Beth Rienzi, Ph.D. on October 29 and 30, 1985.  No findings, opinions, or conclusions were presented to the jury by any of these doctors.

### a.    Dr. Richmond's Summary.

Dr. Richmond took notes of his January 28, 1985 interview but he did not write a report.  The notes are compiled and attached as Exhibit 19 to the Petition.  Instead, on December 20, 1985, approximately 11 months after Ben-Sholom's arrest and Dr. Richmond's interview of him, Mr. Alexander took the doctor's deposition.  A copy of the deposition transcript is attached to the Petition as Exhibit 20.  Dr. Richmond explained that he had been hired by the District Attorney to give an

opinion, as close to the crime as possible, as to whether he believed Ben-Sholom could pursue a psychiatric defense, in particular, an insanity defense, at trial. To prepare for the interview, Dr. Richmond reviewed the investigation report and listened to both of Ben-Sholom's taped confessions. During the one hour and 45 minute interview Dr. Richmond conducted, Ben-Sholom was alert, but tense. He cracked his knuckles when talking about the offense and was near tears repeatedly.

Dr. Richmond recounted that Ben-Sholom was raised as an only child until the age of eight (when his mother and father married). Before that, Ben-Sholom's mother spent time working and dating. Ben-Sholom reported she never developed a close relationship with him. His father was overweight, cruel, sadistic, and very mean. When he came into the household, he tried to force respect. He threw out all of Ben-Sholom's possessions, including toys and games. Ben-Sholom didn't know how his mother felt about this, but he felt hatred and he wanted his father dead. At the time Dr. Richmond interviewed him, Ben-Sholom still wanted his father dead. Ben-Sholom reported feeling sad about the parental rejection he experienced.

Ben-Sholom killed animals for food. He also raised and killed rabbits for their hides and rabbit's foot key chains. As a student, he fought more in high school than in elementary school. He reported that when he was in the fifth or sixth grade, he injured another student so severely the child had to be hospitalized for two months. He described that the put his fingers in the other child's eyes and banged his head on the "monkey bars" in order to break the his skull. Dr. Richmond testified at the deposition he did not inquire about supporting details regarding this incident to ascertain whether it really occurred or Ben-Sholom was fantasizing.

To fulfill a life long dream of being in the Army (since age five), Ben-Sholom enlisted on his 17th birthday. He told his parents he would blow himself and the family up if they didn't sign the forms to allow him to join. He was "relieved" of service on September 9, 1983 due to an ankle injury. Ben-Sholom was "lost" when discharged. He began to look for mercenary groups to find war elsewhere, which might result in death. He became fascinated with war books, particularly tactics and logistics. He played "war" with John Calhoun in the high brush area near his home, using a variety of weapons. He boasted about being able to identify, strip, and load most weapons that existed in the world. He

1  claimed to have been taught by unnamed paramilitary groups about jungle fighting and "silent kills"

2  using knife maneuvers.[9]  Ben-Sholom made it clear he had never before killed a person.

3        Dr. Richmond testified at the deposition that the information Ben-Sholom provided appeared to

4  be largely spontaneous.  Ben-Sholom did not appear to be exaggerating, but boastful of his extensive

5  knowledge and fascination with weaponry.  Dr. Richmond did not inquire further to ascertain whether

6  the experiences Ben-Sholom related were real or fantasy.  Dr. Richmond had the impression that Ben-

7  Sholom was relating real experiences because the details given were fairly organized.  He conceded that

8  if the facts relayed had been fantasy, but Ben-Sholom believed the incidents had occurred, it is possible

9  Ben-Sholom could have related them in the same calm, clear manner.

10        The crime was thought of as a "mission" to obtain guns so Ben-Sholom and his companions

11  would be "accepted by some independent mercenary fighting force."  The three young men intended

12  to spend time in Central America at some kind of boot camp and then proceed to Asia.  Ben-Sholom told

13  Dr. Richmond that Seaman had "inside information" that they would be accepted in El Salvador to fight

14  the Sandinistas.  Again Mr. Alexander confirmed that Dr. Richmond asked no questions to verify

15  whether the information regarding their proposed acceptance into the military forces to fight the

16  Sandinistas was truth or fantasy.

17        When Mrs. Teague was obedient and called Ben-Sholom "sir," it agitated him because he never

18  wanted to be an officer.  He wanted to be a soldier – an order taker, not an order giver.  Before entering

19  the Teague residence, he stated he planned to kill anyone in the house.  He saw Mrs. Teague before

20  entering and was committed to killing her.  He said, "The unit was committed."  He would have been

21  satisfied to tie Mrs. Teague up and leave her there.  The order to kill her came from Calhoun, who in turn

22  received the directive from Seaman.  Ben-Sholom doubted Mrs. Teague thought she was going to be

23  killed.  She showed no fear and did not plead.  He had not thought about taking someone's life and what

24  that would mean to the victim. At that point, it was just a military maneuver.  Afterward, he felt as if he

25

26        [9] According to Gary Wynbrandt, M.D., the "brotherhood of mercenaries" to which Ben-Sholom
27  "made allusions during his confessions and to the first mental health professionals who interviewed him
    after the crime apparently was no more than his friends Brett Thompson and John Calhoun, who did
    target practice and made a 'fort' by the San Joaquin [Saint John's] River . . . in late 1984 [to] early 1985.
28  *See* Part IV.A.4.c., *infra*.

were another person watching himself, as if on television, or reading a book. He said he wouldn't have killed Mrs. Teague in the state of mind he was in when he was talking to Dr. Richmond. He reported that what he had done "wasn't right." He reported to Dr. Richmond that he wished he could trade places with Mrs. Teague, to end his own pain and suffering. He said that if he had been taken care of as a child and youth, or if he had been dead, the crime wouldn't have happened. He told Dr. Richmond that he wanted to be sentenced to death for the crime because he felt really guilty about it – that it shouldn't have happened. He was, at the time of the interview, suicidal. He was fearful of being in prison where he would be completely unarmed, in a hostile environment, with no "back up" or friends.

He related that he had an uncle who experienced auditory hallucinations and had a "real bad mental problem." He also reported past incidents where he hurt himself, including intentionally overdosing on Inderal, jumping off the Sequoia Mall, and playing "chicken" with diesel trucks on major highways. He stated he was depressed 95% of the time and began to have suicidal thoughts at age nine to ten. He also reported that he started experiencing blackouts six months prior to the crime, but denied a past diagnosis of epilepsy or seizures. Dr. Richmond testified he thought the reported blackouts could correspond to a mental condition called "detachment" or be related to Ben-Sholom's increased alcohol usage or brief organic episodes. After the interview, Dr. Richmond was "satisfied [Ben-Sholom] was not in a psychotic state, but that he had completely detached any feelings or displaced – or he was just kind of operating without significant feelings." He felt that what Ben-Sholom described was that he had entered into a military exercise after struggling with himself not to feel anything. He concluded that at the time of the crime, Ben-Sholom

> was operating rationally, that he was able to see and understand and make decisions based on what was really happening around him and he was very much caught up in some of his desire and beliefs about being in the process of becoming a mercenary, and that what he was doing was – I guess you would say, in a sense justified as a military operation in preparation to accomplish his long-range goal of being or becoming a mercenary. . . . [The crime was] part of what you've got to do . . . in order to become a mercenary.

### b.     Dr. Kleist's Reports.

In Dr. Kleist's first, February 26, 1985, report, he stated that no information about Ben-Sholom's background was provided. Exhibit 21 to Petition. Rather, Dr. Kleist reported that Ben-Sholom provided his own background information. Ben-Sholom told Dr. Kleist he "was reared by an autocratic,

1   extremely abusive father and a submissive, unprotecting mother." Ben-Sholom described his hatred for

2   his father, his medical discharge from the Army, his subsequent breakup with his fiancee a little more

3   than a year before the offense, his fascination with weapons, his obsession with vengeance and infliction

4   of pain, and his connection with John Calhoun and Chris Seaman.  Ben-Sholom described himself and

5   his co-perpetrators to Dr. Kleist "as the best guerrilla fighters in the world," he said that he had "friends

6   and/ or relatives of the family" listed as MIAs, he expressed fear that his enemies "could hunt him down

7   in jail, or get some of his relatives," he claimed that his father tried to kill him when he was a child, and

8   he admitted he "slaughtered animals, ripped the head off of a cat, injured dogs, broke tree limbs."

9       Dr. Kleist was impressed with Ben-Sholom's totally emotionless demeanor.  "He spoke in a

10  mechanical, stilted fashion. . . . His intense preoccupation with structured violence through military

11  activities and his obsession with sadistic expressions of revenge and violence defie[d] logic." Dr. Kleist

12  noted that Ben-Sholom gave the impression of "cold-blooded ruthlessness and seem[ed] to relish the

13  listener's repugnance as he [went] into graphic detail about means of torture and expressions of rage."

14  Ben-Sholom took pride in "adhering to the military mentality of unquestioning loyalty and unhesitating

15  execution of orders."

16      Dr. Kleist reported he was not certain whether the "facts" relayed by Ben-Sholom might have

17  been "an extremely well structured delusional system of a persecutory sort," and whether the abuse at

18  the hands of his father was exaggerated.  Ben-Sholom admitted to feeling so much rage at the time of

19  the interview, he could "rip the guard's head off."  He bragged about being able to "pull a pumping heart

20  out of a person's chest."  Dr. Kleist felt that Ben-Sholom denied feelings of depression because it was

21  not becoming.

22      Dr. Kleist regarded Ben-Sholom "as dangerous" since his judgment was "strongly influenced by

23  his paranoid outlook and his intense feelings of hatred."  In the diagnosis section of his report, Dr. Kleist

24  stated: "It is clear we are dealing with a mentally disturbed man. . . . I would regard him as having a

25  severe paranoid personality disorder associated with a probable anti[-]social personality."  Dr. Kleist

26  found Ben-Sholom's "exaggerated preoccupation with violence and revenge simply staggering."

27      In the second interview on March 18, 1985, Ben-Sholom discussed his distress over the loss of

28  his girlfriend/ fiancee in late 1983. Exhibit 22 to Petition.  He recounted to Dr. Kleist nightmares where

he was "tearing her tissues apart, breaking her fingers, pulling her joints from their sockets."  Ben-Sholom denied he was feeling turmoil from the loss of this relationship at the time of the offense.  He told Dr. Kleist he had overdosed on Inderal and three weeks before the offense had "played chicken" with diesels on the highway and ran across train trestles "more or less inviting death."  In his report Dr. Kleist confirmed that based on an interview with Ben-Sholom's mother, Ms. Marshall, the abuse Ben-Sholom discussed in the first interview was not exaggerated.

### c.      Dr. Glenn's Report.

Dr. Glenn examined Ben-Sholom on the issues of criminal responsibility and sentencing six months later, on September 17, 1985.  Exhibit 24 to Petition.  Unlike Dr. Kleist, Dr. Glenn was able to review transcripts of Ben-Sholom's taped custodial statements, as well as transcripts of the custodial statements given by Ben-Sholom's co-perpetrators, John Calhoun and Chris Seaman.  He also reviewed Ben-Sholom's Kings View counseling records.  Further background information was obtained from Ben-Sholom, himself, including the history of his sickly condition as a young child, the abusive environment and resulting paternal hatred in his youth, his cataclysmic enlistment in the Army, his interest in paramilitary activities, and his participation in the offense.  When Mr. Marshall moved in with Ben-Sholom and his mother, he (Mr. Marshall) assumed the role of a "dictator" and there was a "declaration of war" when Mr. Marshall discarded Ben-Sholom's toys.  Mr. Marshall forced his religion of Jehovah's Witnesses on Ben-Sholom and his mother soon after the family moved from Riverside to Paradise, California.  Ben-Sholom resisted.  He reported that his mother had raised him to be independent.  On one occasion when Mr. Marshall arrived home from work, Ben-Sholom was arguing with his mother about going to a meeting of the Jehovah's Witnesses.  Mr. Marshall beat Ben-Sholom with a thin leather strap, which Ben-Sholom explained left welts on his legs and buttocks.  He recounted to Dr. Glenn that he was beaten by this father for telling the truth and at least once a week on "general principle."  Eventually, Mr. Marshall lost his job in Paradise and the family moved to Fresno for a short time and then to nearby Dinuba where Mr. Marshall finally secured a job.  Dr. Glenn reported that in Dinuba, as well as in Paradise, Ben-Sholom was left alone quite often.  When he was in the fifth grade in Dinuba, he slashed his wrist accidentally and sought help from a neighbor for emergency medical treatment.  At this time, Mr. Marshall began giving him a "back hand" to the face "with a closed fist."

By the time he was about 13, Ben-Sholom started accepting the Jehovah's Witness faith, as his father started to drop out.  Also at this time, Ben-Sholom started running away from home following severe beatings and threats of beatings from his father.  Either Ben-Sholom or his mother, or both, would be beaten on nearly a daily basis.  Ben-Sholom feared death and annihilation.  He reported that on several different occasions, he was taken into protective custody and safe houses.  He admitted to hurting animals after being beaten by his father.  When he was 14, Ben-Sholom reported that he felt suicidal over the break up with a girlfriend.

The next year, Ben-Sholom ran away from home to visit his older half-brother (on this father's side).  His encounter with his brother led to a motorcycle accident which broke his ankle (and ultimately led to the disability requiring his discharge from the Army).  He expressed anger and frustration at his life with his parents.  He attended counseling sessions at Kings View.  His temper by this time was very short.  He was disciplined at school for carrying a knife and explained to Dr. Glenn he promised himself if he "ever drew that knife, he would draw 'blood.'"

With respect to the Army, being part of the military had been a life goal for Ben-Sholom.  It would have allowed him to escape his horrible family life, to have a purpose, and to marry his high school girlfriend.  When he was determined to be medically unable to complete basic training exercises, he was "stunned."  Dr. Glenn reported that tears came into Ben-Sholom's eyes at this point of the interview and "the tone of the whole interview changed."  The end of his hoped for military career also led to the end of his relationship with his girlfriend, and the end of his life.  He had no direction after being separated from the military.  He intermittently worked at fast food restaurants, used drugs, engaged in dangerous activities (jumping off the Sequoia Mall and being involved in fights), and he flirted with criminal activity, including once burglarizing his mother's house and stealing cars.[10]  He told Dr. Glenn he wanted "out" and he began using marijuana, alcohol, and hash.

In 1984, when he was 18, Ben-Sholom learned about the Karen National Liberation Army, perhaps from *Soldier of Fortune Magazine*.  He saw this as a chance to start a new life outside of the United States and get involved in military activity.  He waited to find someone to help him get partway

---

[10] While the record does show that Ben-Sholom's stint in Juvenile Hall resulted from his burglary of his mother's house, there is no indication in the record for any auto theft incidents.

across the country, and in the interim worked off and on.  About this time, he began experiencing

marked symptoms of hypertension and anxiety attacks.  After he had a prescription for Inderal, he tried

to commit suicide by overdosing on the drug.  Finally, Ben-Sholom found an ally in John Calhoun for

his paramilitary quest to join the Karen National Liberation Army.  A few days before the offense,

Calhoun introduced Ben-Sholom to Chris Seaman, and together they "cooked up a scheme," as Dr.

Glenn phrased it, to obtain weapons and money so they could fight in a war.  Ben-Sholom described his

paramilitary training from a paramilitary gun club whose members sought him out "when they heard

about some of the things that he was doing."[11]  They trained him in the use of exotic weapons.  He

admitted that bamboo pits at the river were built in June 1984 by Calhoun, another friend Brett

Thompson, and himself.

Ben-Sholom described the offense in military terms.  He and his companions "treated it like a

war."  Ben-Sholom served as the "point man," that is the person designated to take "any shells" that

might have been fired from the house.  Ben-Sholom told Dr. Glenn that after entering the Teague

residence, before Calhoun and Seaman, he was fearful because he didn't have "any back-up."  In his

account of the offense, Ben-Sholom related that he "took the lady [Mrs. Teague] to rooms and tried to

find [valuable] coins that weren't there."  Eventually, Calhoun told him to take Mrs. Teague to the

bathroom and then gave him the order to kill her.  He explained he always had been taught to "follow

through," both from his father, from the Army, and from the paramilitary training.  At the time of the

offense, he described himself as "washed."  He was tired of caring for himself.  He had "died inside."

He told Dr. Glenn he would have followed any orders that had been given, including being told to go

to the Mall and shoot everyone in sight.  At the time of the crime, Ben-Sholom had been rejected by

everything he loved or cared about; "he was looking for something in the way of peer acceptance and

approval and 'belonging' to some sort of group."

Dr. Glenn observed that although Ben-Sholom was cooperative throughout the interview he was

emotionally distant and "quite consciously [hid] his feelings and emotions."  Except when he talked

about being discharged from the service, his speech was spontaneous, coherent, and relevant.  Dr.

---

[11] There is no explanation for "the things that he was doing."

1   Glenn's primary diagnosis was "mixed personality disorder," characterized by passive aggressive and

2   anti-social features.  The secondary diagnosis was "significant depression" stemming from his horrific

3   childhood and more recently from his rejection from the service as well as from his break-up with his

4   girlfriend.  His major depressive episode (from the Army discharge and loss of his girlfriend) was

5   "without psychosis."   Dr. Glenn recommended psychological testing for I.Q., depression, and

6   schizophrenia.  Dr. Glenn also felt that suggestibility and induced psychosis should be explored although

7   he didn't think either of these issues were present.  Finally, Dr. Glenn recommended that Ben-Sholom's

8   need to "belong" should be explored in testing.  Dr. Glenn also felt the records of the medical doctor,

9   Dr. Wong, who diagnosed Ben-Sholom's hypertension should be obtained.   Ben-Sholom had been

10   reaching the point of "crisis" at the time Dr. Wong diagnosed hypertension.  Ben-Sholom then appeared

11   to progress into "some kind of decompensation in his functioning."

12                    **d.      Dr. Geshuri's Report.**

13          Dr. Geshuri, who was retained by Mr. Alexander in response to Dr. Glenn's recommendation,

14   described the purpose of his interview and report was "to explore some of the circumstances and various

15   social factors which have led to the killing and the specific role which [Ben-Sholom] took in that event."

16   The examination, on October 6, 1985, entailed four psychological tests and a clinical interview.  Exhibit

17   25 to Petition.  During the interview, Ben-Sholom exhibited a "flat affect, showing no emotion" as he

18   recounted the offense and the events leading to it.  He emphasized to Dr. Geshuri that "he was a

19   professional, carrying out the details of an agreement or a verbal contract, which he ha[d] committed

20   himself to."

21          Ben-Sholom's score on one of the psychological tests, that assesses credibility, indicated either

22   that he answered the questions to make himself look sicker than he was, or more likely in Dr. Geshuri's

23   opinion, that he actually was affected by "characterological problems manifesting aggressive and sadistic

24   behaviors with possible psychotic thinking."   Dr. Geshuri stated that scores like Ben-Sholom's were

25   associated "with individuals who are aggressive, sadistically punitive, who like to hurt others and arouse

26   anxiety and guilt in their victims."

27          From the background Ben-Sholom supplied, Dr. Geshuri factored into his analysis that Ben-

28   Sholom had a large collection of various knives and fire arms "which he obtained through burglaries and

other means." When asked why he killed Mrs. Teague, he replied that "he found it necessary to carry out the letter and spirit of the verbal contract [with his co-perpetrators] so that his reputation as a reliable professional would be spread around to carve out his future as a professional soldier and mercenary." After reviewing the paternal abuse inflicted, Dr. Geshuri concluded that Ben-Sholom's

> developmental formative years which he spent as an only child with both parent[s] working and absent from the home, with him being socially isolated and receiving the persistent harsh and brutal treatment he has received from his father while his mother stood helplessly by, have evolved [Ben-Sholom] into an angry young man. This anger and insatiable need[] for revenge have turned [Ben-Sholom's] main focus in life and achievement goals into a machinery of death and killing.

His diagnosis was that Ben-Sholom suffered from an anti-social personality disorder ("ASPD").

### e.    Dr. Rienzi's Report.

Dr. Rienzi administered six psychological tests to Ben-Sholom and conducted a clinical interview on October 29 and 30, 1985. Her report is attached as Exhibit 27 to the Petition.[12]  During the interview, Ben-Sholom "justified" his role in the offense in terms of his being "under a military contract" with Chris Seaman. Ben-Sholom explained that both before and after his father came to live with him and his mother, he spent a great deal of time at home alone, totally unsupervised.  His description of his father and his father's treatment of him reflected intense anger and resentment.  He communicated to Dr. Rienzi his disappointment at being medically discharged from the Army and breaking up with his girlfriend.  He also told her about his suicide attempt (overdosing on Inderal).

Dr. Rienzi observed that Ben-Sholom's struggle with his father overshadowed his efforts to develop his own identity.  In the weeks before the offense, he was looking for a "cause" to which he could commit his life and which would "validate" his existence.  Dr. Rienzi did detect "a consistent degree of mild exaggeration to all stories he told about himself."  Based on the intelligence scale testing, Dr. Rienzi found an overall I.Q. of 118, placing Ben-Sholom "with the high average range of intellectual function."  His performance on the test faltered when the questions related to authority figures, children, or praise and punishment.  Dr. Rienzi found that Ben-Sholom's drawing (on another test) revealed his capacity for becoming "rigidly obedient and compliant."  In the projective drawing, Ben-Sholom

---

[12] The report bears the date October 4, 1985, but based on the dates of services described in the report, the Court understands that the report was completed on *November* 4, 1985.

presented himself as frightened, inadequate, and insecure, placing great importance on physical strength and power.  His drawing of an outdoor scene depicted craggy mountain peaks, which Dr. Rienzi opined were symbols of consistency and stability.  When telling "projective" stories, Ben-Sholom assumed a third party view of a detached observer.

In another test, Ben-Sholom identified with an abused child who was left unprotected by "the system."  The complete sentence test demonstrated his sense of self failure, desire to be left alone, annoyance with other people, and conflicts with authority.  Dr. Rienzi found that even his penmanship was indicative of rigid self control.   The results of another test revealed a person who had excessively rigid and "unconventional thinking of a rebellious, socially isolated personality."  Ben-Sholom's scores suggested "artificially inflated self-esteem to cover feelings of helplessness and inadequacy," a tendency to alleviate painful feelings by "striking out in anger and rebellion," impaired empathy, and involvement in "bizarre, self-defeating crimes."

In conclusion, Dr. Rienzi reported that Ben-Sholom used an "elaborate defense system of "symbolic compartments" to keep from expressing pain, rejection, anger, and anxiety.  She observed that his "personality identity" remained incomplete leaving him "susceptible to absorbing large portions of characters in books."  He was able to escape feelings of inadequacy, helplessness, depression, and isolation by identifying "a righteous, external cause or a person that he viewe[ed] as powerful."  In that way he could lose himself and become "part of a greater whole" that was powerful.  He looked at marriage and having a military or paramilitary career in this manner. As to the offense, she opined Ben-Sholom's "childhood defense system that allowed him not to see or feel his own pain, allowed him to act without awareness of the victim."

### 3.    Pre-Trial, Trial, and Post-Trial Proceedings.

The relevant pre-trial, trial,  and post-trial proceedings include relevant testimony from Ben-Sholom's January 9, 1986 suppression motion hearing,[13] Mr. Alexander's opening and closing arguments at both guilt and penalty proceedings, a pre-penalty phase discussion with the trial court and

---

[13] Ben-Sholom's contention about the invalidity of adverse ruling on the suppression motion was analyzed and rejected in the October 5, 2001 order at Part IX.

both counsel, the penalty phase testimony, penalty phase stipulated evidence, a summary of the penalty phase deliberations, and Ben-Sholom's motion for modification of the death verdict.

### a.   Summary of Testimony at the Suppression Hearing Regarding Ben-Sholom's Inderal Use.

The relevance of the suppression hearing testimony to the present analysis is the introduction of the idea of Ben-Sholom's hypertension and Inderal use in the trial proceedings.

### (1)   Ben-Sholom's Testimony.

Discussing his first custodial statement given on January 25, 1985, Ben-Sholom testified that he had a prescription for Inderal (spelled "Enderol" in the transcript) which he was supposed to take twice a day to reduce his blood pressure.  Inderal was first prescribed for him in July of 1984.  MT: 96-97. After his arrest, he was taken to the hospital to have his blood pressure checked, and at that time he was given some Inderal to take with him back to the jail.  He testified he did not feel the effects of Inderal during his custodial interview, and further that usually he didn't feel any side effects from Inderal other than heartburn.  When he didn't take Inderal, however, he did notice when he was experiencing high blood pressure.  *Id.*: 98.

### (2)   Phyllis Marshall's Testimony.

Ms. Marshall testified that prior to Ben-Sholom's arrest, he did suffer from high blood pressure (hypertension), for which he first received a prescription of Inderal in July 1984.  She stated that although he was supposed to go into the clinic to have his blood pressure checked periodically, Ben-Sholom didn't always do so.  *Id.*: 108-09.

### b.   Mr. Alexander's Guilt Phase Opening Statement.

Mr. Alexander agreed with  the Deputy District Attorney assigned to the case, Andrew Walton, that Ben-Sholom and his companions planned the theft of weapons from the Teague residence so they could join the Karen National Liberation Army.  Seaman was acquainted with Mrs. Teague's son, Alva, and knew he had weapons. Ben-Sholom went in first; Calhoun followed. Calhoun directed Ben-Sholom to kill Mrs. Teague and he complied.  Then the three made their way toward Mexico, where they were apprehended in Needles.  Mr. Alexander stressed, however, that these were just boys.  Ben-Sholom was only 18.

The Karen National Liberation Army was fighting Communists in Burma.  Mr. Alexander explained to the jurors they would have to decide whether the boys' plan to join the Karen National Liberation Army was reality or fantasy.  He reiterated the fact that the boys didn't think anyone would be home and didn't realize Mrs. Teague was home until they arrived.

The entire "mission" was not well-thought out.  Ben-Sholom didn't even know why he brought his motorcycle rather than all three boys going in Seaman's jeep.  The jeep was equipped for gasoline canisters, but there were none.  It also was in very poor condition and broke down in the desert.  The boys had no extra clothing with them.  Ben-Sholom had to sell his motorcycle to obtain some money.  The murder was never supposed to have happened.

When he was given the order to kill Mrs. Teague, he did so in a manner to be quick and painless.  Once apprehended, Ben-Sholom was cooperative with authorities.  Mr. Alexander exhorted the jurors to remember that the words about whether anyone at the house would be "eliminated" on the taped custodial statement were the interrogator's, not Ben-Sholom's.

### c.      Mr. Alexander's Guilt Phase Summation.

On summation, Mr. Alexander again agreed with Mr. Walton's rendition of the basic chain of events.  He then reiterated his opening statement emphasis that Ben-Sholom fully cooperated with authorities and told the truth.  He also reiterated his earlier observation that many of the incriminating statements produced during Ben-Sholom's custodial interview were not his words, but rather were the words of the interrogator and Ben-Sholom simply agreed.  He particularly emphasized that Ben-Sholom did not say he and his companions intended to "eliminate" witnesses.  He suggested the reason the boys proceeded with the burglary plan even though someone was home was the result of peer pressure.  None of the boys wanted "to be the first one to back down."  He strenuously argued that the killing of Mrs. Teague was not cold-blooded.  Ben-Sholom shot her four times at the base of the skull because he wanted her death to be quick and painless.

Mr. Alexander also stressed that the crime wasn't really planned out.  Although the boys conceived of the plan as a "foolproof burglary" and the whole thing developed into a "military mission," they made no provisions for getting to Burma.  They had no gas cans, no extra clothing, and no extra food.  Further, Ben-Sholom perceived his role as one who was following orders that came down the line

of command.  Mr. Alexander then commented, however, "I'm not going to ask you to believe that Ryan Marshall [Ben-Sholom] was so entrenched in this military mission that he gave absolutely no thought to what he was doing.  We really don't have evidence of that."  On the very next page of the transcript, however, Mr. Alexander stated in contradiction that when John Calhoun gave Ben-Sholom the order to kill Mrs. Teague, Ben-Sholom "did it without thinking, without stopping and thinking what am I doing. Do I challenge this order?  Do I go ahead with this order?  He went and did it."  Mr. Alexander acknowledged to the jurors :

> I know it's foreign to all of you to think that someone could be entrenched in the military thinking that if they were ordered to shoot, kill an innocent woman, that they would do it without giving it much thought. . . But I would ask you to carefully give it consideration.

### d.    Pre-Penalty Phase Discussions.

Guilt phase closing arguments were made and instructions given on Wednesday, February 5, 1986.  The jury retired to deliberate at 3:10 p.m. and were back in court by 5:05 p.m. with a verdict. Ben-Sholom was convicted of special circumstance murder, robbery, and burglary.  On the following Monday, February 10, 1986, Mr. Alexander and Mr. Walton met with the trial judge to discuss instructions and limitations on the admission of evidence, particularly on the potential rebuttal testimony of Dr. Richmond.  Focusing on the limitations to be imposed on Dr. Richmond's testimony, Mr. Alexander expressed his concern that if Dr. Richmond were to testify on rebuttal, he could recount facts (incidents relayed by Ben-Sholom) that otherwise would be inadmissible during penalty proceedings, as not fitting into any of the statutory aggravating factors.  RT-13: 2357.  He expressed his concerns in this manner:

> My concern at this point is if anything of that nature is going to come in by Dr. Richmond, then I've go to make a decision whether I even want to put on my psychologist because if I put on my psychologist and that opens the door for Dr. Richmond to give statements about some previous act that otherwise would be inadmissible.  Then it seems like it would be wise for me not to call my psychologist.

*Id.*: 2358.

Accordingly, he requested that Dr. Richmond be precluded from testifying about Ben-Sholom's account of getting into a fight with another child when he was 12 or 13 and putting that child in the hospital.  He wanted to preclude Dr. Richmond from recounting Ben-Sholom's burglary of his mother's house when

1    he was a juvenile and any information about Ben-Sholom's use of drugs (marijuana and mushrooms).

2    He wanted to restrict Dr. Richmond from mentioning anything about Ben-Sholom's military training

3    by "groups that shall remain nameless" in forms of jungle fighting, that Ben-Sholom wanted so much

4    to sign up for the Army when he 17 years old that if his parents did not consent he would blow himself

5    up in the house with the entire family.  He didn't want Dr. Richmond to mention that Ben-Sholom

6    wanted the death penalty to be released from this world, and the guilt he felt, or about wanting his father

7    dead.  Overall, Mr. Alexander also sought to confirm that Dr. Richmond would not be allowed to testify

8    on the issue of Ben-Sholom's future dangerousness.  *Id*.: 2365-67

9         Mr. Walton agreed Dr. Richmond's rebuttal testimony, if elicited, would be restricted and that

10   Dr. Richmond would not to testify on any of the subjects mentioned by Mr. Alexander.  Mr. Walton

11   represented to the trial judge: "If he's [Dr. Richmond is] called and will testify for the People, I will

12   instruct him not to go into these areas and we'll just give a basic opinion or [go] into areas that there are

13   no objections."  *Id*.: 2367-68.  Mr. Walton further represented that if he decided to call Dr. Richmond,

14   he would "indicate" to Mr. Alexander what areas he intended to have Dr. Richmond testify about in

15   rebuttal.  In the event Mr. Alexander had any further objections, the two attorneys would attempt to work

16   those out.  Mr. Alexander's response to that offer was, "Fine."  *Id*.: 2368.

17                        **e.      Mr. Alexander's Penalty Phase Opening Statement.**

18        Mr. Alexander explained that the purpose of the evidence the defense would present at this phase

19   of the proceedings was to acquaint the jurors with Ben-Sholom, with the way he really was.  *Id*.: 2382-

20   83.  He explained that Ben-Sholom held his feelings inside, as would be become evident from the

21   testimony of his mother and the fact that he suffered from high blood pressure. Ben-Sholom was

22   medicated with Inderal to combat the high blood pressure problem.  He was not a cold person.  *Id*.:

23   2383-84.

24                        **f.      Penalty Phase Testimony.**

25        The witnesses called to allow the jurors to get to know Ben-Sholom were his mother, Phyllis

26   Marshall, his grandmother, Faye Muldworf, an elder at the local chapter of the Jehovah's Witnesses,

27   Isaac Hull, the mother of one of his school friends, Judy Mayora, his (former) Sea Scout leader, Henry

28

Bethany, and himself.  To the extent the testimony of these witnesses is summarized in the October 5, 2001 order, reference is made to the portion of that order where the full summary can be found.

### (1)     Phyllis Marshall.

Ms. Marshall's testimony described the abuse her husband inflicted on Ben-Sholom.  *See* Part V.A.12, October 5, 2001 order.  She testified that she had been a social worker for the Child Protective Services of Tulare County since 1976.  She described her parenting philosophy as one where she encouraged her son to question parental directives in stark contrast to that of her husband who approached parenting as a means to coerce obedience through cruelty and intimidation.  Mr. Marshall isolated Ms. Marshall and Ben-Sholom by moving frequently.  He forced his religious beliefs of the Jehovah's Witnesses on them and he berated them for their Jewish heritage.

Ms. Marshall's first contact with Mr. Marshall as a parent was in early 1968 when Ben-Sholom was a toddler.  She took Ben-Sholom with her to Louisiana to live with Mr. Marshall, but left after four months because he drank heavily and was physically abusive to her.  She married Mr. Marshall after "he said all the right things" and convinced her that he finally had settled down when Ben-Sholom was seven and a half.  Prior to this, Ben-Sholom and Ms. Marshall enjoyed a pleasant mother-son relationship.  He was bright, enthusiastic, energetic and personable.  RT-13: 2391.  Although Mr. Marshall had "played the wonderful father" with Ben-Sholom prior to the marriage (as part of wooing Ms. Marshall), after the marriage, the father-son relationship almost immediately deteriorated; the physical, psychological, and emotional abuse inflicted on Ben-Sholom was pervasive and severe.  When Ms. Marshall complained about the constant physical abuse (hitting), Mr. Marshall devised a new form of discipline.  That is he directed Ben-Sholom to dig a hole in the backyard and after it was dug, to fill it up again.  *Id.*: 2402.

Mr. Marshall's concept of family life was that "he was the man of the house, he was the one in charge and everybody was going to do what he wanted."  *Id.*: 2391.  He yelled; he never talked.  He threw objects in the house that were not to his standards of cleanness or neatness.  He had an explosive personality.  He had been in the Navy and he  treated Ms. Marshall and Ben-Sholom as they were in the service.  She didn't leave him at first because he threatened to kill her.  Later, after she no longer feared his killing her, he threatened to steal Ben-Sholom and told her she would never see her son again.  *Id.*: 2394.  Ms. Marshall was aware of Ben-Sholom's desire to be in the Army from a very early age.  When

he finally enlisted he was very happy, even though boot camp was difficult. She felt the Army was a way for Ben-Sholom to escape his father and prove he was okay. *Id*.: 2399-2400. When Ben-Sholom was discharged, he was lost, not knowing whether to go to work or to school. He talked more about becoming a mercenary and rescuing MIAs. *Id*. 2402-03. Ms. Marshall didn't pay much attention to this talk because she didn't think it was realistic. Specifically, he talked to his mother about fighting in different countries to free people being held captive by the Communists. He wrote to the French Foreign Legion. *Id*.: 2404.

Because of the "war" between Ben-Sholom and his father, Ben-Sholom learned to keep his feelings inside. That is why he had an ulcer and high blood pressure, both prior to his arrest for the present crime. *Id*.: 2405. She explained that his hypertension had been diagnosed in July of 1984 and he was prescribed Inderal for it. *Id*.: 2407. Not showing his feelings was the only way Ben-Sholom could function in the face of paternal abuse. *Id*. 2405. Ms. Marshall testified that despite Ben-Sholom's emotionless exterior he was extremely sensitive. *Id*.: 2406.

In the last part of her testimony, she authenticated 12 photographs of Ben-Sholom, from about 18 months to 17 years. *Id*.: 2407. She testified one photograph depicted Ben-Sholom, Ms. Marshall, and Ms. Marshall's mother, Mrs. Muldworf. She testified another depicted Ben-Sholom and his former girlfriend, Jackie. *Id*.: 2408.

### (2)      Faye Muldworf.

Mrs. Muldworf testified to the positive aspects of Ben-Sholom's character as well as some very disturbing incidents involving his father. *See* Part V.A.10, October 5, 2001 order. She noted that he always had been helpful to strangers and even saved the life of a little boy drowning in a pool. She described Mr. Marshall as a sadistic and physically strong man who abused Ben-Sholom "all his life for no reason." She relayed that Ben-Sholom "couldn't stay in the same room with him [Mr. Marshall] because if the man looked at his son, he became very enraged for no reason at all and picked on him." Once when Ben-Sholom was nine or ten years old and came to visit her, she purchased an Air Force uniform for him at a thrift store. As a child, Ben-Sholom loved this uniform. But, when he returned home, "his father threw out the uniform because it gave him [Ben-Sholom] pleasure." RT-13: 2411. She testified about an episode where Mr. Marshall, upset because Ben-Sholom failed to water certain

plants, beat his son so severely that when the boy came out of the garage, he crawled; he didn't walk. She recounted that Ben-Sholom had a look of terror on his face she hoped never to see again. Mr. Marshall brutalized and abused Ben-Sholom all his life. She explained that Ben-Sholom lived in a fear of his father. She also relayed how Mr. Marshall gave orders. "If he [Ben-Sholom] didn't obey that order immediately, he beat him. He was supposed to obey his [father's] orders without any idea or thought or anything else. No hesitation." *Id*.: 2412. In response to this abuse, Mrs. Muldworf described how Ben-Sholom retreated to his room into a "fantasy world" where he pictured himself as a mercenary. *Id*.

**(3)     Isaac Hull.**

Mr. Hull was an elder at the Jehovah's Witness church where Ben-Sholom took Bible study instruction. He found Ben-Sholom to be very bright and studious. *Id*.: 2414. Before going into the Army, Ben-Sholom visited Mr. Hull and his wife. Mr. Hull observed that Ben-Sholom seemed to be "pretty obsessed with this thing about guns and military." Being in the Army was something Ben-Sholom could be proud of doing. *Id*.: 2415. After his discharge, Ben-Sholom seemed disappointed, but his continued interest in guns and weapons concerned Mr. and Mrs. Hull. *Id*.; 2416. On cross examination, Mr. Hull testified that Ben-Sholom had not been so interested in guns and weapons when he was younger. The interest seemed to intensify right before he went into the Army. *Id*.: 2419.

Mr. Hull's impression of Lonnie Marshall was that although he was very knowledgeable about the Bible, he didn't apply what he knew. He then described an incident where Mr. Marshall called Mr. Hull to the Marshall residence because Mr. Marshall insisted that Ben-Sholom's foot locker was possessed. Mr. Hull found Mr. Marshall very strange and he was "a little bit afraid of him." *Id*.: 2418.

**(4)     Judy Mayora.**

Ms. Mayora knew Ben-Sholom because he was a friend of her son and both boys were in Sea Scouts. *See* Part V.A.11., October 5, 2001 order. Like Ms. Marshall, Ms. Mayora was employed in a job designed to protect abused children as the director of CASA, which stands for Court Appointed Special Advocates for battered and abused children. RT-13: 2423, 2429. She knew Ben-Sholom to be very kind and sensitive who spent a lot of time trying to become a part of her family. He spent days on end at her home integrating with her other four children. *Id*.: 2424-2427. Although Ben-Sholom spent

so much time in her home, Ms. Mayora never met Ben-Sholom's parents.  She regrets not having picked

up on signs he was abused.  One time he "was pretty well marked up," but he gave her conflicting

accounts for his battered appearance and she didn't follow up.  Another sign was that Ben-Sholom spent

so much time at her home.  *Id.*: 2427-28.

After Ms. Mayora learned of the present crime, she realized that Ben-Sholom, as a child, had

been picked up to spend the night at the home of one of her CASA volunteers.  His participation in the

present crime was unbelievable to her.  It did not fit his character.  He was kind and gentle in her home.

*Id.*: 2429-30.  On cross examination, Ms. Mayora described the way that Ben-Sholom embellished

reality regarding financial ability to purchase a car or girlfriends.  She wasn't sure whether his account

of planning to go into the Army wasn't also fantasy.  *Id.*: 2431.  He was very mature and acted like he

was the same age as her son, who in fact is three years Ben-Sholom's senior.   *Id.*: 2433.  With respect

to physical abuse, Ben-Sholom would disclose that his father had done something to him, and then if

Ms. Mayora "seemed to pick up on that," then he would change the story to say that he got into a fight

at school.  *Id.*: 2434.

### (5)    Henry Bethany.

Mr. Bethany, who had been Ben-Sholom's Sea Scout leader, gave a very brief account of his

acquaintance with Ben-Sholom.  He testified that Ben-Sholom was polite, reliable, a good worker, and

amiable with his peers.  Ben-Sholom was known to Mr. Bethany as "Mike" (his middle name), rather

than Ryan.  *Id.*: 2438-40.

### (6)    Ben-Sholom.

Ben-Sholom first recounted that he had been in the United States Army for four or five weeks,

but received a medical discharge due an ankle injury.  With respect to the crime, he testified that he felt

a great deal of remorse for killing Mrs. Teague, that it was a terrible thing, and that he wished he could

change the events.  *See* Part V.A.9., October 5, 2001 order.  Specifically, with respect to the crime he

testified: "I feel a great deal of remorse.  It was a terrible thing.  And if it could be changed, if it was

within my power, I would change it."  RT-13: 2442.  During his time in jail, he has read five to seven

novels a week, most in the science fiction and horror genre, and studied German.  *Id.*: 2443. On cross

examination, he explained that it took about a week for the entire situation to sink in before he really

1   began to feel remorse for the crime.  He said he was in shock at the time of and just after the crime, and

2   that the shooting had been "an automatic reaction."  He "was given an order" and he "followed the order

3   explicitly."  Later he had time to think about what carrying out that order meant to his life, the lives of

4   the family affected by the offense, and the lives of friends and relatives.  *Id*.: 2444.

5       On re-direct, Ben-Sholom identified a photograph of himself taken out Fort Sims, Oklahoma,

6   when he was in the Army.  *Id*.: 2445.

7               **g.       Penalty Phase Stipulated Evidence.**

8       Mr. Alexander offered medical records listing the medications given Ben-Sholom in the Tulare

9   County Jail, including amitriptyline hydrochloride, an anti-depressant, Haldol, a tranquilizer, Elavil, an

10  anti-depressant, Dalmane, a hypnotic for treatment of insomnia, and Inderal, for treatment of

11  hypertension.  The explanations of the drugs listed came from a photocopy of the Physician's Desk

12  Reference.  *Id*.: 2445-46.

13              **h.       Mr. Alexander's Penalty Phase Summation.**

14      Following Mr. Walton's closing where he emphasized the callousness of the crime committed

15  by an 18 year old *man* (Ben-Sholom), Mr. Alexander began by imploring the jury to consider sympathy.

16  *Id*.: 2455-56.  In the next breath, he stated: "But my objective in talking to you is not asking for

17  sympathy at this time.  I want you to consider that.  But what I would ask you to do is follow the law."

18  *Id*. 2457.  He explained he wasn't asking the jurors to "forgive" Ben-Sholom, but to let him live the rest

19  of his life in prison where he could accomplish a lot of good things, including self-education and helping

20  others.  *Id*.: 2458.  He noted the factors in mitigation included the absence of evidence of prior violent

21  criminal activity and prior felony convictions.[14]

22          Now, Judge Allen will read you an instruction regarding this particular factor [the
            presence or absence of criminal activity involving violence].  That will say word for
23          word, "There has been no evidence presented [of] other criminal activity of the
            Defendant which involves the use or attempted use of force or violence or the expressed

24

25

26  _____

27  [14] The presence or absence of uncharged violent criminal activity was a statutory sentencing
    factor under California Penal Code § 190.3(b), sometimes referred to as "factor (b)."  The presence or
    absence of prior felony convictions was a sentencing factor under § 190.3(c), sometimes referred to as
28  "factor (c)."

1

> or implied threat[15] to use force or violence.  The circumstance should therefore be
> viewed as a circumstance in mitigation."

2

3

> • • •

4

> What is the next factor to consider?  The presence or absence of any prior felony
> convictions.  Judge Allen will read an instruction on that factor.  "There has been no
> evidence that the Defendant has been convicted of any prior felony.  This circumstance
> should therefore be viewed as a circumstance in mitigation."

5

6

*Id.*: 2461.  He especially emphasized the fact of Ben-Sholom's youth at the time of the crime.[16]  Mr.

7

Alexander recited the instruction on this point:

8

> If the Defendant had been under 18 years old when the crimes were committed, he would
> be subject to neither life imprisonment without parole nor the death penalty.  You must
> consider the Defendant's age only as a mitigating factor, to be accorded whatever weight
> you believe it deserves.  You may not under any circumstance consider Defendant's age
> as an aggravating factor.

9

10

11

*Id.*: 2462.  He explained there were three sentencing factors which were definitely mitigating (factors

12

(b), (c), and (i)), and one factor that could be mitigating (factor (k)).[17]  But there was only one factor

13

which would be aggravating (the factor (a) circumstances of the crime).[18]  He explained that if the jurors

14

were unmoved by evidence of Ben-Sholom's difficult childhood, they were to disregard the catachall

15

factor (k).  If they wanted to show sympathy and give this factor weight, then it would be a factor in

16

mitigation.  *Id.*: 2462.  He argued this case was not appropriate for the death penalty.  *Id.*: 2463.  He

17

urged the jurors to consider Ben-Sholom's potential for rehabilitation and leading a useful life in prison

18

as circumstances in mitigation of the sentence.  *Id.*: 2466.  He then recounted the testimony of the

19

witnesses who saw good in Ben-Sholom.  *Id.*: 2467.

20

21

22

[15] The judge actually read, "the expressed or implied *intent* to commit force or violence."  *Id.*: 2471.

23

24

[16] The defendant's age was a sentencing factor under § 190.3(i), sometimes referred to as "factor (i)."

25

26

[17] The factor (k) instruction derives from § 190.3(k), and is sometimes referred to as the catchall factor.  Mr. Alexander argued the would be instructed to consider "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime, and any other aspect fo the Defendant's character or record that the Defendant offers as a basis for [a] sentence less than death."

27

28

[18] The circumstances of the crime of which the defendant was convicted was a sentencing factor under § 190.3(a), sometimes referred to as "factor (a)."

1                      **i.     Penalty Phase Deliberations.**

2       Following a penalty phase presentation that lasted less than two and one-half hours, deliberations

3 continued on for nearly 17 hours.[19]   There also were several inquiries made by the jury during their

4 deliberations.  On the first day of deliberations, the jurors asked for a definition of aggravating and

5 mitigating circumstances as well as the Physician's Desk Reference definitions for the medications

6 prescribed for Ben-Sholom.  *Id*.: 2477.  There also was a question clarifying jail medical records.  By

7 mistake Ben-Sholom's juvenile records from 1984 had been given to the jurors.  Since, according to the

8 trial judge, the jurors were "not to know about something like that," the date was changed to 1985.  *Id*.:

9 2478-79.  On the second day of deliberations, the jurors asked for a copy of the transcript of Ben-

10 Sholom's penalty phase testimony.  *Id*.: 2483-84.  Then they wanted to know how many years until a

11 person sentenced to life without the possibility of parole would be eligible for parole.  The trial judge

12 clarified that life without parole meant no parole.  *Id*.: 2485.  On the third day, the jurors asked whether

13 the prosecution could have presented additional witnesses, to which the court responded in the

14 affirmative.  *Id*.: 2487.  A verdict that Ben-Sholom should suffer the death penalty was entered after a

15 full day of deliberations on that third day.  *Id*.: 2488.  From the August 15, 1988 declaration of the jury

16 foreman (attached to Ben-Sholom's first state habeas petition), Ben-Sholom reveals that the first vote

17 cast during penalty deliberations was eight to four for life.  The second vote was ten to two for death and

18 the final two votes were unanimous for death.  *See* Part V.A.36, October 5, 2001 order, more fully

19 summarizing the jury foreman's declaration testimony.

20                **j.     Ben-Sholom's Motion for Modification of the Death Verdict.**

21       Mr. Alexander and Mr. Walton argued their respective positions on Ben-Sholom's motion to

22 modify the death verdict pursuant to Penal Code § 190.4(e) on April 14, 1986.  Mr. Alexander reiterated

23

24        [19] Penalty proceedings commenced at 10:09 a.m. on Tuesday, February 11, 1986 with the reading
of introductory instructions.  RT-13: 2371.  The court recessed for lunch from 11:40 a.m. to 1:32 p.m.

25 CT-2: 306. The jury initially retired for penalty deliberations that same day at 2:30 p.m.  RT-13: 2476;
CT-2: 306.  This court time works out to be slightly less than two and one-half hours.  The jurors

26 deliberated that day from 2:30 p.m. until 5:04 p.m. (two and one-half hours).  RT-13: 2480.  Court was
dark on February 12, a court holiday.  On Thursday, February 13, 1986, the jurors deliberated from 10:02

27 in the morning to 5:00 in the afternoon (seven hours).  Deliberations then continued on Friday, February
14, 1986 at 9:45 a.m. and concluded at 5:01 p.m. when the jury reached a verdict (seven and one-quarter

28 hours).  RT-13: 2487-88.  The total number of hours for deliberations is 16 3/4.

1   the defense position that Ben-Sholom joined the daytime burglary scheme of Chris Seaman as a step

2   towards getting to Burma to join the Karen Liberation Army.  He emphasized that Ben-Sholom actually

3   believed this would happen and that the burglary was a step to achieve that goal.  HT-1: 5-6.  He further

4   argued that although following orders was not an excuse, the chain of command must be considered in

5   sparing Ben-Sholom's life.  *Id*.: 7.   Mr. Walton reiterated that Ben-Sholom's initial expression of

6   remorse was not for having taken Mrs. Teague's life, but for not being able to go to Burma as he had

7   planned.  *Id*.: 13.  Adding to the following orders theme, on rebuttal, Mr. Alexander argued that when

8   Ben-Sholom was given the order to kill Mrs. Teague, he executed the order, "without thinking" at least

9   in part because he perceived himself as being lowest in command.  *Id*.: 17.  Mr. Alexander strenuously

10  argued that Ben-Sholom felt remorse.  *Id*.: 17-18.  He also made a substantial argument regarding inter-

11  case and intra-case proportionality.  *Id*.: 18-26.  Mr. Walton argued the aggravated circumstances of the

12  crime; it was callous and cold, all for five guns.  *Id*.: 32-34.

13      The trial judge delivered his ruling on the motion on May 9, 1986.  Being guided by the

14  aggravating and mitigating sentencing factors referred to in Penal Code § 190.3, the court denied the

15  motion.  HT-2: 2.  The record provides:

16      This Court has re-examined the evidence offered in the penalty phase by the defense and
        finds beyond a reasonable doubt that there was [sic] not circumstances which extenuated
17      the gravity of the crime, whether or not it be a legal excuse. [¶] None of the witnesses
        called could offer any explanation or give any evidence of any conceivable circumstance
18      that the Court finds would extenuate the gravity of this crime.  The evidence, which the
        defense offered, concerning the Defendant's extenuation was merely as to his
19      background, and the abuse he suffered at the hands of his stepfather [sic]. [¶] The
        members and friends of the Defendant's family who testified did not, in the Court's
20      opinion, present any evidence which this Court would find to be a moral justification or
        extenuation for the Defendant's conduct.

21

22  *Id*.: 3.

23      Nonetheless, the trial court found a number of factors were established in mitigation, including,

24  the absence of (uncharged) violent criminal activity, the absence of any prior felony conviction, Ben-

25  Sholom's age, 18 years old, the environment in which he was raised, and his expression of remorse

26  during penalty proceedings.  The court noted there was a lack of evidence that Ben-Sholom was under

27  the influence of extreme mental or emotional disturbance, that he was acting under duress or was

28

1   substantially dominated by another person, and he didn't try to disabuse his companion, John Calhoun,

2   of the notion that Mrs. Teague had to be killed. *Id.*: 4-6.

3              **4.      Evidence Presented by Ben-Sholom at the Evidentiary Hearing.**

4       In his case in chief, Ben-Sholom called Mr. Alexander, Kings View social worker Anthony

5   Casillas, psychiatrist Gary Wynbrandt, M.D., Ms. Marshall, psychologist Beth Rienzi, Ph.D., Assistant

6   Tulare County Public Defender Neil Pereira, and *Strickland* expert Philip Cherney.  The Warden called

7   psychologist Yosef Geshuri, Ph.D. and psychiatrist James Richmond, M.D.  On rebuttal, Ben-Sholom

8   recalled Dr. Wynbrandt and psychologist James Park.

9                        **a.      Roger Alexander.**

10      Roger Alexander worked for the Tulare Public Defender's Office from 1980 to 1986 or 1987.

11   When Ben-Sholom's case was assigned to him, he had tried five cases charged as special circumstance

12   cases, but none went to a penalty phase.  He testified that when he first met Ben-Sholom, he knew there

13   was a possible mental defense.  He also was worried that Ben-Sholom was a suicide risk and in need of

14   medication.  As a preliminary matter, he retained psychiatrist and neurologist Dr. Kleist, to interview

15   Ben-Sholom, but did not provide Dr. Kleist any materials or documents to review prior to the interview.

16   No report was requested, but Dr. Kleist provided one anyway.  That report, dated February 26, 1985,

17   documented Ben-Sholom's fantasy as a paramilitary soldier and deluded account of his abilities.  Of note

18   to Mr. Alexander was that Dr. Kleist suspected that the accounts of paternal abuse recounted by Ben-

19   Sholom were exaggerated.  Ultimately Dr. Kleist found Ben-Sholom sane.

20      After rendering this report, Dr. Kleist conferred with Ben-Sholom's mother, Ms. Marshall, and

21   learned that the level of paternal abuse reported by Ben-Sholom was not exaggerated.  In a subsequent

22   report, however, Dr. Kleist did not offer a new diagnosis or amend the initial impression.  Like Dr.

23   Kleist, Mr. Alexander related that Ben-Sholom said strange and outrageous things to try to elicit a

24   response and to impress his listener.  After reviewing Dr. Kleist's second report, Mr. Alexander

25   consulted with Ms. Marshall.

26

27

28

1      Mr. Alexander testified that after receiving Dr. Kleist's report, he hired mental health experts,

2  Drs. Glenn, Geshuri, and Rienzi.[20]  None of these mental health professionals, however, were contacted

3  until the following September 1985 (over six months later).  Mr. Alexander also did not begin requesting

4  information about Ben-Sholom's mental health history until September and October 1985.[21]  In the

5  interim, in June of 1985, Mr. Alexander consulted with Allen Middleton, Ph.D, a specialist in post-

6  traumatic stress disorder ("PTSD") to see if Ben-Sholom's military experience may have caused any

7  mental problems.  At the time Mr. Alexander had not heard of PTSD outside of the military combat

8  context.  Mr. Alexander gathered from Dr. Middleton, however, that Ben-Sholom's military experience

9  (in the United States Army) did not cause PTSD.[22]

10      The purpose for retaining psychiatrist/ neurologist, Dr. Glenn, was to ascertain if Ben-Sholom

11  was mentally ill.  To prepare Dr. Glenn for his interview with Ben-Sholom, Mr. Alexander provided him

12  Ben-Sholom's Kings View counseling records and police reports.[23]  He specifically wanted Dr. Glenn

13  to comment on the defense of diminished capacity and insanity.  He did not request a report and was

14  surprised Dr. Glenn provided one (dated September 21, 1985).  Dr. Glenn opined that Ben-Sholom was

15  not insane.  Mr. Alexander testified that Dr. Glenn recounted facts about Mr. Marshall's paternal

16  brutality, the horribly abusive home life, Ben-Sholom's failure in the Army, his major depression and

17  suicide attempt, his jumping from the Sequoia Mall, and the need for psychological testing.  Dr. Glenn

18  also sent Mr. Alexander articles about Inderal.  Mr. Alexander stated he did not intend to use Dr. Glenn

19  as a witness.

20      The next mental health professional consulted was psychologist, Dr. Geshuri.  Mr. Alexander

21  retained Dr. Geshuri to conduct psychological testing.  Mr. Alexander purposefully did not provide Dr.

22  _____

23  [20] Mr. Alexander also hired Bernard P. Rudis to conduct a physical examination of Ben-Sholom.
   Dr. Rudis examined Ben-Sholom on December 30, 1985, concluding an "essentially normal" neurologic
24  examination, finding no abnormalities.

25  [21] The subpoenas Mr. Alexander served were returnable on November 18, 1985, the day after the
   original trial date.

26  [22] Since, Dr. Middleton's assessment is inconclusive about whether Ben-Sholom suffered from
   PTSD from paternal abuse and other stressors (as he was not asked that question), it is not summarized.
27

28  [23] Although subpoenas for records were returnable on November 18, 1985, the Kings View
   counseling records, evidently came into Mr. Alexander's possession in advance of that return date.

Geshuri any background information.  Nor did he talk to Dr. Geshuri before the report was prepared.  Mr. Alexander described the report as "really bad."  Shortly thereafter, Mr. Alexander retained Dr. Rienzi, also to conduct testing and hopefully yield a more favorable impression.  With Dr. Rienzi, Mr. Alexander stuck with his strategy of not providing psychologists with any substantiated background information, although he testified that he did inform her of the charges and the basic facts of the case.  He testified his decision not to provide Drs. Geshuri and Rienzi with background information was strategic.  Even conceding that there was some background information which did not contain any violent past behavior on the part of Ben-Sholom, Mr. Alexander testified he "wanted a clean opinion" based only on the testing.

Dr. Rienzi wrote a report noting the crime resulted from a "military contract."  Mr. Alexander recalled Dr. Rienzi's impressions that Ben-Sholom was excessively rigid and insecure and that he desperately wanted to belong to something.  Mr. Alexander described Dr. Rienzi's impressions as having been solely based on testing.  Later, he testified that he didn't know whether Dr. Rienzi's clinical interview informed her opinion.  He did know that he wanted her to testify solely about the empirical results of the tests she administered because he didn't want to appear to be making excuses.

After receiving and reviewing Dr. Rienzi's report, Mr. Alexander decided that his penalty phase strategy would be to call her to the stand.  Along with this plan, he also worked to get the trial judge to give specific instructions, namely that Ben-Sholom's age at the time he committed the crime, under Penal Code § 190.3(i) and the fact that he had no uncharged violent criminal activity or prior felonies, § 190.3(b) and (c), were factors in mitigation of the crime warranting life without the possibility of parole rather than death.  He intended for evidence about Ben-Sholom's mental state and childhood abuse to be covered under the catchall penalty factor, § 190.3(k).  He knew that the sole aggravating factor to be relied on by the prosecution was the circumstances of the crime factor under § 190.3(a), and he wanted to have a "clean" penalty case, where the defense instructions would relate only to mitigating factors.  He didn't want any factors mentioned that the jurors could twist into aggravators.

Mr. Alexander did not recall reading the penalty factors individually to assess whether he could produce any other mitigating evidence.  Later he testified he actually deleted factor (d) (extreme mental or emotional disturbance, under Penal Code § 190.3(d)) and factor (g) (substantial domination, under

§ 190.3(g)) from the instructions.  He did not conduct research on factor (g), although he did have in mind that Ben-Sholom was easily led.  He testified he was afraid the jury would have responded unfavorably, either with disgust or derision[24] to a factor (g) instruction.  He also was fearful a factor (g) instruction would have been turned in an aggravator if the jury didn't find substantial domination to be mitigating.  This followed, in Mr. Alexander's reasoning, because Ben-Sholom went into the house first and was the actual shooter.  He (Mr. Alexander) said he would follow the same strategy at the time of his testimony; he simply didn't want to blame the crime on others.  He had the same belief about a factor (d) instruction, that is, he would not use an instruction under this factor, even at the time of his testimony, since evidence of mental or emotional disturbance could be presented under the catchall factor (k). He believed the jurors would not ignore general mitigating evidence (i.e., paternal abuse) even if there was no specific instruction, although he wasn't sure they would know what to do with it.  At the time Mr. Alexander tried Ben-Sholom's case, his experience with mental health issues was limited to determining a defendant's guilt or innocence.  In those situations, mental defenses were viewed as mere excuses.  He would not use a mental defense unless there was a neurological backing.  He felt mental mitigation was a hard sell, whereas the mitigation impact of child abuse was easier.

With respect to the substantial domination factor (g) instruction, Mr. Alexander was questioned about an interview conducted of Mr. Marshall, pre-trial, by the defense investigator.  In the interview, Mr. Marshall stated that Ben-Sholom definitely was a follower, who wanted to lose his identity in some kind of military organization. The interview report was admitted as Exhibit 8 to the evidentiary hearing transcript ("EHT").  Mr. Alexander, however did not recall any such information in the report or the interview with Mr. Marshall.  In any event, Mr. Alexander did not intend to call Mr. Marshall.  Not only did Mr. Alexander fear for his own safety when it came to Mr. Marshall, but he explained that Mr. Marshall threatened he would have said things on the stand to ensure that his son would get the death penalty if he had been subpoenaed to testify.

---

[24] "The jury would have – I don't know if laughed at me, laughed at Ryan [Ben-Sholom], been disgusted with him for blaming someone else."

1    Initially, Mr. Alexander tried to have Ben-Sholom's custodial statements suppressed.[25]  When

2    this failed, he believed the prosecution would get a conviction and the case would proceed to a penalty

3    phase.  At the time of Ben-Sholom's penalty phase, Chris Seaman already had been sentenced to death.

4    Mr. Alexander believed a death verdict was possible for Ben-Sholom as well.[26]  Mr. Alexander wanted

5    to maintain credibility with the jury.  He intended to point out the mitigating factors and argue they

6    outweighed the aggravating factor.  In Mr. Alexander's view, his job during the penalty phase was to

7    humanize Ben-Sholom.  To do that, he called witnesses who were knowledgeable and credible.  The

8    defense investigator interviewed 21 potential witnesses between August and December 1985.  He also

9    subpoenaed numerous documents, to be produced in November 1985.   Six of the 21 witnesses

10   interviewed were subpoenaed and only four were called as witnesses.[27]  He also marked as trial exhibits

11   childhood photographs of Ben-Sholom, admitted during Ms. Marshall's testimony.  He denied not

12   reviewing with her the contents and events depicted in the photographs.[28]  He also explained that

13   interacting with Ms. Marshall was difficult and time-consuming because she required so much attention.

14   Additionally, he testified she was not always a reliable historian.  Before calling his witnesses, Mr.

15   Alexander  explained to the jury that the penalty phase evidence would allow the jurors to get to know

16   and gain some "insight" into Ben-Sholom.  One concern he had was that jurors wouldn't look at Ben-

17   Sholom during the trial proceedings.  His purpose in having Ben-Sholom testify was to give the jurors

18   an opportunity to look at him and listen to him.  Mr. Alexander prepared Ben-Sholom for his testimony

19   by ensuring he wouldn't say anything about wanting to die.

20

21

22        [25] As noted above, the validity of the admission of Ben-Sholom's custodial statements was
23   upheld in the October 5, 2001 order at Part IX.

24        [26] This testimony was contrary to Mr. Alexander's declaration executed June 16, 1997, as
     described in Part V.A.34., October 5, 2001 order.

25        [27] Of the five witnesses (other than Ben-Sholom) who testified, it's not clear which ones came
26   to court because of a subpoena. Mr. Alexander called Phyllis Marshall, Faye Muldworf, Isaac Hull, Judy
     Mayora, Henry Bethany, and Ben-Sholom.

27        [28] The trial transcript reveals that he did ask her, and she testified about, the contents of the
28   photographs, though, not in detail.  The trial transcript also reveals that one photograph of Ben-Sholom
     in the Army, which was admitted during his (Ben-Sholom's) testimony.

1    From Mrs. Muldworf, Ben-Sholom's grandmother, Mr. Alexander wanted evidence of Ben-

2    Sholom's abusive background, as a sympathy factor.  He did not feel that Ben-Sholom's abuse was a

3    factor as to his participation in the crime.  Isaac Hull was called to testify about the bizarre behavior of

4    Ben-Sholom's father in burning Ben-Sholom's foot locker,[29] and Henry Bethany was called to give good

5    character evidence.  Mr. Alexander also intended to review Dr. Rienzi's test results, particularly the fact

6    that Ben-Sholom wanted to belong to something larger than himself.  He intended to emphasize the

7    military aspect of the crime and the fact that Ben-Sholom perceived the burglary as a military operation.

8    Mr. Alexander thought this would show there was something wrong with Ben-Sholom.  He believed

9    mental state mitigators, and the paternal abuse would be developed through Dr. Rienzi.

10   He intentionally withheld background information about Ben-Sholom's social history (which Mr.

11   Alexander developed himself through investigation and witness interview).[30]  Although he didn't know

12   whether Dr. Rienzi's clinical interview of Ben-Sholom informed her opinion, he testified that the clinical

13   interview was not necessary to the test interpretation and therefore irrelevant to her anticipated

14   testimony.  In preparing her for her testimony, he directed her to limit her testimony only to the objective

15   tests.  He was so concerned about excluding her clinical impression that he considered a motion in

16   limine to exclude testimony about her interview.  He conceded, however, that he didn't know whether

17   Dr. Rienzi would have been able to testify without referring to her clinical interview.

18   Ultimately, he decided not to use Dr. Rienzi because he was able to get the jury instructions he

19   requested.  This decision had a secondary benefit in Mr. Alexander's estimation of precluding Dr.

20   Rienzi's access to damaging information in the Kings View reports, police reports, and other expert

21   reports relative to Ben-Sholom's capacity and preoccupation with violence, killing himself, and killing

22   his father.  Mr. Alexander certainly didn't want the prosecutor, Mr. Walton, to have access to any of the

23

---

24   [29] Mr. Hull did not actually testify that Mr. Marshall burned Ben-Sholom's foot locker.  He
     testified that Mr. Marshall believed the foot locker was possessed.  Social historian/ psychologist Karen
25   Froming, Ph. D., wrote a social history report in which she relayed Mr. Marshall's burning of Ben-
     Sholom's foot locker.  *See* Part V.A.23., October 5, 2001 order.
26

27   [30] Mr. Alexander testified that the concept of a social history was conveyed at the defense bar
     conferences he attended.  His understanding was that the materials simply were compiled, not that a
28   separate expert was hired to compile them.  He prepared a social history of Ben-Sholom's background
     himself.

1    damaging reports (from Drs. Kleist and Geshuri).  He wanted any violent elements of Ben-Sholom's

2    background (other than paternal abuse) to be excluded from the jury, so as not to contradict the

3    mitigation factor under Penal Code § 190.3(b) (the absence of uncharged violent criminal activity).  He

4    also was concerned about how unemotional Ben-Sholom was, referring to Dr. Kleist's impression that

5    Ben-Sholom was a very scary person.  Not calling Dr. Rienzi also eliminated the possibility that the

6    prosecution would call Dr. Richmond in rebuttal.  He testified he didn't know what Dr. Richmond would

7    say if called, because at the time Mr. Alexander conducted Dr. Richmond's deposition, the doctor said

8    he hadn't formed any opinions about Ben-Sholom's mental health.  Mr. Alexander feared if Dr.

9    Richmond testified, he might have formed and testified about an opinion.  Although some concessions

10   about Dr. Richmond's proposed testimony at the pre-penalty phase discussions were reached between

11   Mr. Alexander and Mr. Walton, in Mr. Alexander's experience, Mr. Walton, was prone to change

12   positions.

13       The concern Mr. Alexander had with Dr. Richmond was the possibility the doctor would relay

14   violent incidents Ben-Sholom recounted to him (Dr. Richmond) in the January 28, 1985 interview.  Mr.

15   Alexander testified he could not have obtained an in limine order to limit Dr. Richmond's rebuttal in

16   advance of Dr. Rienzi's testimony because the trial judge would have wanted to hear what Dr. Rienzi

17   had to say before limiting the rebuttal.  On cross examination, he testified that without the benefit of

18   hindsight, he would not have altered his decision about not calling Dr. Rienzi.

19       Although Mr. Alexander knew from his interaction with Ben-Sholom there was something wrong

20   with Ben-Sholom, he testified he "never got at what it was" and he didn't get the full picture before the

21   jury.  His self-assessment was that he performed above average in terms of the time spent developing

22   a defense and consulting with experts, considering the limitation on funding.  Yet, still, he testified he

23   felt he didn't adequately investigate the mental health issues and mitigators because the jurors returned

24   a death verdict.

25                          **b.     Anthony Casillas.**

26       Mr. Casillas, a licensed clinical social worker, was a therapist at Kings View Mental Health

27   Center in Visalia.  Ben-Sholom was considered a volunteer admission, at age 14, brought in and referred

28   by his mother, Ms. Marshall.  In her capacity as a CPS worker for the County of Tulare, Ms. Marshall

previously had referred CPS children to Kings View.   During their first session, Mr. Casillas noted that Ben-Sholom came into the session dressed in a cowboy hat and sun glasses.  He wanted to be called "Mike" (his middle name) rather than Ryan.  Ben-Sholom expressed hatred for his father, which Mr. Casillas understood followed from verbal abuse.  The impact of this abuse on Ben-Sholom was to produce fear, low self-esteem, and lead Ben-Sholom to distance himself from people.  In the summary Mr. Casillas authored,[31]  the presenting situation, according to Ms. Marshall, was that Ben-Sholom had a poor relationship with his father and wanted to leave home.  Ms. Marshall was concerned about Ben-Sholom being afraid of his father. She reported that Ben-Sholom tended to get himself in trouble at school by getting into fights.  In addition, she reported the following behaviors during the few months prior to his admission (on August 25, 1980 at age 14): nail biting, stomach upsets, over-eating, stuffing himself at the table, headaches, difficulty falling asleep, not wanting to go to school, feeling fearful, being restless and quarrelsome, irritability, temper tantrums, disobedience, talking back, getting his feelings hurt too easily, talking about "unpleasant thoughts," complaining, pouting, feeling "unliked," demanding too much attention, showing off, being disliked by other children, picking on other children, and being picked on by other children.  Exhibit 10 to Petition, page 1.   Mr. Casillas's impression was that Ben-Sholom suffered from an adjustment disorder with mixed disturbance of emotions and conduct. *Id*., page 2. In a later session on October 21, 1980, during which Mr. Casillas met with Ms. Marshall, she reported Ben-Sholom to be obstinate and disobedient.  She expressed concern that Ben-Sholom might "want to become physically violent" with her. *Id*., page 12.   Mr. Casillas's report of his session with Ben-Sholom the next day, however, described Ben-Sholom as "in a lot of emotional pain and agony" and resentment toward his mother "for not divorcing or leaving his father."  *Id*., at page 13.

Neither Ms. Marshall nor Ben-Sholom reported physical paternal abuse.  Mr. Casillas's interview with Mr. Marshall (as part of the therapeutic process) also did not indicate abuse, although Mr. Casillas described Mr. Marshall as resentful and non-communicative.  On cross examination, Mr. Casillas revealed he did not learn of the physical abuse inflicted on Ben-Sholom until he was told by Ben-Sholom's federal habeas counsel. In the absence of knowledge about the physical abuse at the time of

---

[31] This admission summary, dated August 25, 1980, is part of the Kings View counseling records attached to Ben-Sholom's Petition collectively as Exhibit 10.

Ben-Sholom's therapy, Mr. Casillas testified his was "alarmed" by Ben-Sholom's demeanor and emotions in wanting to kill his father. Ben-Sholom reacted to his emotions by running away from home. Mr. Casillas testified that he believed Ben-Sholom did not disclose the paternal abuse either from personal fear of retribution from his father or fear of getting his mother into trouble. Mr. Casillas also suggested that Ben-Sholom may have been coached not to disclose this information.[32]

According to Mr. Casillas, Ben-Sholom responded positively to group therapy. He served as a "co-leader" with Mr. Casillas in giving answers without prodding, openly participating in the therapeutic sessions, and helping other participants. Ben-Sholom aligned and identified himself with Mr. Casillas. Ben-Sholom also attended individual sessions. Mr. Casillas testified to Ben-Sholom's openness, an unusual occurrence in a boy of 14. A manifestation of this candor was that Ben-Sholom cried during a group therapy session. On cross examination, Mr. Casillas testified that he did not diagnose Ben-Sholom with PTSD. Mr. Casillas was not aware of PTSD as a diagnosis outside of the combat setting. Ben-Sholom was pulled from therapy by his mother in December 1980.[33]

The records reflect that on July 14, 1981, Ben-Sholom was readmitted to Kings View with the chief complaint that his mother was upset because he told her he put a contract out on his father and wanted him (the father) dead. His mother also reported he told her that if she got in his way he would kill her too and he threatened her with a kitchen knife. *Id*., page 19. He told the therapist (not Mr. Casillas) that he didn't care if he died and that he had considered suicide as a way of securing his release from his father. This report was taken by a social work intern under the supervision of psychiatric social worker, Carol Sawyer. In spite of this report, the therapist believed Ben-Sholom was an angry adolescent (15 years old) who was afraid of his father. She was not concerned that Ben-Sholom would actually harm either of his parents. *Id*., page 20. Two months later, Ben-Sholom ran away from home and went to Kings View for help. On at least one occasion, he rode his bicycle from Fresno to Visalia

---

[32] Mr. Casillas's testimony suggested that Ms. Marshall coached Ben-Sholom in this manner.

[33] Ben-Sholom was still 14 at this time.

1   to meet with a counselor. [34] Each time Ben-Sholom ran away from home and sought help, he was

2   returned home.  Mr. Casillas testified that Ben-Sholom was really trying fix his life and trying to figure

3   out what to do – again, an unusual occurrence in an adolescent boy.  Mr. Casillas did not recall a Kings

4   View report where Ben-Sholom said his father kicked him and that was why he ran away from home.[35]

5                              **c.      Gary Wynbrandt, M.D.**

6            Dr. Wynbrandt, a psychiatrist, was first hired in 1995 by Ben-Sholom's federal habeas counsel

7   to provide an assessment of Ben-Sholom's mental state in 1985.  To do so, Dr. Wynbrandt reviewed

8   numerous records and actually examined Ben-Sholom in person at San Quentin State Prison.  The

9   records and documents he reviewed are identified in his June 17, 1997 declaration (Exhibit 3 to the

10  Petition), including numerous mental health expert reports, letters, test results, police reports, transcripts

11  of Ben-Sholom's custodial statements, medical progress notes, the deposition transcript of Dr.

12  Richmond, and the social history of Ben-Sholom complied by Karen Froming, Ph.D.  *See* summary in

13  Part V.A.35., October 5, 2001 order.[36]   In addition, Dr. Wynbrandt conducted three mental status

14  examinations of Ben-Sholom at San Quentin State Prison, on March 22, 1995, March 28, 1995, and

15  April 10, 1995, for a total of eight hours.  Dr. Wynbrandt noted that a detailed social history is important

16  to conducting a mental assessment.   On cross examination, however, he declined to adopt the

17  characterization that he "relied" on Dr. Froming's social history.  Rather, he utilized it, just as he did all

18  the other information provided.   Based on all the information he reviewed, plus his in–person

19  examination, Dr. Wynbrandt concluded that Ben-Sholom suffered from PTSD at the time of the crime.

20  He testified that this condition is commonly seen in people badly traumatized, physically, emotionally,

21

---

22      [34] This is an approximate 40 mile distance.  The Kings View records reflecting this bicycle ride

23  or rides is part of Exhibit 10 to the Petition at page 24.  It is clear from the notes that Ben-Sholom rode his bicycle to Kings View on September 11, 1981, after having run away from home.  It is not clear that

24  he also rode his bicycle to Kings View a second time on September 14, 1981.  From the context of the entries, the September 14, 1981 entry date may well be an error.  Mr. Casillas did review those records,

25  but he was not the counselor who made the notes about Ben-Sholom's bicycle ride nor who interacted with Ben-Sholom at his July 14, 1981 readmission.

26      [35] This report, dated March 2, 1981 and part of Exhibit 10 to the Petition, at page 17,  was not

27  written by Mr. Casillas, but by another health care worker at Kings View.

        [36] Dr. Froming's social history report, Exhibit 4 to the Petition, is summarized at Part V.A.23.

28  of the October 5, 2001 order.

or sexually, in early years of life.  PTSD is accompanied by panic attacks, nightmares, depression, dissociation, and a volatile affect.  In a person with PTSD, the "nervous system reacts as if trauma w[ere] about to occur."  PTSD was recognized in the Diagnostic and Statistical Manual ("DSM"), third edition ("III"), first printed in 1980.

He explained the DSM classifies mental conditions based on a 5-axial system.  Axis I  is the acute diagnosis; Axis II is the underlying structure or core personality characteristics of the individual; Axis III involves underlying medical conditions; Axis IV measures the psycho-social stressors on a scale of from one to six; and Axis V quantifies the level of functioning for the previous 12 months.  Dr. Wynbrandt opined that PTSD, as well as major depressions comprised the Axis I diagnosis for Ben-Sholom at the time of the crime.  He stated that major depression would have included the state of mind of feeling hopeless, helpless, overwhelmed, withdrawn, suicidal, unhappy, prone to acting out, and distracted. Ben-Sholom's Axis II diagnosis was identity fragmentation, a condition found in borderline personality disorder.  It means the person suffers confusion about his identity, or has problems establishing his identity, accompanied by extreme displays of emotion and impulsiveness.  The person would be unstable and adapts to environmental factors.

Dr. Wynbrandt concluded that Ben-Sholom's PTSD resulted from the abuse he suffered as a child, including the four month period in Louisiana with his father as a toddler.  He considered Ben-Sholom's attendance at 13 schools between kindergarten and 11th grade and his residence with his grandmother and psychotic uncle as a toddler to be contributing factors.[37]  The return of Mr. Marshall into Ben-Sholom's life at age seven and a half was accompanied by extreme physical abuse and utter terror in the child.  Abuse and depression also were evident in the fact that Ben-Sholom was accident prone.  Dr. Wynbrandt mentioned the incident where Ben-Sholom slashed his wrists when he was ten years old and sought assistance from a  neighbor to obtain medical attention.  Sources for Ben-Sholom's

---

[37] In his declaration, Dr. Wynbrandt noted that Ben-Sholom's maternal uncle, Norman Muldworf, received full disability as a paranoid schizophrenic and experienced episodic displays of violence, including an incident when he physically injured Ms. Marshall during Ben-Sholom's early childhood. This information, in turn was derived from Dr. Froming's social history report. (Exhibit 4 to Petition.)

major depression included his abandonment by his mother as a young child.[38]  Manifestations of his depression included his emotionally flat demeanor as a youngster, his desire to die at age ten, and the wrist slashing incident mentioned above.

With respect to Ben-Sholom's identity fragmentation, Dr. Wynbrandt learned from Ben-Sholom that he maintained various wardrobes to represent diverse personae, including a cowboy outfit, military fatigues, special clothing for his contact with homosexual males and a "drag queen" called "Bubbles," and a "preppie" outfit for the clean-cut personae.  Dr. Wynbrandt felt that although, Ben-Sholom's father was a horrible role model, Ben-Sholom's affinity for the mercenary personae (military fatigues) demonstrated attachment to his father and his father's enthusiasm for weapons.  In Dr. Wynbrandt's opinion, Ben-Sholom's borderline personality originated when he was a toddler and went (with his mother) to live with his father in Louisiana.  The abuse inflicted came during the 18 to 36 month period, where people develop separation and individuation.  It was an unsafe environment.  Moving back to California also was unsafe, since he was in his grandmother's household with his psychotic uncle.

Dr. Wynbrandt testified that at the time of the crime, Ben-Sholom was acting under the substantial domination of others.  He had been in basic training since he was eight years old from "the militaristic life that his father imposed when he returned to the family."  In Ben-Sholom's family, there were two family member types: the dominator and the "submitter."  Mr. Marshall dominated; Ben-Sholom was forced to submit.  Apart from that, Ben-Sholom had long been interested in the military and wanted to follow orders given by someone with his best interests in mind.  After his discharge from the Army, Ben-Sholom was desperate to find some order and to get away from his father.  He looked up to Chris Seaman because Seaman "beat" cancer.  Ben-Sholom was "whole cloth susceptible" to embracing instructions as to what his role should be so he could be a "good boy."  Related to this was Ben-Sholom's interest in joining the Karen National Liberation Army so he could be a good soldier and provide a service for the good of others.  In fact, Dr. Wynbrandt described this as a "flight of fantasy," a crazy idea founded on magical thinking common in people suffering from borderline personality.  He testified that magical thinking is a form of episodic psychosis.

---

[38] Dr. Wynbrandt, noted that Ms. Marshall characterized her conduct as instilling independence in Ben-Sholom, but he (Dr. Wynbrandt) viewed it as abandonment.

1    Underlying all the foregoing was that Ben-Sholom suffered from hypertension, so much so that

2    he was required to take medication, Inderal.  Hypertension to this degree was not common for an 18 year

3    old boy.  Dr. Wynbrandt concluded that the fact of his hypertension indicated Ben-Sholom was under

4    a lot of stress, abused alcohol, and/ or suffered from a physical/ hereditary condition.  Dr. Wynbrandt

5    discussed a major disadvantage to Inderal, namely that it was known to contribute to depression in some

6    people.  Because of this risk, Dr. Wynbrandt explained, Inderal has been discontinued for treatment of

7    hypertension.  The  Physician's Desk Reference in use at the time of Ben-Sholom's trial indicated that

8    Inderal had this depressive side effect.

9    Dr. Wynbrandt strongly disputed the conclusion of other mental health experts that Ben-Sholom

10    was afflicted with ASPD.  Ben-Sholom's symptoms and conduct belied this diagnosis.  First, as Mr.

11    Casillas testified, when Ben-Sholom was an adolescent, he wanted to get help for his problems.  He was

12    emotive in group and well as individual therapy.  Dr. Wynbrandt also referred to Judy Mayora's penalty

13    phase testimony about Ben-Sholom, describing him as personable and empathetic.[39]  These traits are

14    inconsistent with ASPD.  People with ASPD are completely disinterested in treatment and making

15    meaningful attachments.  Dr. Wynbrandt found the interview comments from Mr. Marshall taken from

16    Mr. Alexander's trial investigator about Ben-Sholom wanting to belong to something also inconsistent

17    with ASPD.

18    In drawing this conclusion, Dr. Wynbrandt considered that Ben-Sholom had displayed anti-social

19    behavior in his truancy from school, and later his drinking, as well as the fact that he showed no empathy

20    (for Mrs. Teague) at the time of the crime when he was decompensating.  ASPD remains with the person

21    as part of the core personality structure.

22    Dr. Wynbrandt testified that his opinions and conclusions about Ben-Sholom were consistent

23    with what any well-informed psychiatrist would have observed if complete information had been

24    provided.  As a mental health professional, Dr. Wynbrandt stressed the importance of receiving all

25    relevant information in order to conduct a valid evaluation.  On cross examination, Dr. Wynbrandt

26

27    [39] Ms. Mayora certainly described him as personable and wanting to be one with her family.  She
did not use the word "empathetic."  She testified that Ben-Sholom liked to "talk" with her and her four
28    children.  She accepted the fact that he had made himself part of her family.

1   confirmed that in rendering his opinion about Ben-Sholom, he utilized the reports of Drs. Geshuri,

2   Kleist, and Glenn, all of which contained information about Ben-Sholom's anti-social behavior.[40]

3   Further, he testified, there would be no point in rendering an opinion as to a person's mental state

4   without a clinical interview.

5               **d.      Phyllis Marshall.**

6       Ms. Marshall's penalty phase testimony did not give a complete picture of life with her ex-

7   husband.  During her and Ben-Sholom's four month residence with him in Louisiana, Mr. Marshall

8   expected 17 month old Ben-Sholom to be toilet trained and off the bottle.  She testified about an

9   occasion when Mr. Marshall grabbed the bottle from Ben-Sholom and threw it in the street and spanked

10  or shook him if he wet his diaper.  When Ms. Marshall left the room and Ben-Sholom was alone with

11  his father, the child would go to sleep.

12      Approximately six years later, when Ms. Marshall married Mr. Marshall, she thought he had

13  changed.  But, he was worse and more abusive.  Mr. Marshall demeaned Ben-Sholom by calling him

14  stupid, worthless, and a punk.  He demeaned Ms. Marshall be calling her a bitch, a whore, and worthless.

15  Mr. Marshall told Ben-Sholom not to listen to his mother.  He physically abused Ben-Sholom everyday,

16  using his hand or a belt.  He left bruises.  Mr. Marshall also abused Ms. Marshall, usually when she tried

17  to intervene to prevent harm to Ben-Sholom, but apart from that as well.  She described that he threw

18  her against walls.  He abused Ms. Marshall in front of little Ben-Sholom.     Mr. Marshall became angry

19  everyday.  Ms. Marshall testified that he "escalated himself."  His skin whitened, his eyes widened, and

20  his mouth frothed.  The hitting and abusive treatment preceded and continued while these symptoms

21  were present.

22      When Ben-Sholom was 17, Mr. Marshall attempted to kill him by strangulation.  Ms. Marshall

23  tried to get police intervention, but Mr. Marshall was never arrested.  Earlier in the marriage, Mr.

24  Marshall once jumped out of bed in the middle of the night with his loaded gun running through the

25  house and yard.  Ms. Marshall testified that her marriage was like living a nightmare.  She always had

26

27      [40]  Dr. Geshuri concluded Ben-Sholom suffered from ASPD.  Dr. Kleist regarded him as having
a severe paranoid personality disorder associated with a probable anti-social personality.  Dr. Glenn's
primary diagnosis of Ben-Sholom in 1985 was "mixed personality disorder," characterized by passive
28  aggressive and anti-social features.

1   to be on guard.  She also relayed that it was not uncommon for Mr. Marshall to run into Ben-Sholom's

2   room at odd times, turn it over, and then demand that it be cleaned.

3        Ms. Marshall testified that she gave all this background information to Mr. Alexander.  He told

4   Ms. Marshall that at penalty proceedings he would emphasize Ben-Sholom's age and the fact that he had

5   been programmed by his father to obey orders.  He also told her that Dr. Rienzi, with whom Ms.

6   Marshall was acquainted professionally, would testify.  Then he told her that he didn't think Dr. Rienzi's

7   testimony would be necessary.  When Mr. Alexander prepared Ms. Marshall for her penalty phase

8   testimony, he did not tell her what the point of her testimony would be or how it would fit into his trial

9   strategy.

10       Ms. Marshall testified that when Ben-Sholom was in therapy at Kings View Mental Health

11  Center, she told Anthony Casillas that Mr. Marshall was beating Ben-Sholom and her.  Co-workers from

12  CPS (where Ms. Marshall worked) also were aware of the abuse.  Sometimes she and Ben-Sholom spent

13  the night at homes of colleagues.  She testified she never reported the abuse to law enforcement for fear

14  that Mr. Marshall would carry through with threats of harming her or Ben-Sholom, or that Ben-Sholom

15  would be removed from the home.

16                           **e.    Beth Rienzi, Ph.D.**

17       At the time of her evidentiary hearing testimony (February 2003), Dr. Rienzi had been a

18  professor of clinical psychology for 14 years, principally psychological testing under the DSM.  Her

19  evidentiary hearing testimony was consistent with a declaration she executed on June 14, 1997 (Exhibit

20  1 to the Petition).[41]  When she was retained by Mr. Alexander in 1985, the reference question was vague.

21  She understood that he wanted an overview of Ben-Sholom's personality and what was going on with

22  him mentally.  In her 1985 report (Exhibit 27 to the Petition), she described her assignment was to

23  provide a psychological evaluation "to obtain a picture of Ryan's [Ben-Sholom's] personality, character

24  and functioning and to help clarify his motives and behaviors during the alleged crime."  She was not

25  asked about specific sentencing factors, or anything referencing penalty.  Mr. Alexander did not tell Dr.

26  Rienzi his purpose in seeking her assistance.  She was not provided with any records.  She explained that

27

28          [41] Dr. Rienzi's 1997 declaration is summarized in the October 5, 2001 order at Part V.A.33.

records are very important when conducting a forensic psychological evaluation because they provide corroboration for information given by the subject.  Generally, when conducting a forensic evaluation, she is suspicious of what defendants tell her.  This follows because when the subject is accused of a crime, there is a secondary gain involved.

With respect to Ben-Sholom, she administered psychological tests and conducted a clinical interview.  Psychological tests provide profile characteristics on a probability basis.  Conducting a clinical interview is part of the testing process.  There was never any discussion with Mr. Alexander about her just conducting tests without a clinical interview.  A true evaluation requires a clinical interview.  She also testified that it's important to have both "the good and the bad" information about a person.  In Ben-Sholom's case, when she finally was able to review all the available information prior to her 1997 declaration, her view of Ben-Sholom was "clarified."

When she first met Ben-Sholom in 1985, he was hard to like.  He presented himself in a very inflated manner, but also appeared very helpless.  For Mr. Alexander to have withheld unfavorable information from her made no sense to Dr. Rienzi, since Ben-Sholom told her (and his other examiners) everything bad anyway.  Dr. Rienzi discounted his reports of abuse because she knew his mother, Ms. Marshall, and Ms. Marshall would have known that the kind of abuse Ben-Sholom described was severely damaging.  Dr. Rienzi thought Ben-Sholom might have made up stories to discredit his mother.  Although Dr. Rienzi recorded in her notes that Ben-Sholom reported childhood suicide ideation and a purposeful Inderal overdose, she did not include or factor in this information into her 1985 report based on questionable credibility.  In her experience many people have their first suicidal thoughts after being incarcerated.  She acknowledged on cross examination that the test results reported in the 1985 report that showed Ben-Sholom to be oppositional, unconventional, rebellious, and having a lack of empathy.

But being able to confirm this pre-crime suicide ideation would have been very important.  It was not until Dr. Rienzi reviewed records provided by federal habeas counsel that she could corroborate Ben-Sholom's suicidal thoughts.  As stated in Dr. Rienzi's 1997 declaration, she reviewed Dr. Richmond's deposition transcript, police reports, Ben-Sholom's custodial statements, penalty phase testimony of Ben-Sholom's grandmother and friend, Judy Mayora, juvenile records pertaining to Ben-Sholom's burglary of his mother's house, Kings View records, medical records, school records, and Dr. Froming's

social history report.  The Kings View records, for instance, indicated that Ben-Sholom may have attempted his first suicide when he was nine years old, as well as that he suffered from chronic dysthymic (chronic depression) disorder.  Similarly, she felt that several conclusions stated by Dr. Richmond in his deposition testimony supported a potential diagnosis of PTSD, as well as depression. Dr. Rienzi believed that the dissociation Dr. Richmond observed was especially indicative of PTSD.

Even without the benefit of substantiated background information, in 1985, Dr. Rienzi hypothesized that Ben-Sholom suffered from PTSD at the time of the crime and before.  She felt in 1985 it was a 60% probability, which she described as "greater than chance."  She pointed out during her evidentiary hearing testimony that PTSD was a diagnosis in the DSM since 1980 and by 1985 was associated with victims of domestic violence, rape, torture, and child abuse, including at Kings View. She would have used PTSD in 1985.  At that time, she likewise thought there was a 60% probability that Ben-Sholom was acting under the substantial domination of others when he shot Mrs. Teague.  She did not include either of these or any other diagnosis in her 1985 report because she was not asked to provide a diagnosis.

After reviewing the Kings View records, the deposition transcript of Dr. Richmond, and other records, she believed that the probability Ben-Sholom suffered from PTSD was 90%.  Knowing his background also lead her to believe there was a probability greater than 60% that he acted under the substantial domination of others at the time of the crime.  The fact that Ben-Sholom was "in charge" of the "mission" when he and his companions left the Teague residence did not detract from Dr. Rienzi's opinion that he acted under substantial domination.  He knew the roads.  Assuming the role of "soldier," he was an integral part of the "unit."

The psychological testing in 1985 revealed dissociation and identity fragmentation, which is part of a borderline personality disorder.  She testified that dissociation can follow trauma and is a form of magical thinking, usually to escape something horrible.  After looking at the records, she realized that Ben-Sholom had been subjected to psychological torture.  Based on the accounts of the home life given by Ms. Marshall and observations by Ben-Sholom's grandmother, Mrs. Muldworf, Dr. Rienzi saw that Ben-Sholom actually believed he was going to be killed.  The childhood trauma contributed to Ben-Sholom's inability to develop "self."  At the time of the crime, because Ben-Sholom wanted to be part

of a greater whole, he felt helpless when holding a gun to Mrs. Teague because he had no "back up." The information obtained from Mr. Marshall's interview (about Ben-Sholom walking off a cliff if so ordered) led her to understand that Ben-Sholom was extremely obedient.[42] Mr. Marshall inflicted militaristic terror. When Ben-Sholom followed the command to kill Mrs. Teague, he was playing the role of "good soldier." In this fantasy, he was influenced by superiors. He assumed roles because of his identity problems. She also opined that the trauma Ben-Sholom suffered during the four-month period he lived with his father in Louisiana as a toddler contributed to his fragmentation identity disorder. Statistically, two years of age is very significant, because children understand when they're not supposed to do something, but they can't stop themselves. Most adults diagnosed with borderline personality disorder have had disruptive experiences when they were between 18 months and three years old.

Dr. Rienzi believed the lack of remorse Ben-Sholom expressed in his first custodial statement also stemmed from lack of appropriate separation identity from trauma to his development when he was a toddler living with his father in Louisiana. The subsequent abuse inflicted on Ben-Sholom after Mr. and Ms. Marshall married made Ben-Sholom a constant victim, leaving him unable to empathize.

She concluded that much of Ben-Sholom's pre-crime conduct was antithetical to a diagnosis of ASPD. He voluntarily attended therapy sessions at Kings View to seek help dealing with his difficult home environment. People with ASPD do not look for help. Ben-Sholom's post-conviction conduct, including regular correspondence also is inconsistent with ASPD. To the extent Ben-Sholom showed anti-social behavior in his late teens, Dr. Rienzi concluded this was a reaction to his environment rather than an underlying core structure of his personality.

Knowing a defendant's mental state before the crime is helpful to determining the mental state at the time of the offense. Ben-Sholom lived a fantasy world. He assumed different roles. What he reported to Dr. Rienzi during the 1985 interview was colored with what he wanted to be like. He had a major depressive episode in 1983 (referring to his medical discharge from the Army) which was superimposed over his dysthymic disorder that continued to the time of the crime. He experienced

---

[42] This was one of the statements Mr. Marshall made about Ben-Sholom during his interview with Mr. Alexander's defense investigator. Exhibit 8 to EHT, p. 12.

1   double depression.  He was suicidal and romanticizing death.  A suicidal person is not adverse to killing

2   another, since life isn't valued.

3                          **f.       Neil Pereira.**

4          Mr. Pereira was the Assistant Public Defender in Tulare County during Ben-Sholom's trial.  He

5   testified Mr. Alexander was given a light load during the period he represented Ben-Sholom.   Mr.

6   Alexander did not consult Mr. Pereira for advice about strategy.  In 1985 and 1986, mental health experts

7   were utilized for most murder cases.  It was the practice in the Public Defender's Office at that time for

8   lawyers to turn over social history material to mental health experts, otherwise, Mr. Pereira commented,

9   there was no reason to have an expert.[43]  The background information was provided so usable input from

10  the expert could be obtained.  After Mr. Pereira became the Public Defender for Tulare County in 1987,

11  this practice became a *rule* in the office, a rule implemented because of omissions in Ben-Sholom's case.

12  After Mr. Pereira became the Public Defender, there was one occasion where an attorney did not turn

13  over background information to the mental health expert, but his was only after consultation with him

14  (Mr. Pereira).  Mr. Pereira, personally, turned over all social history material to mental health experts

15  in *all* homicide cases.

16                         **g.       Phillip Cherney.**

17         Phillips Cherney testified as Ben-Sholom's designated expert under *Strickland v. Washington*,

18  466 U.S. 688 (1984).  His background as a capital case defense attorney includes working for the Tulare

19  County Public Defender's Office from 1987 through sometime in the early 1990s.[44]  Roger Alexander

20  was no longer working for the Office when Mr. Cherney started.  In preparation for his testimony, Mr.

21  Cherney reviewed the Court's October 5, 2001 order, portions of the petition, the Clerk's Transcript, the

22  Reporter's Transcript, the Warden's pleadings, exhibits, declarations, opening and closing statements

23  from the guilt phase proceedings, the deposition transcript of Dr. Richmond, and the penalty phase

24

25          [43] His exact words were, "Otherwise, why have the expert?"

26          [44] His testimony was that after he left the Tulare Public Defender's Office, he was appointed to
    represent capitally convicted Dean Carter.  According to the California Supreme Court docket for Dean
27  Carter, Phillip Cherney was appointed on March 18, 1994.  From this information, the Court understands
    that Mr. Cherney remained employed by the Tulare Public Defender's Office approximately six to seven
28  years.

proceedings. He concluded that Mr. Alexander did not provide constitutionally adequate representation at Ben-Sholom's penalty phase.

The purpose of presenting a mitigation case at a penalty phase trial should be to explain "how" and "why" a crime has been committed. Mr. Alexander did not do this. Further, competent counsel would have begun developing "themes" for the guilt *and* penalty phase proceedings long before jury selection. In Ben-Sholom's trial, however, the only consistent theme utilized by Mr. Alexander was Ben-Sholom's young age. It wasn't until Mr. Alexander presented his motion to modify the death verdict that he mentioned mental and psychological issues, and even then, he didn't argue Ben-Sholom's remorse. And, although the trial judge found that Ben-Sholom expressed remorse for the crime during his penalty phase testimony, and that this was a factor in mitigation of the sentence, he still found that none of the witnesses offered an explanation of any circumstances which would extenuate the crime. Later, Mr. Alexander focused his efforts on getting jury instructions that Ben-Sholom's lack of prior felony convictions and lack of unadjudicated criminal violence were mitigating. He also determined at some point that he wanted to "humanize" Ben-Sholom. Mr. Cherney concluded Ben-Sholom's was "a rich case in mitigation." The potentially successful themes included Ben-Sholom's age, his remorse, psychological issues, family issues, paternal abuse, and trauma.

Mr. Cherney was especially critical of Mr. Alexander for not supplying his retained experts with relevant background information, including the legal standards (sentencing factors) and Ben-Sholom's social history. The experts needed to have a "big picture" of the trial strategy in order provide any helpful information. This would have included understanding the difference between mental state defenses and mitigation evidence. Instead, he was so worried about giving "bad information" to the experts that they received no helpful information. In Mr. Cherney's opinion, the damaging information was mild compared to the magnitude of the mitigating benefit. Mr. Alexander should have utilized the research information he acquired about the Karen National Liberation Army. He should have argued intercase proportionality to the jury instead of waiting until the sentence modification hearing. On cross examination, Mr. Cherney testified that what Mr. Alexander did correctly was to send Dr. Kleist in to see Ben-Sholom for an initial evaluation. Where he faltered was in not sharing the many records he had in his possession, including school, medical, and Kings View counseling records. Further, although Mr.

1   Alexander requested numerous documents, he could not recall reviewing them.  Nor was there an

2   indication in his trial file that he read them (because no notes were made on or about the records).

3       Aside from not supplying sufficient background information to his experts, and not promptly

4   ascertaining what relevant background information existed, Mr. Alexander's approach to Dr.

5   Richmond's deposition was inadequate.  He asked questions which seemed intended to elicit a diagnosis

6   from Dr. Richmond, even though the doctor did not render a diagnosis.  On the other hand, Mr.

7   Alexander asked Dr. Richmond no questions about Inderal.  There was plenty of helpful information

8   developed in Dr. Richmond's interview with Ben-Sholom, including the recounting various paramilitary

9   experiences as reality, when Dr. Richmond was concerned those accounts were fantasy, the fact that

10  Ben-Sholom was terribly unhappy and near tears during the interview, Ben-Sholom's report that he was

11  depressed, began having suicidal thoughts in grade school, and a history of family mental illness.  Dr.

12  Richmond's observations would have been helpful to develop mitigation evidence.  After reviewing the

13  records and even after listening to Dr. Richmond's evidentiary hearing testimony,[45] he felt that Mr.

14  Alexander's fear of what Dr. Richmond might have said as a rebuttal witness was irrational.  The fear

15  resulted from Mr. Alexander's failure to conduct "a reasonably adequate investigation."   Mr.

16  Alexander's concern about the uncorroborated account of Ben-Sholom beating up another child on the

17  playground was completely unfounded because Ms. Marshall reported that no such incident ever

18  occurred.  In any event, evidence of such a school yard fight would not have been admissible under §

19  190.3(b) (uncharged criminal acts) because there was no way to prove it beyond a reasonable doubt.  In

20  any event, the prosecutor,  Mr. Walton, gave an affirmation that he would not put on the damaging

21  evidence developed during Dr. Richmond's interview.  Mr. Alexander's stated distrust for Mr. Walton

22  does not excuse him for not developing a mitigation case.  If he distrusted Mr. Walton, he should have

23  brought a motion; the judge was available for this purpose.[46]  It was not a reasonable strategy for counsel

24  ———————————

25  [45] Part of Mr. Cherney's testimony was given with the other evidence presented in Ben-Sholom's case-in-chief.  A portion was presented after the Warden put on his case.  Mr. Cherney testified after
26  Ben-Sholom's other two rebuttal witnesses, Dr. Wynbrandt and Mr. Park.

27  [46] In fact there was a discussion on the record about Dr. Richmond's potential rebuttal testimony between the guilt/ special circumstance verdict and the penalty phase proceedings.  The matter appears
28  to have been settled by agreement of the parties, with Mr. Walton agreeing not elicit any testimony from Dr. Richmond on the subjects of Ben-Sholom's paramilitary training, statement to his parents that he

1    to forego the benefit of Dr. Rienzi's testimony on the chance that Dr. Richmond might mention the

2    uncorroborated playground incident.

3         Mr. Cherney did not agree that Mr. Alexander's strategy for keeping Ben-Sholom's murderous

4    thoughts concerning his father from the jury was reasonable.   This information would have been

5    consistent with the mitigation case which was never presented, and relevant under factor (k).  Abuse was

6    a major force in developing Ben-Sholom's character.  Mr. Alexander could have shown that the act of

7    killing Mrs. Teague was indirectly related to Ben-Sholom's abuse as a child and adolescent.  The abuse

8    would have been corroborated by Ms. Marshall.[47]

9         Next, he believed Mr. Alexander should have moved to limit Dr. Richmond's potential rebuttal

10   testimony before the guilt phase commenced.   There was a pre-voir dire hearing on January 9, 1986

11   hearing date at which this could have been accomplished.  At the suppression hearing, on this same date

12   (where Mr. Alexander unsuccessfully sought to exclude Ben-Sholom's confession), Ben-Sholom's

13   testimony did not reveal his mental problems.  That hearing could have been a good opportunity for Mr.

14   Alexander to introduce Ben-Sholom's mental problems.   There also was conflicting and confused

15   evidence presented about the effect of Inderal and Inderal deprivation, and nothing that would benefit

16   the defense during penalty proceedings.  In fact Mr. Alexander undermined a potential penalty issue by

17   having Ben-Sholom and his mother testify that Inderal had no impact on Ben-Sholom's mental state.

18   If Inderal was a "theme," it was not developed.  From Mr. Cherney's review of Mr. Alexander's files,

19   it became clear to him that even as late as jury selection, no decision had been made as to what, if

20   anything, to do about the Inderal issue.  Mr. Alexander had among his files a Harvard Medical school

21   article about increased anti-depressant use for people taking high blood pressure medication (beta

22   blockers).   There was an internal memorandum asking for someone in the Tulare Public Defender's

23   office to call the Harvard doctor to obtain additional information.   Mr. Alexander had no strategy, as

24

25   _____

26   would blow up the entire house if they wouldn't give him permission to enlist in the Army, his suicidal
     thoughts, and his patricidal thoughts.  The trial judge presided over this agreement.  Part IV.A.3.d.,
27   *supra*.

28        [47] It also was corroborated by Mrs. Muldworf's testimony, and to a lesser extent Ms. Mayora's
     testimony

1  seen by the fact that he told the Court he would have at least a two day to one week penalty case (when

2  in fact he had a two and one-half hour penalty phase).

3      Next Mr. Cherney testified that the jury questionnaire Mr. Alexander used was so general it could

4  have been used in any case.  This was another indication that Mr. Alexander had no strategy.  As

5  explained by Mr. Cherney, the purpose of a questionnaire was to flesh out "themes" to be presented to

6  the jury.  Similarly, Mr. Cherney testified that the purpose of voir dire, both at the time of his testimony

7  and in 1986, was to qualify jurors for service at the penalty phase and communicate the defense themes.

8  The voir dire questions Mr. Alexander asked did not demonstrate that he was considering the lack of

9  prior convictions and uncharged criminal activity.  Further, he never even confirmed with potential

10 jurors that they would consider Ben-Sholom's youthful age as mitigating.  The most he did in that regard

11 was to call Ben-Sholom by his first name, "Ryan."  In addition, Mr. Cherney stated that Mr. Alexander

12 *should have* asked *all* the jurors if Ben-Sholom's remorse was mitigating.  He asked only one juror this

13 question.  Mr. Alexander also should have explored Ben-Sholom's childhood abuse and his submission

14 to others by presenting psychological experts consistent with the sentencing factors under § 190.3(d)

15 (extreme mental or emotional disturbance), § 190.3(g) (substantial domination), § 190.3(h) (impairment

16 due to mental disease or defect), and § 190.3(k) (any other mitigating catchall).

17     Mr. Cherney was critical of Mr. Alexander's brief guilt phase opening statement, where he could

18 have raised the penalty phase themes.  Since Mr. Alexander testified he believed a penalty phase was

19 inevitable, bringing penalty phase issues to the jurors' attention at the beginning of guilt phase

20 proceedings would have been helpful.  While conceding that Ben-Sholom did kill Mrs. Teague in the

21 course of a perceived military mission that ultimately would take Ben-Sholom and his companions to

22 Burma was acceptable, Mr. Alexander's failure to emphasize and directly tell the jurors that the ultimate

23 goal amounted to pure fantasy was professionally incompetent.  Instead, Mr. Alexander told the jurors

24 they would have to determine whether the military purpose of the crime was reality or fantasy.  In the

25 same light, when he described the military mission aspect of the crime, Mr. Alexander also could have

26 introduced the domination-submission theme when referring to Ben-Sholom following orders.

27     Mr. Alexander's guilt phase summation actually discredited mitigating factors when he told the

28 jurors there was no evidence Ben-Sholom was so entrenched in a military mission so as not to know

1  what he was doing.  In Mr. Cherney's opinion, Mr. Alexander should have told the jurors what to think

2  about the bizarre mission of joining the conflict in Burma.  Further, while Mr. Alexander's statements

3  about Ben-Sholom following orders without thinking suggested the substantial domination theme, his

4  introduction of Ben-Sholom's Army discharge papers confused the issue.[48]

5          Mr. Cherney found the penalty phase opening statement wanting in several respects, beginning

6  with its brevity, only five minutes long.  Passing over many viable mitigation themes, Mr. Alexander

7  referenced Ben-Sholom's hypertension and Inderal use.  He failed, however, to explain how these topics

8  might have been mitigating.  He also never mentioned the import of Ben-Sholom being dressed up in

9  military clothing as part of the fantasy aspect of the operation.[49]  Nor did Mr. Alexander mention Ben-

10 Sholom's mental or emotional state at the time of the crime.  Mr. Cherney found the entire penalty phase

11 presentation to be at cross purposes.  Mr. Alexander called Ben-Sholom's mother to show mental health

12 issues resulting from abuse, but then presented Judy Mayora to show that Ben-Sholom was just a regular

13 kid, with some depression and bruises.  Instead, Ms. Mayora's testimony could have been used to show

14 that her house was a refuge for Ben-Sholom.[50]  Likewise, the testimony of Sea Scout leader Henry

15 Bethany illuminated nothing in Ben-Sholom's life that would explain the crime.[51]  Introducing Ben-

16 Sholom's childhood photographs was meaningless because there was no effort to connect them to

17 memorable events in his life.  Finally, other than discussing his remorse for killing Mrs. Teague, Ben-

18 Sholom's testimony was not helpful.  He discussed his ankle injury, but not the facts leading up to it,

19 that is it occurred when Ben-Sholom had run away from home to meet up with his overweight half-

20 brother who caused Ben-Sholom to tip his motorcycle.  Nor did Ben-Sholom discuss that the ankle

21 injury led to the termination of his military career and the beginning of a major depression.  Mr. Cherney

22

23          [48] Ben-Sholom's Army discharge papers were introduced at guilt phase proceedings during the
   cross examination of one of the Tulare County investigating detectives.

24

25          [49] Evidence of the clothing Ben-Sholom wore at the time of the crime was introduced during guilt
   phase proceedings.

26          [50] Notwithstanding Mr. Cherney's impression, Ms. Mayora also testified that Ben-Sholom wanted
   to belong to her family and appeared to have been physically abused.

27

28          [51] Transcript shows that Mr. Bethany described Ben-Sholom as reliable worker who completed
   assigned tasks in the Sea Scout group.

found especially damaging Ben-Sholom's mention of the type of reading material he hoped to pursue if sentenced to life in prison: science fiction and horror books.  Mr. Alexander didn't seem to know Ben-Sholom would identify these types of books, which can be associated with future dangerousness in the minds of jurors.  If Mr. Alexander was trying to show the potential for good institutional adjustment, the strategy backfired.  Instead, Mr. Cherney opined, he should have called an institutional adjustment expert like Mr. James Park.  Also, if he really saw Ben-Sholom's remorse as a "theme," he should have mentioned that subject during his penalty phase summation and in the jury instructions.  Ben-Sholom's testimony also raised the substantial domination issue when he said he followed the order to kill Mrs. Teague "without question."  There was no follow up on the idea that Ben-Sholom followed this order because he wanted to be part of a greater whole.

The stipulation Mr. Alexander offered as to what prescription drugs Ben-Sholom took was equally unavailing because there was no concomitant explanation about why the drugs were necessary.  Mr. Alexander should have explored why an 18 year old boy had high blood pressure and needed Inderal in the first place.  He could have presented argument about the effects of Inderal under the catchall factor § 190.3(k), or one of the deleted factors § 190.3(d) or § 190.3(h).  He also could have shown that Ben-Sholom was a human being who made an extremely bad decision stemming from emotional disturbance.

The summation also was contradictory.  First Mr. Alexander earnestly asked the jury to consider sympathy, but he did not do so forcefully or convincingly, as he followed this request by asking the jury to follow the law.  Mr. Cherney found this professionally incompetent because sympathy, mercy, and compassion "are probably the hallmarks of the mitigation case."  Although he knew the jurors were supposed to weigh, and not count, the mitigating and aggravating factors, he basically asked them to count the circumstances of the crime factor (a) against the three mitigating factors, his age under factor (i), the absence of uncharged criminal acts under factor (b), and the absence of prior felony convictions under factor (c), plus the catchall factor (k), which could be mitigating.  In Mr. Cherney's view, Mr. Alexander totally failed to explain how the law was to give effect to the mitigating factors.  The summation was transcribed into 12 pages, which translated into 15 to 20 minutes.  Giving only that brief time to arguing for Ben-Sholom's life was, in Mr. Cherney's opinion, "pathetic, frankly."

1    With respect to Mr. Alexander's evidentiary hearing testimony (which Mr. Cherney observed

2    from the public gallery), he strongly disagreed that jurors would necessarily reject mental defenses or

3    a substantial domination argument as excuses.  In his experience as a Tulare County Deputy Public

4    Defender, it was possible to convince jurors that mental defenses were mitigating.  Mr. Alexander didn't

5    really know how to put on a penalty case.  His only experience was in guilt phase proceedings.

6    Mr. Cherney then testified about a number of publications available at the time of Ben-Sholom's

7    trial about the then-prevailing standards and procedures for handling a capital trial and penalty phase

8    proceedings.  There was a Summer/ Fall 1985 edition of the *California Defender* about how to present

9    a penalty phase argument, entitled "Building a Penalty Phase Final Argument."  The *California Defender*

10   article was marked and admitted at the evidentiary hearing during Mr. Cherney's testimony as Exhibit

11   10 to the EHT.  There was the Gary Goodpaster article of 1983 which was cited by the Supreme Court

12   in *Strickland*.  *See* 466 U.S. at 689-90.[52]

13   In sum, Mr. Alexander failed to conceptualize how the penalty phase would be implemented in

14   a coherent fashion and consequently did not develop a mitigation strategy.  Despite these failings, the

15   jurors deliberated for almost 17 hours.  That they were confused and poorly directed by Mr. Alexander's

16   mitigation case, was evident from their questions during deliberations.  First they didn't know how the

17   medications fit into the murder plot.  Second, they really didn't understand mitigation and aggravation.

18   ## 5.    The Warden's Response to Ben-Sholom's Evidence.

19   Dr. Richmond and Dr. Geshuri testified for the Warden, both concluding on direct examination

20   that Ben-Sholom's crime most reasonably was explained by ASPD.  They discounted PTSD, substantial

21   domination, and other emotional disturbance.  The Warden also contacted Dr. Kleist for an expert

22   opinion, but Dr. Kleist declined to participate in the litigation process, as explained in his November 26,

23   2002 declaration admitted on behalf of the Warden.  Exhibit C to the EHT.  Similarly, the Warden

24   contacted Dr. Glenn to ascertain whether the provision of additional background information would

25   facilitate the rendering of a diagnosis as to Ben-Sholom's mental state.  Referring to an earlier

26

27   [52] The Goodpaster article is entitled, "The Trial for Life: Effective Assistance of Counsel in
Death Penalty Cases," published at 58 N.Y.U.L.Rev. 299 (1983).  Specifically, in *Strickland*, the
28   Supreme Court referred to page 343 of Professor Goodpaster's article.

declaration executed on November 27, 2001 (and prepared by Ben-Sholom's attorney Patience Milrod),

Dr. Glenn declined the Warden's request, as explained in his handwritten letter.  Exhibit D to the EHT.

### a.    Yosef Geshuri, Ph.D.

When Mr. Alexander hired Dr. Geshuri in 1985 to interview Ben-Sholom, he provided no reference question and no background information.  He also didn't tell Dr. Geshuri he was the third mental health professional to have seen Ben-Sholom.  Mr. Alexander stated he wanted a general assessment, a "snapshot" of Ben-Sholom.  Dr. Geshuri administered psychological tests and conducted an interview.  Both the clinical interview and the testing were important for reciprocal validation.

The backdrop for Dr. Geshuri's evidentiary hearing testimony was a report he prepared for the Warden's counsel, Deputy Attorney General Jean Marinovich dated November 22, 2002, and offered by the Warden as Exhibit E to the EHT.  In that report he concluded that Ben-Sholom might have been under the influence of extreme mental or emotional disturbance, but only in a general way, the claim Ben-Sholom was under the substantial domination of another person was "somewhat stretching the point," and that Ben-Sholom was not so impaired by mental disease or defect at the time he committed the crime so that he could not appreciate the criminality of his conduct.

Testifying about his initial contact with Ben-Sholom, Dr. Geshuri stated that his psychological test results were consistent with the results obtained by Dr. Rienzi in 1985.  One of those tests measures lack of subject credibility.  Like the score Dr. Rienzi obtained, Dr. Geshuri scored Ben-Sholom high on this (in)validity scale, which indicated that Ben-Sholom may have been trying to feign some personal difficulties.  With respect to the clinical interview, Dr. Geshuri agreed, generally, it would be important to have a client's social history.  However, when a client was referred by counsel, he assumed the client would be truthful.  On the other hand, he also conceded that a client suffering from mental illness might not give an accurate self-report.  During the clinical interview of Ben-Sholom, he reported that his father was abusive.  Dr. Geshuri testified he had no reason to doubt this account.  In his initial 1985 report, Dr. Geshuri gave only an Axis II diagnosis of ASPD.  There were no Axis I, III, IV, or V diagnoses.[53]  With

---

[53] As Dr. Wynbrandt explained, Axis I is the acute diagnosis; Axis II is the underlying structure or core personality characteristics of the individual; Axis III involves underlying medical conditions; Axis IV measure the psycho-social stressors on a scale of from one to six; and Axis V quantifies the level of functioning for the previous 12 months.

1    respect to the Axis III diagnosis, Dr. Geshuri testified he didn't know Ben-Sholom suffered from

2    hypertension, because it wasn't reported.  Other facts that Dr. Geshuri didn't know at the time he

3    rendered his ASPD diagnosis in 1985 include that Ben-Sholom attempted suicide four months before

4    the crime with an Inderal overdose, cut his wrist at age nine or ten, had suicidal thoughts since age ten,

5    played "chicken" with diesels on the freeway, experienced blackouts, had been in counseling at Kings

6    View Mental Health Center, was depressed 95% of the time, suffered from insomnia, experienced a loss

7    in appetite, was subjected to a forced religious conversion from Judaism to Jehovah's Witnesses, was

8    subjected to hateful anti-Semitism by his father, was strangled by his father when he was 17,

9    experimented with homosexuality, including with "drag queens," and expressed remorse for the crime

10   on January 28, 1985, both in his confession and during his interview with Dr. Richmond.

11        Dr. Geshuri's notes of his 1985 interview did indicate that Ben-Sholom reported having attended

12   13 different grade and high schools as a youngster, but this information was not included in any of his

13   reports.  He justified this omission because attendance at many schools was the natural consequence of

14   the family moving a lot.  Although he discounted the significance of this occurrence, he conceded on

15   cross examination that subjecting a child to frequent moving could be stressful because of lack of

16   emotional stability.  When discussing the religious aspects of Ben-Sholom's upbringing, Dr. Geshuri

17   testified it was significant that Ben-Sholom's father called him "hebe" or "kike," and this very well

18   could have led to stress, anger, fear, and impairment to sense of self.  With respect to Ben-Sholom's

19   homosexuality, Dr. Geshuri testified that sexual identity and confusion were important areas of concern.

20   On cross examination, Dr. Geshuri conceded he missed a lot of important events in Ben-Sholom's life.

21   This omission was attributed to at least two causes: that Dr. Geshuri didn't ask all the appropriate

22   questions and the Mr. Alexander didn't give him appropriate guidance with his vague reference question.

23   He testified that the reference question is very important because it sets the framework for the

24   evaluation.  The reference question should be specific and tie the question into legal principles relevant

25   to the case.  Since Dr. Geshuri's experience being retained by Mr. Alexander, he testified he learned to

26   clarify reference questions with attorneys.

27        In Dr. Geshuri's 2002 report, he acknowledged that Ben-Sholom was abused and traumatized

28   by his father and that he may have suffered from PTSD.  Nonetheless, Dr. Geshuri did not believe these

factors mitigated or even affected his mental state at the time of the crime.  He based this conclusion on the absence of any indication in the Kings View records that Ben-Sholom had PTSD.  Dr. Geshuri also discounted PTSD as a cause for Ben-Sholom's participation in the crime because his participation involved advance planning, forethought, and distribution of responsibility (for certain aspects of the crime).  Whereas PTSD would be characterized by anxiety, depression, panic, and thoughtlessness, in Dr. Geshuri's opinion, the Teague home invasion operation "went with a kind of calmness and logical . . . process."  Further, Ben-Sholom reported the crime with a sense of pride and fulfillment of a verbal contract and there was no sense that Ben-Sholom was fearful during the crime.  Dr. Geshuri did not believe Ben-Sholom killed Mrs. Teague as the result of fear-induced PTSD; the killing was a planned military operation motivated by Ben-Sholom's wanting to be considered reliable in the eyes of his "commanding officer."   The well-planned character of the crime together with Ben-Sholom's intelligence also led  Dr. Geshuri to discount the potential that extreme emotional disturbance might have mitigated the crime.  On balance, Ben-Sholom's goal of becoming a mercenary outweighed any emotional distress he may have been experiencing.  He conceded, however, that even intelligent, logical thinking people can be afflicted with mental disorders.

On cross examination, Dr. Geshuri explained that the criteria for PTSD included narcism, a histrionic or borderline personality, dysthymia, and dissociative disorder.  Neither intelligence, nor lack of intelligence were criteria.  When told that Kings View therapist Anthony Casillas did not believe PTSD was in use as a diagnosis at the time of Ben-Sholom's treatment, Dr. Geshuri admitted that the lack of an earlier PTSD diagnosis could have been the result of an oversight.

In rendering his 2002 report, Dr. Geshuri considered the fact that Ben-Sholom had been subjected to severe and consistent abuse, a fact he admitted he had not known at the time he wrote his 1985 report.  He testified that the abuse was significant.  According to a study with which he agreed,[54] abuse can physically alter brain development, particularly if it begins early in life.  Dr. Geshuri's evidentiary hearing testimony as well as his 2002 report also took into account the information in Dr. Froming's social history report that Ben-Sholom lived with and was abused by his father when he was 17 to 21

---

[54] The report of the study, published in 2002, was marked as Exhibit 11 to the EHT, but was not admitted.  Dr. Geshuri's testimony about the conclusions in the study was admitted.

months old.   In particular, Ben-Sholom was punished for not being toilet trained.   Dr. Geshuri discounted the abuse from this period because it was brief, he soon returned to the safety of his grandmother's home, and he would have no cognitive memory of this period.   He conceded, however, that it could have had some impact.   In a letter written by Ben-Sholom's attorney Ms.  Milrod to Dr. Geshuri on May 14, 2002,[55] she confirmed his view that severe abuse can result in the deterioration of the neuropathological process, that the abuse inflicted on Ben-Sholom in particular resulted in his rage, anger, and depression, that Ben-Sholom manifested some components of borderline personality disorder (as found by both Dr. Richmond and Dr. Wynbrandt).   Dr. Geshuri testified further that Mr. Marshall's unpredictability could have induced terror in Ben-Sholom when he was a little boy.   He wanted to join the Army because it was regulated and predictable.   Basic training for Ben-Sholom probably was much easier than his home life.   Ben-Sholom's life goal was to be a soldier and to escape from his mother and father.

Dr. Geshuri concluded in his 2002 report that victims often identify with their aggressors to reduce the level of negative interaction, and apparently Ben-Sholom adopted his father's character.   This was not an issue in mitigation, but rather, a psychological process.   Dr. Geshuri found that Ben-Sholom was depressed over the loss of his future dreams (becoming a mercenary) not over past abuse.   In testimony elicited on cross examination, Dr. Geshuri clarified that Ben-Sholom was depressed about his broken dreams as well as his past abuse.

The conclusion that Ben-Sholom's participation in the crime was not based on substantial domination drew support for Dr. Geshuri from Ben-Sholom's view of the military operation or "mission."   Ben-Sholom voluntarily entered into a contract.   He was not coerced; there was no forceful influence.   Dr. Geshuri explained that substantial domination refers to the relationship between a dominant person and a submissive person and then to the mental state of the submissive person being susceptible to influence of another.   When questioned further on this topic, Dr. Geshuri admitted that he was not aware that Dr. Richmond wrote in a January 1, 2003 report that Ben-Sholom displayed a

---

[55] The letter was marked and admitted as Exhibit 12 to the EHT.

histrionic personality disorder.[56]  Dr. Geshuri testified this condition may have been present in Ben-Sholom and that one of the traits of histrionic personality disorder is being suggestible or easily influenced by others.  He agreed that an easily influenced person could go along with something voluntarily and still be considered to be "influenced."

Despite Ben-Sholom's perception of the crime as a military operation, he retained the ability to appreciate the gravity of his crime.  Cognitively, he knew what he was doing and chose to do it.  Dr. Geshuri described his own involvement in "special forces" in the Israeli Army and thus he was familiar with how operations were conducted.  A soldier is called upon to follow a pre-planned operation.  Dr. Geshuri confirmed that his own experience in the Israeli military taught him about military cohesion and structure.  Although Dr. Geshuri agreed that Ben-Sholom's plan for joining the Karen National Liberation Army was "crazy," far-fetched from reality, fantastical, and the product of magical thinking, it wasn't crazy to Ben-Sholom.  Ben-Sholom's expressed pride in killing Mrs. Teague so as to eliminate suffering did not show that he identified with her, it showed, rather, that he didn't want to be identified with his father; he didn't want her to suffer as his father had made him suffer.

Dr. Geshuri did not find that his original diagnosis of ASPD was minimized or mitigated by the fact that Ben-Sholom maintained correspondence in prison.  A classic trait of ASPD is basic selfishness.  Writing to people could be motivated by selfishness.  Dr. Geshuri's impression that Ben-Sholom had ASPD, both in the 1985 and 2002 reports was based on his lack of remorse for the crime, since people with ASPD do not show "true" remorse.  He admitted that Ben-Sholom's active participation in counseling at Kings View undercut this conclusion, but sometimes people with ASPD like to have someone listen to them.  Although deceit and manipulation are traits associated with ASPD, and Ben-Sholom was open and honest in his confessions to authorities, Dr. Geshuri did not feel this honesty dispelled the ASPD diagnosis, because giving a confession is not a normal life situation.  Another trait associated with ASPD is irresponsibility.  When pressed, Dr. Geshuri agreed that Ben-Sholom's post-conviction conduct in prison of challenging the rule forbidding him from wearing his yarmulke in the

---

[56] Dr. Richmond's January 1, 2003 letter report was offered and received by the Court as Exhibit F to the EHT.  Dr. Geshuri certainly would have been *unable* to have reviewed this 2003 report before he prepared his November 22, 2002 report.

1   visiting area was a responsible act.  Ben-Sholom's attorney Michael R. Levine,[57] explained to Dr.

2   Geshuri that the rule challenge required two levels of administrative review to the Department of

3   Corrections and ultimately a petition for habeas corpus relief in the Superior Court granting him the

4   requested relief.[58]  Likewise, although a defining criteria of people with ASPD is being cynical, callous,

5   and lacking empathy, Ben-Sholom's preparation of a San Quentin prisoner resource directory[59]

6   demonstrated sympathy and concern for others.  Pointing out that people with ASPD "remit" when they

7   enter their fourth decade,[60] Dr. Geshuri did not concede that the directory dispelled the notion that he

8   had ASPD.  When Mr. Levine explained that Ben-Sholom prepared the directory ten years earlier, when

9   Ben-Sholom was in is 20s, Dr. Geshuri responded that Ben-Sholom was smart and that he didn't actually

10  know whether Ben-Sholom was manipulating the system.

11              **b.       James Richmond, M.D.**

12          As with Dr. Geshuri, the backdrop for Dr. Richmond's evidentiary hearing testimony was his

13  preparation of a report for the Warden's counsel, Ms. Marinovich, on January 1, 2003.  Exhibit F to the

14  EHT.  To prepare this report, Dr. Richmond reviewed numerous school and medical records, including

15  Kings View records, transcripts of Ben-Sholom's confessions, his own January 28, 1985 examination

16  notes of his interview with Ben-Sholom, the reports prepared for Mr. Alexander by Drs. Kleist, Glenn,

17  Rudis, Geshuri, and Rienzi, the declaration of Dr. Wynbrandt, penalty phase testimony, Ms. Marshall's

18  questionnaire responses,[61] and Dr. Froming's social history report.  Based on his review of this

19  information, Dr. Richmond concluded Ben-Sholom's psychiatric condition at the time of the offense was

20  indicative "of a severe personality disorder" summarized in the DSM as "Cluster B Personality

21

22

_____

[57] Mr. Levine and Ms. Milrod were co-counsel representing Ben-Sholom at the evidentiary
23  hearing.

24  [58] The documents evidencing Ben-Sholom's administrative review and court case were offered
    and received, collectively as Exhibit 15 to the EHT.
25

26  [59] The Prison Resource Directory was offered and received as Exhibit 23 to the EHT.

27  [60] Ben-Sholom was just a month shy of his 37th birthday at the time of the evidentiary hearing.

28  [61] Ms. Marshall's questionnaire responses were attached to the Petition as Exhibit 7 and
    summarized at Part V.A.16. of the October 5, 2001 order.

Disorders," including ASPD, borderline personality disorder, histrionic personality disorder,[62] and narcissistic personality disorder.  ASPD and borderline personality disorder dominated.  He criticized Dr. Rienzi's 1985 and 1997 reports because she ignored anti-social, borderline, and psychotic elements in her interpretation of psychological test results.  He criticized Dr. Wynbrandt's June 17, 1997 declaration for purporting to conclude from his 1995 clinical interview and review of records that Ben-Sholom did not harbor the requisite legal mental state to commit robbery and murder in 1985.  He also strongly stated that a person's genetics, not just his environment, play a key role in shaping personality, attitudes, and behavior.    Dr. Richmond found similarities between Ben-Sholom's dispassionate, emotionally detached conduct at the time of the crime, and his father's inability to express empathy.  He did not find Ben-Sholom's emotional detachment to be a psychotic state.  At most, it could have been indicative of a dissociative disorder.[63]  With respect to PTSD, Dr. Richmond wrote, "[w]hile there appears to have been more than sufficient cruelty and abuse to contribute to such a disorder, the presence of that abuse does not in itself determine that it [PTSD] will occur."  Dr. Richmond concluded that even if Ben-Sholom suffered from PTSD, his conduct in participating and committing the crime showed him to be "an intellectual planner, consenter, and participant."  Dr. Richmond rejected the notion that Ben-Sholom was substantially dominated by others at the time of the crime, and posited that based on "the intensity of his [Ben-Sholom's] determination to obtain weapons and his desire to become a mercenary following his failure in the Army, he appears to have had the strongest motive of the three [Chris Seaman, John Calhoun, and himself] to carry out the crime."  If he was controlled, Dr. Richmond opined, "it was not by another person but by his own base and anti[-]social motives."  He also rejected the notion that Ben-Sholom experienced true remorse for killing Mrs. Teague or was so impaired he could not appreciate the criminality of his conduct.  Dr. Richmond found Ben-Sholom "was very much

---

[62] In a concluding section of the report, he wrote that at the time of the offense, Ben-Sholom "was suffering from severe mental and emotional disturbance" stemming from "his lifelong character disorder with increasing unstable moods and impulsive behaviors triggered by the immediate threat of losing the opportunity to become a member of an organized militia."  He further opined there "was possibly a superimposed posttraumatic stress disorder," but that neither the personality disorder nor the PTSD amounted to mitigation for the crime.

[63] Dr. Richmond also testified that Ben-Sholom was not dissociating when he killed Mrs. Teague because he recounted the details of the incident.

in control but unwilling to deal with his conscience," and therefore he "continued with the military charade that made it acceptable to him to express his pent up, murderous rage upon a hapless and helpless victim, rationalizing the while that he was only a soldier following orders."

At the evidentiary hearing Dr. Richmond reiterated his conclusions that Ben-Sholom may have suffered from PTSD, but that this was not a major factor in the crime. He discounted Ben-Sholom's severe emotional disturbance, mental impairment to appreciate the criminality of his conduct, and his susceptibility to substantial domination. He felt that ASPD was a likely contributor because of the absence of true remorse, Ben-Sholom's rationalization for his conduct, and the planning of the "mission." Also, Ben-Sholom's conduct at the Teague residence was not consistent with PTSD, but with ASPD. His purpose in committing the crime was to show himself as a good soldier and order taker and to establish a reputation as a good mercenary. Ben-Sholom told Dr. Richmond that other mercenary groups had heard of and contacted Ben-Sholom at times when he got into trouble. In general, and reiterating his 2003 report concerning Dr. Wynbrandt, Dr. Richmond found unreliable a mental health assessment conducted ten or more years after the relevant time period because people change their mental status. He also commented that if the factual foundation for an expert opinion were altered, the opinion likewise would be altered. With respect to factual foundation, Dr. Richmond did not believe that background records were always necessary to conduct an evaluation. He did stress, however, that a clinical interview would be necessary.

During his testimony he reiterated his opinion that Ben-Sholom did not experience a psychological fear reaction when he committed the crime as a result of PTSD. The fact that Ben-Sholom went into the Teague house armed, with a plan to kill, but having never killed before, would instill fear and stress, not necessarily the result of PTSD. Although Ben-Sholom described that his conduct happened outside of reality, he was not dissociating when he killed Mrs. Teague. He told Dr. Richmond that his training took over, referring to receiving instruction from paramilitary groups about how to use a knife to sever the brain stem. He described this procedure to Dr. Richmond in detail, and confirmed he was the actual perpetrator in killing Mrs. Teague. Nor was he under the substantial domination of others at the time of the crime. The crime resulted from his own free-will. It wasn't that he was "controlled" by others, but "that he didn't want responsibility." His being rattled when Mrs. Teague

called him "sir" manifested his wish for someone else to be responsible. During cross examination, Dr. Richmond acknowledged that in his 2003 report he found that Ben-Sholom displayed many characteristics of histrionic personality disorder, one of the traits for which is being suggestible or easily influenced by others or circumstances. On re-direct, Dr. Richmond clarified that Ben-Sholom was more influenced by circumstances than other people. In his 2003 report, he also found that Ben-Sholom displayed traits of narcissistic personality disorder, a condition associated with being overly trusting of strong authority figures who they see as having the ability to magically solve their problems. This acknowledgment followed the cross examination testimony about fantasy and whether Ben-Sholom's goal of joining the Karen National Liberation Army was realistic. Dr. Richmond testified he didn't know whether Ben-Sholom's plan to join the Karen Nationals was fantasy. He thought it possible that Ben-Sholom actually had the military training he talked about it, even though there was no corroboration. When Ben-Sholom told Dr. Richmond about his training as a jungle fighter, Dr. Richmond testified he "entertained the thought that that might not be reality." Ben-Sholom appeared to believe he had undergone mercenary training.

From the beginning, Dr. Richmond gave very little weight to the four month period during which Ben-Sholom and his mother lived with Mr. Marshall in Louisiana when Ben-Sholom was a toddler. A person develops identity throughout his or her life. Identity is not formed solely between the ages of 18 and 36 months. Dr. Richmond reiterated the conclusion in his report that nurture is not more important than nature. Even where there has been trauma at the toddler stage, borderline personality disorder doesn't necessarily follow. Dr. Richmond stated he was not aware that Mr. Marshall disciplined Ben-Sholom for his failure to toilet train. The fact that Mr. Marshall grabbed a bottle from Ben-Sholom and threw it into the street could contribute to insecurity and distrustfulness. Similarly, he conceded that the abusive life Ben-Sholom experienced from age seven to 17 could result in a child experiencing fear, betrayal, and lack of trust.

The 13 school changes for Ben-Sholom also was not overly significant to Dr. Richmond. While this could have an impact on Ben-Sholom's establishment of identity, many children of military families move often and adjust well. He also reiterated the conclusion in his 2003 report that the presence of childhood abuse will not necessarily cause a person to develop PTSD. On the other hand, the nightmares

Ben-Sholom reported also suggest emotional trauma and Ben-Sholom's adolescent desire to kill his father or have his father killed suggests extreme anger. Dr. Richmond further conceded that Ben-Sholom's hypertension was a symptom of stress, although he discounted the hypertension diagnosis on the supposition that the treating physician rendered the diagnosis after a single blood pressure reading.[64] Although Dr. Richmond testified that Ben-Sholom's report of overdosing on Inderal could suggest a mental disturbance, it also could have been the result of impulsive, not necessarily depressed, behavior. As to Ben-Sholom's accounts of playing "chicken" with diesels on the highway and jumping off the Sequoia Mall, Dr. Richmond wasn't sure whether Ben-Sholom jumped or fell off the Mall. Dr. Richmond ascribed no particular meaning to Ben-Sholom's statement (to Dr. Richmond during the January 28, 1985 interview) that he was depressed 95% of the time or that he began having suicide thoughts when he was nine or ten years old, because it depended on what Ben-Sholom meant by depression or suicide. Dr. Richmond conceded only that these reports could have meant Ben-Sholom was depressed. In all, Dr. Richmond testified that a number of factors *could* have had an impact on Ben-Sholom's ability to develop identity, including his abusive father from 17 to 21 months and seven to 17 years, his abused, battered mother, his schizophrenic uncle and 13 school changes.

Dr. Richmond did not see any of the factors emphasized by defense experts to detract from the conclusion Ben-Sholom had ASPD as being persuasive. Contrary to the defense expert assessments, Ben-Sholom did not initiate counseling at Kings View; he was brought in by his mother to address his troubling behavior at home. When he did initiate contact with Kings View it was as a rescuing role and "counter authority" when he didn't like what was going on at home. He stated, "there's essentially no indication that [Ben-Sholom] approached counseling as a source of help with his inner problems." Dr. Richmond found Ben-Sholom was not seeking therapy; he was manipulating Kings View. His manipulation was consistent with ASPD.

Next, his relationship with Judy Mayora and her family did not demonstrate empathy. While Ben-Sholom was at the Mayora household frequently and over long periods of time, Ms. Mayora was not close to Ben-Sholom. People with ASPD have a facility to move in and out of relationships so long

---

[64] In fact there were at least three readings of Ben-Sholom's blood pressure by the treating physician. *See* Part V.A.18., October 5, 2001 order, summarizing Exhibit 6 to the Petition.

as they don't become close.  Similarly, the fact that Ben-Sholom has maintained pen-pals since his incarceration at San Quentin is not inconsistent with ASPD.  Dr. Richmond felt Ben-Sholom's motives must be examined, since people with ASPD can become model prisoners once they realize they cannot get away with bad behavior.  Not all prisoners with ASPD act out.  Some are even suicidal.  Dr. Richmond did not believe that Ben-Sholom's desire not to cause Mrs. Teague pain when he shot her demonstrated empathy.  He didn't want to inflict pain because he hated people, like his father, who inflicted pain.  Nor was his expressed remorse a reflection of empathy.  Ben-Sholom was unhappy about his life and that his life in prison would be even more unpleasant that his life had been up to that point.  When Ben-Sholom told Dr. Richmond he felt really guilty about the crime, to Dr. Richmond that did not necessarily mean he felt guilt about killing Mrs. Teague.  Also during Ben-Sholom's penalty phase testimony, he talked about how much his own life was messed-up before talking about the loss of the victim's life or impact of her death on her family.  His primary concern was for his own life.  After reviewing the transcript of Ben-Sholom's second confession, where he said he felt very bad about having killed Mrs. Teague and that if he had to do over, he wouldn't have committed the offense because "nothing is worth a person's life," Dr. Richmond conceded this was an expression of remorse.  To minimize this finding, he added that people with ASPD do express remorse when they have to deal with the consequences of their behavior.

When Dr. Richmond conducted the initial interview of Ben-Sholom he felt he had adequate information to assess Ben-Sholom's mental state at the time of the crime.  All that is necessary to determine a mental state is to conduct a clinical interview and then fit that impression into the DSM.  While a diagnosis would not predict or determine behavior, it would allow professionals to communicate with one another.  But knowing a diagnosis doesn't mean that a professional would know a person's mental state.  As with Ben-Sholom, the required information would be obtained by asking the subject questions.  Even with some information missing, for instance Ben-Sholom's homosexuality, as described in Dr. Froming's social history report, Ben-Sholom still gave enough information for Dr. Richmond to provide an accurate opinion of his mental state at the time of the crime.  Nor did Ben-Sholom's prevalent exaggerations during the interview prevent Dr. Richmond for forming an opinion.  Ben-Sholom gave very specific information about the break up with one of his girlfriends and over dramatized other

1   events.  In one account (to Dr. Kleist), he said he broke down Mrs. Teague's door and did a roll-over

2   into the house, coming up with the gun in his hand.  To Dr. Richmond, he described that he knocked on

3   the door and then forced the door open when Mrs. Teague tried to close it on his arm.  When Ben-

4   Sholom was talking about the actual killing he did not embellish to Dr. Richmond.

5             **6.      Ben-Sholom's Rebuttal.**

6        Ben-Sholom called Dr. Wynbrandt to rebut the opinions and the bases for the opinions given by

7   Drs. Geshuri and Richmond.  He called Mr. James Park to discuss the inconsistency between ASPD and

8   Ben-Sholom's post-conviction conduct in prison.

9             **a.      Dr. Wynbrandt.**

10       Dr. Wynbrandt commenced his rebuttal testimony by defending the credibility of his thorough

11  evaluation of Ben-Sholom's mental state in 1985, even though the evaluation took place in 1995.  First,

12  Dr. Wynbrandt's evaluation was informed by the comprehensive review of all the records previously

13  mentioned, plus an in depth interview with Ben-Sholom over three days lasting eight hours.  Dr.

14  Wynbrandt established a relationship with Ben-Sholom and Ben-Sholom opened up during the course

15  of the evaluation.  In contrast, Dr. Richmond's evaluation was based on a brief interview conducted

16  without any background information.  Dr. Wynbrandt described Dr. Richmond's evaluation as cursory.

17  In order to make a valid assessment of a personality or mental disorder the professional should see the

18  subject more than once.

19       Next, Dr. Wynbrandt criticized Dr. Richmond's discounting of the significance of Ben-Sholom's

20  traumatic exposure to his father as a toddler.  Dr. Wynbrandt explained that the significance of identity

21  development from 18 to 36 months is well recognized in literature and statistical evidence.  Borderline

22  personality disorder can be predicted based on the failure to develop during this stage.  Essential

23  elements of borderline personality disorder are instability in mood, self image, and interpersonal

24  relationships.  This in turn stems from inconsistent parenting, childhood trauma, instability of

25  environment, and turbulence.

26       In Dr. Wynbrandt's view, Dr. Richmond was completely wrong in his conclusion that Ben-

27  Sholom didn't seek out therapy.  Although his mother brought him in initially, the Kings View records

28  show Ben-Sholom actively participated in therapy.  He wasn't just showing off.  It wasn't just that Ben-

Sholom had aberrant behavior his mother wanted to be addressed; Ben-Sholom was reported by his mother to be afraid of his father.  Dr. Richmond distorted the reasons Ben-Sholom was brought to therapy.  Dr. Richmond also was off the mark in calling Ben-Sholom manipulative for calling Kings View, using an alias, for purposes of escaping his abusive home.  Ben-Sholom was being sensible in trying to get out of the house and into a foster home.  He was doing the job Child Protective Services should have been doing.  This was adaptive, not manipulative behavior.  In Dr. Wynbrandt's opinion, Dr. Richmond likewise was wrong in finding support for ASPD in Ben-Sholom's relationship with Judy Mayora.  To the contrary, Ben-Sholom was ready to be affable to anyone who was nice to him.

Dr. Wynbrandt disagreed with Dr. Richmond's conclusion that Ben-Sholom's wish not to inflict pain on Mrs. Teague did not show empathy.  While not wanting to be like his father, who inflicted quite a bit of pain, was a factor, Ben-Sholom also expressed real empathy for Mrs. Teague.  Dr. Richmond also was wrong when the said that Ben-Sholom didn't feel remorse for his crime.  Ben-Sholom told Dr. Richmond he (Ben-Sholom) wanted to be put to death because he felt guilt for the homicide.  That was remorse.

Dr. Wynbrandt understood Ben-Sholom's capacity to over-dramatize and exaggerate.  It was totally unrealistic for Ben-Sholom to think that paramilitary mercenary groups would have been interested in him when he got into trouble.  This trouble included burglarizing his mother's house, alcohol and marijuana use, running in and out of traffic, and jumping off the roof of the Sequoia Mall. Thus, Dr. Wynbrandt did not think much of Dr. Richmond's testimony crediting any of Ben-Sholom's fantasies about having received paramilitary training or that mercenary groups were interested in him.

Dr. Wynbrandt didn't think Dr. Richmond gave sufficient weight to Ben-Sholom's self destructive behavior prior to the crime, including the Inderal overdose, jumping (or falling) from the Sequoia Mall, drinking, and use of drugs.  Nor did Dr. Richmond properly weigh Ben-Sholom's report of having been depressed 95% of the time and that he first thought of suicide when he was nine or ten. Dr. Richmond's discounting of the numerous schools Ben-Sholom attended with a comparison to children of parents in the military was troubling to Dr. Wynbrandt.  Unlike the children of military families, Ben-Sholom's frequent moves were unplanned and disorganized.

1    Next, Dr. Wynbrandt discussed the opinions and conclusions of Dr. Geshuri.  He criticized Dr.

2    Geshuri for interpreting Mr. Alexander's request to get a "snapshot" of Ben-Sholom as direction not to

3    obtain any background information.  Dr. Wynbrandt thought it ironic that Dr. Geshuri even gave a

4    diagnosis given the fact that he wasn't asked to do so and he didn't have sufficient background to inform

5    a diagnosis.  Dr. Geshuri's focus definitely was not on historical background, as seen by the fact that

6    although he had in his notes that Ben-Sholom attended 13 schools, this fact was not mentioned in the

7    report.  No other historical information was uncovered.  This failure to obtain background information

8    compromised his 1985 clinical impression.  The fact that Dr. Geshuri, during the evidentiary hearing,

9    discounted the abuse Ben-Sholom encountered between 17 and 21 months because it was of short

10   duration and afterwards Ben-Sholom was returned to safety, also was troubling to Dr. Wynbrandt.  First,

11   four months out of a toddler's life is a significant proportion of life.  Dr. Wynbrandt didn't feel Dr.

12   Geshuri understood stages of development.  Harm caused at one stage shows up in subsequent stages.

13   Correction comes from family and individual treatment.  Second, contrary to Dr. Geshuri's conclusion,

14   following this four month period, Ben-Sholom was not returned to safety and normalcy.  The

15   environment at Ben-Sholom's grandmother's house was unstable.  Ben-Sholom's maternal uncle

16   suffered from schizophrenia and there were many babysitters.  Dr. Wynbrandt disagreed with Dr.

17   Geshuri's view that because of Ben-Sholom's intelligence, any mental disorders were diluted or

18   neutralized.  Dr. Geshuri assumed Ben-Sholom's cognitive mind was in control and that he made

19   choices based on rational and logical capacity.  It was Dr. Wynbrandt's opinion, however, that

20   intelligence would be of no use in protecting oneself against the conditions inflicted on Ben-Sholom.

21   In sum, Dr. Geshuri was very selective in his assessment of Ben-Sholom, which Dr. Wynbrandt

22   believed was to cast Ben-Sholom in the worst light.  To say that Ben-Sholom's emotional and mental

23   disturbance was very general and not mitigating follows from the fact that Dr. Geshuri's evaluation was

24   so brief and uninformed.  He didn't have the ability to develop a more comprehensive profile.  In Dr.

25   Wynbrandt's opinion, Dr. Geshuri had insufficient information to make an Axis II diagnosis.  The

26   psychological test result that Ben-Sholom's credibility was low should have motived Dr. Geshuri to

27   delve further in the clinical interview.  He should have rendered a provisional diagnosis, since he noted

28   visible signs of stress in Ben-Sholom's demeanor.  Dr. Wynbrandt further criticized Dr. Geshuri because

his view that Ben-Sholom did not suffer from substantial domination was in part based on his own (Dr. Geshuri's) experience in the Israeli Army.  This was a transfer of Dr. Geshuri's experience on Ben-Sholom, a phenomenon called "counter-transference."  Dr. Wynbrandt noted that clinicians are trained to be on the alert against counter-transference.

Regarding Ben-Sholom's post-conviction conduct, Dr. Wynbrandt reviewed the declarations of Anna Vahakangas (Exhibit 19 to the EHT), Jane Davis (Exhibit 20 to the EHT), Fiona McGillivray (Exhibit 21 to the EHT), and Mavis Gilbert [65] discussing their correspondence with Ben-Sholom.  From this review,[66] Dr. Wynbrandt concluded that Ben-Sholom demonstrated genuineness and the ability to become attached to other people.  This is quite different than what would be expected in people with ASPD, where even after the most dramatic symptoms begin to wane, there remains difficulty in interpersonal relationships.  A person with ASPD would not be able to make attachments, have deep relationships, or feel empathy for others.  The declarations show Ben-Sholom's ability to do so.

Ben-Sholom disclosed to Dr. Wynbrandt that he was never comfortable with Mr. Alexander, and that is the reason he (Ben-Sholom) did not disclose his homosexuality.  Recognizing that Ben-Sholom, himself, decided what information to disclose and what information to withhold from his attorney as well as to his examiners, Dr. Wynbrandt did not feel manipulated by Ben-Sholom.  The disclosure and withholding of information was never made with any well-organized plan.

---

[65] The content of the declarations of Ms. Vahakangas, Ms. Davis and Ms. McGillivray are summarized in the context of Mr. Park's declaration. Part IV.A.6.b., *infra*. A facsimile of Ms. Gilbert's declaration was filed and served on February 10, 2003, two days before Dr. Wynbrandt's rebuttal testimony. The original is the subject of Ben-Sholom's motion to augment the record filed on March 19, 2003. Ms. Gilbert, 72 years old when she executed the declaration, was a Salvation Army Retired Officer with experience doing social work.  She began writing to Ben-Sholom as part of a prison correspondence program through the Salvation Army.  She found him to be forthright, informative, and generous, never asking for money or other help as many prison correspondents have done. He updated her on prison life, including his administrative victory in securing a ruling allowing him to wear his yarmulke in the visiting room.  He also has sent her "clever drawings" and photographs.  She averred that Ben-Sholom "has definitely enriched [her] life."

[66] Ms. Marinovich elicited from Dr. Wynbrandt on cross examination that he did not actually review the correspondence, just the declarations about the correspondence.

1    Dr. Wynbrandt determined Ben-Sholom's Axis I diagnosis to be severe PTSD.  His Axis II

2    diagnosis was borderline personality disorder.[67]

3                           **b.    Mr. Park.**

4    After Mr. Park completed his bachelor's degree in psychology, he commenced working on his

5    doctorate, and completed four years of graduate studies in clinical psychology, but never completed his

6    doctorate thesis.  In 1952 he began working for the California prison system.  He was a psychologist

7    conducting psychological evaluations to make inmate placement classifications.  Between 1956 and

8    1962, licensure requirements were instituted in the State of California and Mr. Park obtained a license

9    as a clinical psychologist.  His license was inactive at the time of his testimony, and had been so for the

10   preceding four to six years.  Mr. Park worked in the prison system until his retirement in 1983, where

11   he spent much of his career assessing inmates for evidence of sociopathic or deviant behavior.  The

12   DSM criteria for ASPD, that is, a "pervasive pattern of disregard for and a violation of the rights of

13   others," is consistent with description of a sociopath or deviant forty years earlier when Mr. Park was

14   classifying prisoners for housing placement.  The Court admitted Mr. Park's testimony in rebuttal to the

15   Warden's contention that Ben-Sholom had ASPD.  Specifically, the Court accepted his opinion as to

16   whether Ben-Sholom's prison record was consistent or inconsistent with the essential factors of ASPD,

17   as stated in the DSM.  The testimony was not admissible on the issue of Ben-Sholom's institutional

18   adjustment.  Nor was Mr. Park's testimony admissible on the issue of whether Ben-Sholom suffers from

19   ASPD, since he (Mr. Park) was not qualified to render a medical opinion.

20   Mr. Park reviewed Ben-Sholom's grievance forms (Exhibits 13 and 14 to the EHT) challenging

21   the rule prohibiting him from wearing his yarmulke in the visiting area.  Mr. Park found that Ben-

22   Sholom's pursuit of the grievance procedure showed persistence and sincerity.  In contrast to inmates

23   pursuing grievances to receive pornographic magazines, Mr. Park opined that Ben-Sholom received no

24   secondary benefit from permission to wear a yarmulke.  There were more Nazis than Jews in the San

25   Quentin yard.  Ben-Sholom's grievance pursuit was the opposite of irresponsibility and impulsivity

26   characteristic of ASPD.

27   _____

28   [67] In his earlier testimony, he stated that Ben-Sholom's Axis II diagnosis was identity
     fragmentation, which is a condition found in borderline personality disorder.

1    Next Mr. Park reviewed academic coursework in Ben-Sholom's prison academic files.  Exhibits

2    15 and 16 to the EHT.  These records showed Ben-Sholom to be a good and diligent student.  Again,

3    Ben-Sholom received no secondary benefit or privilege from pursuing these academic subjects.  With

4    respect to the religious courses, Ben-Sholom's reason for pursuing these courses was to sort out his own

5    religious confusion between Judaism and Christianity.  Mr. Park found in Ben-Sholom a consistent,

6    sustained focus on fairly difficult biblical study.  A person with ASPD might pursue education if there

7    were a secondary gain, for instance, contact with a female teacher.  People with ASPD, however, would

8    not be consistent and would soon give up.  Ben-Sholom was persistent.

9    Mr. Park then reviewed the five declarations marked and admitted as Exhibits 17, 18, 19, 20, and

10   21 to the EHT, of Rabbi Barbara Goldman-Wartell, Debbie Marrujo Sloss, Anna Vahakangas, Jane

11   Davis, and Fionna MGillivray.  The profile of Ben-Sholom as reflected in the declarants did not draw

12   a picture of a sociopath or someone with ASPD.

13   Rabbi Goldman-Wartell (Exhibit 17) was not only a religious leader, but also a social worker.

14   Mr. Park was impressed that Rabbi Goldman-Wartell evaluated Ben-Sholom's interest in Judaism as

15   sincere even in the face of prevalent antipathy for Jews in prison.  Rabbi Goldman-Wartell's declaration

16   demonstrated that Ben-Sholom was able to overcome the unfeeling, paramilitary mold imposed by his

17   father to become a person willing to learn and be open about his feelings.[68]

18   Ms. Sloss (Exhibit 18) was acquainted with Ben-Sholom when she (Ms. Sloss) had been a foster

19   child under the supervision of Ms. Marshall (in Ms. Marshall's capacity as a CPS worker).  Ms. Sloss

20   averred that Ben-Sholom was very kind to her when they were young teenagers.  He listened to her and

21   gave her advice.  He discouraged her from using drugs.  Although Ms. Sloss would have been willing

22

23

24

25

---

26   [68] Rabbi Goldman-Wartell actually visited Ben-Sholom in the Tulare County Jail during trial
proceedings, after the guilt phase proceedings.  She visited him a second time after the penalty phase
27   proceedings.  She averred in her declaration (executed January 31, 2003) that Roger Alexander never
contacted her to ask her to testify at Ben-Sholom's penalty phase trial.  Had he done so, Rabbi Goldman-
28   Wartell would have testified to her favorable impressions of Ben-Sholom.

1  to have sex with Ben-Sholom at the time, he declined.  Mr. Park opined that his altruism in this regard

2  was inconsistent with ASPD.  He could have, but didn't victimized Ms. Sloss.[69]

3          Ms. Vahakangas (Exhibit 19) was a student when she initiated contact with Ben-Sholom after

4  reading an magazine article he wrote.  She described him as having high moral values.  Mr. Park opined

5  this impression was inconsistent with ASPD.

6          Ms. Davis (Exhibit 20) was an ordained Jewish minister and employed by the New Mexico

7  Department of Corrections as a psychologist.  She observed a display of openness in Ben-Sholom, a

8  great deal of trust and respect for the rights of others, and a lack of physical aggressiveness and

9  impulsivity.  Mr. Park noted this was inconsistent with ASPD.[70]

10         Ms McGillivray (Exhibit 21) initiated correspondence with Ben-Sholom after reading an article

11  in her local Quaker newsletter.  She stated Ben-Sholom showed interest in her as a person.  He both

12  volunteered information about and took responsibility for the crime.  Mr. Park opined this is inconsistent

13  with ASPD.

14         In the context of opining that the descriptions of Ben-Sholom by these various declarants painted

15  a picture of someone who did *not* have ASPD, Mr. Park also noted that the absence of any disciplinary

16  reports at San Quentin solidified his opinion.

17         Mr. Park reviewed the declaration of Dr. Kenneth Searle (Exhibit 22 to the EHT).  Dr. Searle

18  taught Ben-Sholom a two-semester class called "Survey of the Old Testament" at San Quentin.  Ben-

19  Sholom's enrollment in this class is listed on his academic record (Exhibit 15).  Mr. Park described the

20  Old Testament survey class as a tough course and noted that Dr. Searle found Ben-Sholom to be "a man

21  of honesty and humility."  Mr. Park emphasized that Dr. Searle averred he was not opposed to the death

22  penalty.

23

24         [69] Like Rabbi Goldman-Wartell, Ms. Sloss averred in her declaration (executed January 30, 2003)
    that she would have testified in a manner consistent with her declaration at Ben-Sholom's trial if Mr.
25  Alexander had contacted her.

26         [70] Not mentioned in Mr. Park's testimony about Ms. Davis's declaration was the fact she brought
    a troubled teenager to see Ben-Sholom in prison.  Ms. Davis averred: "With the parents' notarized
27  permission letter, I took the young man to the San Quentin visiting room, where he met with Mr. Ben-
    Sholom.  Mr. Ben-Sholom was completely open and helpful to the boy; I saw that the visit had a
28  profound and beneficial impact."

1    Finally, Mr. Park reviewed the Prison Resource Directory which Ben-Sholom prepared.  Exhibit

2    23 to the EHT.  Mr. Park stated this was not an easy document to put together.  It required a great deal

3    of persistence because it is difficult to find resources at San Quentin.  Further, there was no secondary

4    gain involved with compiling the directory.  A prisoner with ASPD might have put this directory

5    together for money, but Ben-Sholom did not.

6    Mr. Park's review of Ben-Sholom's post-conviction prison record and activities show the

7    establishment of meaningful relationships, lack of violence, pursuit of academic improvement, religious

8    commitment, and pursuit of grievances through proper channels.  Mr. Park found this conduct

9    inconsistent with ASPD, even taking into account the Warden's argument that a person with ASPD does

10   not act anti-socially in every respect.

11   On cross examination Mr. Park conceded that all people mellow with age and that young

12   prisoners become sobered with time and settle down.  Mr. Park stated that a person with severe ASPD,

13   however, would have a hard time adapting and could misbehave persistently.  Mr. Park did not

14   personally interview Ben-Sholom, although he read prison records, various declarations, and Dr.

15   Froming's social history.  Mr. Park also conceded that some of Ben-Sholom's past conduct was

16   consistent with ASPD, including his running away from home, burglarizing his mother's house, and

17   committing the present crime.  Mr. Park did not believe that firing four bullets into the back of

18   someone's head invariably would be consistent with ASPD.  He testified it could be consistent with

19   schizophrenia, fright, anxiety, anxiety disorder, or delusion.

20                              **7.      The Warden's Evidence.**

21   The Warden filed an exhibit list consisting of seven exhibits lettered A through G.  Exhibit A

22   is discussed in connection with Claim 22.  *See* Part V., *infra*.  Exhibit B is an investigation report of an

23   interview of Roger Alexander conducted by Ms. Marinovich on December 31, 2002.[71]  Relevant excerpts

24   of this report, in tandem with excerpts from a corresponding subsequent declaration over Mr.

25   Alexander's signature and dated January 20, 2003 refuting and clarifying certain statements in the report

26

27   ───────────────

28   [71] Ms. Marinovich's cross examination of Mr. Alexander roughly tracked the substance of the
Exhibit B investigation report.

are recounted below.[72] Exhibits C, D, E, and F are described in the Warden's response to Ben-Sholom's evidence presented during the evidentiary hearing. *See* Part IV.A.5., *supra*. Exhibit G consists of 33 trial exhibit photographs moved into evidence by the prosecution, and recounted below. The Warden's final evidentiary proffer is a request for judicial notice filed after the evidentiary hearing, on March 3, 2003, as recounted below.

### a.       Report and Declaration of Roger Alexander.

Although Mr. Alexander's evidentiary hearing testimony was extensive, several passages in the investigation report and declaration not mentioned in his testimony bear relevance to the analysis of Ben-Sholom's ineffective assistance of counsel claim. First with respect to PTSD, Mr. Alexander is reported to have stated that this was a diagnosis some attorneys used as mitigation evidence, but he could not recall when it first came into use. He reportedly told Ms. Marinovich that Ben-Sholom directed him not to use certain defenses and that he (Ben-Sholom) specifically did not want any type of mental defense, such as insanity. In his declaration, Mr. Alexander explained that sometimes Ben-Sholom expressed opposition to certain trial strategies, but this did not cause Mr. Alexander to forego anything he felt would be beneficial to the defense case. Also, although Ben-Sholom was worried about being perceived as "crazy," he agreed with mental state strategies after Mr. Alexander explained them. The investigation report states Mr. Alexander told Ms. Marinovich that he felt he had obtained some really good information for the penalty phase from the experts, and that the information would have been really useful if he could have been sure the jurors would listen.

He identified one potential penalty phase witness, one of Ben-Sholom's school teachers, who originally agreed to testify and then backed out after being informed by a member of her church that Mrs. Teague's family attended the same church. Mr. Alexander felt she would have cast Ben-Sholom in a sympathetic light.

With respect to the omitted sentencing instructions under factors (d) (extreme mental or emotional disturbance), (g) (substantial domination), and (h) (mental disease or defect), Mr. Alexander told Ms. Marinovich he could not recall whether he considered those instructions, but that it might have

---

[72] Both the investigation report, Exhibit B to the EHT, and the January 20, 2003 declaration, were admitted by Court order entered January 30, 2003 (document 377).

been a tactical decision to omit them.  In his supplemental declaration, he clarified that he was just speculating about whether he had a tactical reason for omitting instructions under these factors, because he had no recollection about it one way or the other.[73]  Ms Marinovich further questioned Mr. Alexander as to whether he believed Ben-Sholom was extremely emotionally or mentally disturbed.  Mr. Alexander responded in the affirmative, attributing this response to Ben-Sholom being caught up in his miliary mission.  He thought this evidence was a double-edged sword, however, because the cause of Ben-Sholom's disturbance was sociopathy.  In his supplemental declaration, Mr. Alexander clarified that attributing the cause of Ben-Sholom's mental or emotional disturbance to sociopathy was not his idea, but came from Dr. Geshuri.

Mr. Alexander was reported to have said he did not believe jurors would ignore mitigating evidence if not highlighted by a specific instruction.  In his supplemental declaration he averred that the actual question Ms. Marinovich asked was if each factor was not labeled as a mitigator by the trial judge did he believe the jurors would ignore them.  He answered no to that.  His concern, as he testified at the evidentiary hearing, was not that the jurors would ignore mitigation evidence, but that they wouldn't know how to apply it and wouldn't give it full effect.  He also told Ms. Marinovich that he believed if the jurors followed the instructions he requested and were given by the trial judge, there was no way they would have returned a death verdict.  He explained to Ms. Marinovich that part of his penalty phase strategy was to keep evidence about Ben-Sholom's fascination with and the pursuit of the paramilitary away from the jurors.

Although he said he struggled quite a bit with the decision of whether or not to call Dr. Rienzi, his main concern being that the jurors might not follow the instructions.  He reportedly told Ms. Marinovich that his decision not to call Dr. Rienzi was tactical and seemed right at the time, although it was excruciating.   In this supplemental declaration he stressed that the decision not call Dr. Rienzi was difficult to make and followed extended consideration.  As he testified at the evidentiary hearing, the decision followed the trial judge's determination to give the sentencing instructions as Mr. Alexander

---

[73] At least with respect to the factors (d) and (g) instructions, Mr. Alexander's testimony at the evidentiary hearing reverted to the sentiment expressed in the investigation report.  He testified  at the hearing that he actually deleted instructions under factors (d) and (g).

1    had requested.  However, since the jury did return a death verdict, and Mr. Alexander didn't think it

2    would, he believed he should have done something differently in the presentation of the mitigation case.

3              **b.        Prosecution Trial Exhibit Photographs.**

4              The 33 prosecution trial exhibit photographs depict the weapons and ammunition recovered

5    from Ben-Sholom, Calhoun, and Seaman when they were arrested in San Bernardino County, as well

6    as the crime scene as authorities found it, and as Mrs. Teague's son, Alva Teague,[74] found it, in the early

7    evening of January 23, 1985, when he returned home from work.    The front door to the house was

8    open, Mr. Teague's bedroom had been ransacked, and his mother was lying face down on the bathroom

9    floor, forehead resting on her hands, eye glasses still on, in a pool of blood.  RT-11: 1940-43.  The

10   exhibits include two close up photographs of Mrs. Teague in this condition and one longer shot from

11   Alva Teague's ransacked bedroom, as well as a photograph of the bloody bathroom floor after

12   authorities removed Mrs. Teague's body from the scene.  There also is an autopsy photograph of Mrs.

13   Teague showing the bullet holes at the base of her skull.  The Warden  moved to expand the record to

14   include these 33 photographs on January 28, 2003.  The Court granted the motion on January 30, 2003

15   (document 377).

16             **c.        Request for Judicial Notice.**

17             The Warden requests the Court to take judicial notice of two court documents.[75]  The first is an

18   order issued in *Laval Frierson v. Jeanne Woodford, Warden of California State Prison at San Quentin,*

19   Case No. CV 92-6251 CM, dated October 15, 2001, by Central District of California.  The second is a

20   reporter's transcript of a hearing on October 28, 1998  from a Washington State criminal matter against

21   Alex K. Baranyi, Case No. 97-1-00343-8 SEA.  The request for judicial notice pertains to the credibility

22   of Dr. Froming.  The request for judicial notice is granted, although in light of the testimony and

23   documents admitted at the evidentiary hearing, reliance on Dr. Froming's conclusions is minimized.

24   To the extent Dr. Froming's conclusions drawn in her social history report are based on facts

25   corroborated by other sources in the record, her credibility is not called into question.

26

27             [74] Alva Teague was 20 years old at the time.

28             [75] The request for judicial notice was filed March 3, 2003.

93dp05531.OFollEvidHrg.Ben.wpd                80

**(1)** *Frierson* **Order.**

In the *Frierson* order, the court denied all claims developed during an evidentiary hearing.  In particular, the court found Dr. Froming's reliance on selective background information as a basis for giving little weight to her conclusions with respect to the severity of Frierson's mental impairment.  In one instance she adjusted downward her computation of Frierson's "T-score" (which is a percentile rank used to score impairment) by inflating his education level to the twelfth grade (because he received GED in prison).  The district court was troubled by the fact that she ignored "test results which did not support her ultimate conclusions," but only reported results on which Frierson performed poorly.  Next, Dr. Froming concluded that Frierson suffered from demyelinization (damage to tissue which covers the neurons, aids in neural transmission, and connects the various regions of the brain) and this conclusion was relied on by psychiatrist Zakee Mathews, M.D. as the basis for his conclusion that Frierson suffered from organic brain damage and might have been unable to premeditate at the time of the homicide.  Another psychiatrist opined, however, that a neuropsychologist, like Dr. Froming, ordinarily would not be able to measure demyelinization from psychological testing, since demyelinization is considered a radiographic, anatomic or pathological diagnosis, beyond the expertise of a psychologist.[76]

**(2)** *Baranyi* **Transcript.**

During the hearing involving Mr. Baranyi, the prosecutor caught Dr. Froming in an apparent misrepresentation, thus impugning her credibility.  During cross examination concerning a report she apparently wrote, she twice stated that the abbreviation "ASP scale" stood for "aspiration scale."  From

---

[76] The Ninth Circuit, in an unpublished opinion agreed that Dr. Froming's conclusions lacked credibility:

> We also reject the remaining sub-claim regarding neuropsychological testimony. . . .Even if Lieman [Frierson's trial attorney] had conducted a more thorough investigation of Frierson's mental capacity, we cannot conclude from this record that he would have been able to present neuropsychological evidence that Frierson was unable to deliberate or premeditate, or act with the intent to kill. At the first evidentiary hearing in district court, Frierson presented the testimony of Dr. Froming, a neuropsychologist. Although Dr. Froming testified that Frierson suffered from organic brain damage, which affected him at the time he committed the crime, her test methodology was wholly discredited. Therefore, the failure to present testimony similar to that presented by Dr. Froming at the evidentiary hearing did not undermine confidence in the special circumstances findings.[FN3]
> FN3. This is also true of the testimony of Dr. Matthews, who relied on Dr. Froming's neurological testing.

*Frierson v. Woodford*, 202 Fed.Appx. 152, 156 (9th Cir. 2006).

the context of the transcript excerpt, it appears Dr. Froming also testified ASP stood for aspiration during her direct examination testimony earlier the same day.  Thus, she testified that the defendant had high aspirations.  Dr. Froming corrected her misstatements during her cross examination testimony, stating that "ASP" on the test results stood for anti-social practices.  It was thus revealed that the testing at issue revealed the defendant to have had  a high index for anti-social practices.  She explained that she didn't bring her misstatement about the meaning of ASP to the defense attorney's attention in the course of his direct examination of her because she forgot.

### 8.      Ben-Sholom's Post Evidentiary Hearing Motion to Augment the Record.

Ben-Sholom asks the Court to consider three pieces of evidence in a post evidentiary hearing motion to augment: a supplemental declaration over the signature of Dr. Froming explaining certain statements made in social history report (concerning Ben-Sholom), as well as the two documents for which the Warden has requested judicial notice; defense trial exhibit photographs; and the original of the declaration of Mavis Gilbert.  The request to augment the record is granted.  Since the substance of Ms. Gilbert's declaration already has been explored in connection with Dr. Wynbrandt's rebuttal evidentiary hearing testimony, *see* Part IV.A.6.a., *supra*, the substance of that document will not be summarized.

### a.      Dr. Froming's Declaration in Response to the Warden's Request for Judicial Notice.

Dr. Froming first defended her misstatement in the *Baranyi* transcript that "ASP" stood for aspiration instead of anti-social practices in a particular psychological test.  She averred that at the time of her 1998 testimony, she was only familiar with the clinical diagnostic scale in the original version of this test, not the revised version.  The abbreviation ASP was not in the original version, and hence, she made the mistake identified.  She also explained that the mistake was preceded by four days of intense testimony.

With respect to the *Frierson* case, Dr. Froming criticized the value of the testimony given by the respondent's mental health expert because he had no experience evaluating the impact of drug use.  Next, she refuted the court's conclusion in the order that she failed to identify the norms she used to administer psychological tests.  She explained that she did identify the norms she utilized in her

1   testimony.   The problem with identifying Frierson's education level for the T-scale (showing

2   impairment) was attributable, she averred, to the fact that there are many norms for determining

3   education level.   Utilizing from the sixth to eighth grade, all the way up to the twelfth grade was

4   acceptable.  She urged that both she and the respondent's expert found evidence of Frierson's organic

5   brain impairment, and although standing alone, insufficient to preclude the formation of intent, it was

6   a contributing factor.

7        With respect to the social history report prepared for Ben-Sholom's case, she stated that she

8   conducted no testing and drew no neuropsychological conclusions.  All the information included in her

9   report was obtained from counsel and interviews with licensed clinical social worker Anthony Casillas,

10   Ms. Marshall, and Ben-Sholom.

11        **b.        Defense Trial Exhibit Photographs.**

12        These photographs depict Ben-Sholom as a child, young teenager, and in the Army.  As a child

13   he was an attractive, cheerful looking child, as his mother described him in her penalty phase testimony,

14   bright, enthusiastic, energetic and personable.  As he matured, he retained his good looks, and a pleasant

15   smile.  The Army photograph depicts a serious countenance.

16        **B.        Analysis.**

17        To establish constitutionally ineffective assistance of counsel, Ben-Sholom must demonstrate

18   (1) that Mr. Alexander made errors so serious that he was not functioning as the counsel guaranteed by

19   the Sixth Amendment, and (2) that the deficient performance prejudiced the defense.  *See Bonin v.*

20   *Calderon*, 59 F.3d 815, 833 (9th Cir. 1995).  With respect to the performance prong, Ben-Sholom must

21   carry the burden of demonstrating that Mr. Alexander's performance fell below an "objective standard

22   of reasonableness." *Strickland*, 466 U.S. at 688.  The assessment must be made from Mr. Alexander's

23   "perspective at the time," so as "to eliminate the distorting effects of hindsight." *Id*. at 689.  Further, the

24   Court must entertain a "strong presumption" that Mr. Alexander's conduct fell "within the wide range

25   of reasonable professional assistance," and hence judicial scrutiny "must be highly deferential." *Id*. at

26   689.   The prejudice prong requires a showing of a "reasonable probability that, but for counsel's

27   unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.  "To perform

28   effectively in the penalty phase of a capital case, counsel must conduct sufficient investigation and

engage in sufficient preparation to be able to 'present[ ] and explain[ ] the significance of all the available mitigating evidence.'" *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 393, 399 (2000)), *quoted by Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002). The process of determining penalty phase prejudice requires courts to "evaluate the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – in reweighing it against the evidence in aggravation." *Williams (Terry Williams) v. Taylor*, 529 U.S. 362, 397-98 (2000), *quoted by Mayfield*, 270 F.3d at 919, n. 1.  In utilizing this reweighing process, what really is at issue here is the relative impact between what was presented during Ben-Sholom's penalty proceedings, and what Ben-Sholom alleges could have been presented, plus the evidence submitted by the Warden.  *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (holding that assessing prejudice requires re-evaluating the prosecution evidence against the totality of available defense evidence).

### 1.    Performance.

Ben-Sholom recites a litany of claimed errors committed by Mr. Alexander, rendering his representation constitutionally incompetent:

> \* He failed adequately to investigate potential evidence of mitigation factors of substantial domination, severe mental and emotional disturbance, and mental disease or defect;

> \* He unreasonably failed to provide mental health experts with comprehensive social history information necessary to secure a competent psychological evaluation of his client;

> \* He failed to request opinions of his mental health experts about possible statutory mitigating factors;

> \* He failed to present non-expert testimony in support of possible statutory mitigating factors;

> \* He failed to present expert testimony to explain mitigating factors and concepts to the jury;

> \* He failed to request jury instructions on potential statutory mitigating factors;

> \* He failed to argue basic penalty concepts, such as sympathy, mercy, and compassion, and to argue as factor(k) mitigation the concepts of substantial domination, mental and emotional distress, or mental disease or defect.

a.      **Inadequate Investigation of Substantial Domination, Severe Mental and Emotional Disturbance, and Mental Disease or Defect.**

Ben-Sholom argues that despite the fact Mr. Alexander hired mental health experts, interviewed numerous witnesses, and collected numerous documents, the defense investigation was uninformed. While Mr. Alexander knew from the outset that the focus of the case (both guilt and penalty) would be on mental issues, there was no investigation plan and no theme driving the investigation. Even as late as January 1986, the month the trial actually commenced, Mr. Alexander had not identified what role Ben-Sholom's prescription for Inderal would play in the defense strategy.

The reports of Drs. Kleist, Glenn, Geshuri, and Rienzi all provided Mr. Alexander with substantial information that Ben-Sholom had been subjected to serious abuse as a youngster. Ben-Sholom argues this information "revealed the need to dig deeper." *See Douglas v. Woodford*, 316 F.3d 1079, 1089 (9th Cir. 2003); *see also Wiggins*, 539 U.S. at 523. In *Douglas*, trial counsel failed to adequately conduct a mental health and social history investigation for the penalty phase. He also failed to prepare the witnesses he did call. The mitigation case presented by various witnesses, including Douglas's wife and son, consisted of evidence that Douglas had an aversion to the sight of blood and had a nonviolent nature. The penalty phase defense strategy was to focus on the "lingering doubt" theory. 316 F.3d at 1087. The evidence not uncovered as a result of this strategy included Douglas's horrible childhood, abuse by foster parents (including being locked in a closet for long periods of time), being a run-away, and extreme poverty. Nonetheless, he joined the Marines at age 15 and earned a number of medals for laudable conduct. Later, however, he was arrested and jailed in Florida, where he was gang-raped by other inmates. Following his release from prison and establishment in the furniture refinishing business, he was exposed to toxic solvents daily, was involved in a serious automobile accident in 1967, and consumed large quantities of alcohol from 1966 to 1977.[77] The court held that the fact Douglas was not forthcoming with useful mitigation information did "not excuse counsel's obligation to obtain mitigating evidence from other sources." *Id*. at 1088 (quoting *Silva v. Woodford*, 279 F.3d 825, 846-47 (9th Cir. 2002)).   In *Wiggins*, the Court found the trial attorneys'

---

[77] The murders for which Douglas was sentenced to death were committed in 1982. 316 F.3d at 1082.

failure to investigate Wiggins' background beyond a one page presentence investigation report, a department of social services report (documenting his foster care placement), conversations with Wiggins, and retention of a psychologist was ineffective because these sources alluded to serious problems but did not reveal the "severe privation and abuse" of Wiggins' formative years as well as physical torment, sexual molestation, and repeated rape during his subsequent years in foster care, plus his homelessness and diminished mental capacity.  539 U.S. at 535.

Ben-Sholom argues a primary area where Mr. Alexander should have, but did not, "dig deeper" was in determining whether the instances of prior violent (criminal) activity which Ben-Sholom reported to his examiners and to Mr. Alexander actually took place.  No one knew whether Ben-Sholom was telling the truth or exaggerating.  Citing *Wiggins*, 539 U.S. at 524, Ben-Sholom argues it was Mr. Alexander's job to investigate whether potential aggravating evidence was corroborated and learn where Ben-Sholom's exaggeration gave way to reality.  *See Silva*, 279 F.3d at 846-47.

The Warden refutes Ben-Sholom's claim that Mr. Alexander's investigation was insufficient, because he arranged for five experts to examine Ben-Sholom to explore mental, social, and physical factors which led to the crime.  The Warden points out that the consultations with  Drs. Glenn, Kleist, Geshuri, and Rienzi resulted in reports that put him on notice of the harsh treatment Ben-Sholom received at the hands of his father and other sympathetic aspects of his background.  He then concludes that Mr. Alexander rightly did not want to present testimony of these experts because their reports also contained information harmful to Ben-Sholom.  Dr. Kleist concluded that Ben-Sholom was dangerous.  Dr. Glenn described that Ben-Sholom shot Mrs. Teague methodically when given the order, that there was no issue of suggestibility, and that Ben-Sholom's personality disorder was predominated by anti-social features.  Dr. Geshuri concluded Ben-Sholom may have given some test responses to make himself look sicker than he was, that he displayed aggressive and sadistic behaviors and an insatiable need for revenge, and that he had ASPD.  The Warden further points out that the numerous records Mr. Alexander obtained from Kings View were not universally favorable to developing a mitigation case.  On the mitigating side, the Kings View records demonstrated that Ben-Sholom attended therapy sessions.  On the aggravating side, however, they showed that Ben-Sholom hated his father so much he

wanted him (the father) dead.  Other anti-social traits also were revealed in the records, including his disobedience, obstinance, and threats towards his mother.

With the combined information from the experts and the Kings View records, the Warden argues that Mr. Alexander was not required to "dig deeper," in contrast to the defense attorneys described in *Douglas* and *Wiggins*, because nothing in the reports or opinions of the retained experts suggested a viable defense of substantial domination, severe mental or emotional disturbance, or mental disease. Rather, Mr. Alexander's strategy of trying to draw the jury's attention away from the facts of the crime and humanize Ben-Sholom while at the same time presenting a "clean" penalty case and keeping the damaging, anti-social evidence away from the jury was reasonable.[78]  Since the circumstances of the crime sentencing factor (Penal Code § 190.3(a)) was the only aggravating factor explained to the jury, the Warden contends it was reasonable for Mr. Alexander not to focus on substantial domination, severe mental or emotional disturbance and mental disease or defect because these sentencing factors were related to Ben-Sholom's mental state at the time of the crime, a subject matter to be avoided.  Further, had Mr. Alexander introduced mental state evidence, the Warden maintains that all the harmful evidence in the reports as well as the potential testimony of Dr. Richmond would have come to light.  The Warden emphasizes that Ben-Sholom's statements about wanting to kill his parents, ripping people's heads off, tearing their beating hearts out of their chests, and getting into fights would have been terribly damaging to the mitigation case.  The Warden also stresses that the crime showed a team operation with no single person in charge and that Mr. Alexander reasonably foresaw the jury would react unfavorably if he advocated the substantial domination theory.  Relying on Mr. Alexander's experience as a defense attorney, the Warden advocates deference to his decision not to present mental defenses because they were not really strong and did not have an empirical backing.

As a preliminary matter, the Warden's argument that because the prosecution focused on the aggravating circumstances of the crime Mr. Alexander should have totally ignored Ben-Sholom's mental

---

[78] Mr. Alexander used the term "clean" both in the context of the type of penalty phase case and the kind of mental health opinion he wanted.  In his lexicon, a "clean" penalty phase case was one in which the defense instructions related only to mitigating factors.  The Warden also refers to this as "a uniformly mitigating penalty case."  A "clean opinion" was based only on psychological testing and excluded opinions based on the clinical interview.

1   state at the time of the crime is meritless.  It is manifest that to counter the effect of the aggravating

2   circumstances of the crime Mr. Alexander was obligated to show something mitigating about Ben-

3   Sholom's mental state during his homicidal actions.  This required that he fulfill his "sacrosanct duty

4   to conduct a full and complete mitigation investigation before making tactical decisions."  *Earp v.*

5   *Ornoski*, 431 F.3d 1158, 1175 (9th Cir. 2005).  As Mr. Alexander testified, he knew from his interaction

6   with Ben-Sholom that there was something wrong with him, mentally, but he "never got at what it was"

7   and he didn't get the full picture before the jury.  What was missing was evidence explaining why Ben-

8   Sholom committed this awful crime and an effort on Mr. Alexander's part to develop that evidence.  As

9   a secondary matter, the Warden's argument that Mr. Alexander withheld mental state evidence because

10  he wanted the jurors' attention diverted from mental mitigators appears to be speculation.  It is

11  unsupported by Mr. Alexander's evidentiary hearing testimony.

12          The Warden also erroneously surmises that if mental state evidence had been introduced, the

13  negative aspects of the reports Mr. Alexander received from Drs. Kleist, Glenn, and Geshuri would have

14  been revealed.  In fact, the only expert Mr. Alexander ever considered presenting was Dr. Rienzi, whose

15  report the Warden concedes was helpful.  Had he called Dr. Rienzi, only Dr. Richmond would have

16  testified in rebuttal.  So long as he did not show the reports of his other retained experts to Dr. Rienzi,

17  Mr. Alexander would not have been compelled to reveal their reports or to have called them as

18  witnesses.  Next, the Warden conflates the damaging evidence from all sources (Drs. Kleist, Geshuri,

19  Richmond as well as portions of the Kings View records) with potential testimony of Dr. Richmond.

20  Of the damaging testimony emphasized by the Warden above (wanting to kill his parents, ripping heads

21  off, tearing out beating hearts, and fighting), only Ben-Sholom's statement that he wanted his father dead

22  (not that he wanted to kill his parents) and that he got into a fights at school were mentioned by Dr.

23  Richmond.[79]  At least with respect to the school fights, it is by no means clear testimony describing these

24  fights would have come before the jury.  Mr. Walton indicated he wouldn't elicit testimony of this nature

25

---

26          [79] This includes the unfounded report that Ben-Sholom put his fingers into another child's eyes
27  and banged the child's head against school playground equipment.  The most negative information was
    relayed in Dr. Kleist's report, including Ben-Sholom's expressions feeling so much rage he could "rip
    the guard's head off," being able to "pull a pumping heart out of a person's chest," going into "graphic
28  detail about means of torture" and hurting animals.

from Dr. Richmond, and independently, it would not have been admissible under sentencing factor (b) (uncharged acts of violent criminal behavior) unless subjected to the beyond a reasonable doubt burden of proof. *People v. Thompson*, 45 Cal. 3d 86, 127 (1988); *People v. Rundle*, 43 Cal. 4th 76, 182 (2008). Most importantly, in taking the negative reports from Drs. Kleist, Geshuri, and Richmond at face value, the Warden completely glosses over the chief complaint against Mr. Alexander: that he didn't take the necessary steps to verify Ben-Sholom's social history, childhood abuse, past counseling, and exaggerated claims of mercenary training or to convey the true facts to the examiners so the resulting opinions would be informed.   Ben-Sholom's reliance on *Douglas* and *Wiggins* is well-founded.   In this case, however, it was not the quantity of sources consulted but the quality of the investigation and the assimilation of that information into a coherent mitigation case.  Because Mr. Alexander hung onto a "strategy" of not providing experts with pertinent background information and the belief that a clinical interview was unnecessary for psychological testing, the expert consultations he arranged were worse than worthless because not only were they based on insufficient information, but on fabricated information Ben-Sholom supplied.  Digging deeper in this case meant that Mr. Alexander needed to ascertain the true facts about Ben-Sholom.

A  trial  lawyer's  strategic  decisions  made  after  thorough  investigation  "are  virtually unchallengeable," but "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 690-91).  By the same token, defense attorneys have a duty to seek out relevant information to a defendant's background and bring this information to the attention of experts, whether or not the experts request it.  *Hovey v. Ayers*, 458 F.3d 892, 925 (9th Cir. 2006) (quoting *Wallace v. Stewart*, 184 F.3d 1112, 1118 (9th Cir. 2002)).  Mr. Alexander never accomplished this.  Even when Mr. Alexander examined Dr. Richmond in the pre-trial deposition 11 months after the crime, when there had been ample opportunity for him to undermine the bases that did or might have informed the doctor's opinions, the opportunity was missed.  The most Mr. Alexander did was to ask whether Dr. Richmond inquired further to ascertain whether the experiences Ben-Sholom related were real or fantasy.  He did not confront Dr. Richmond with the true facts, that Ben-Sholom was relentlessly abused by his father, that giving credence to the incident with the severely injured child on

1   the playground was unfounded, that there was no mercenary training, and that the "mission" to obtain

2   guns from the Teague residence so Ben-Sholom and his companions would be accepted in the Karen

3   Liberation Army (after undergoing training in El Salvador) was complete fantasy.  He did not ask Dr.

4   Richmond what his opinion would be if Ben-Sholom's claims of prowess and accomplishments turned

5   out to be false.  Similarly, Mr. Alexander's failure to fully explore the extent of the psychological torture

6   and unjust militaristic conditioning to which Ben-Sholom was subjected as a youngster undermined even

7   his own impression that Ben-Sholom was easily led and thus eliminated the substantial domination issue

8   from consideration.

9        Mr. Alexander's experience as a homicide defense attorney did not justify his omissions.  First,

10  prior to trying Ben-Sholom's case, Mr. Alexander had never had a capitally charged case proceed to a

11  penalty phase.  Second, Mr. Alexander's opinion about mental defenses being a "hard sell" and that the

12  jury would have been disgusted by the notion that Ben-Sholom subjectively believed he was acting under

13  substantial domination was not borne out by either former Tulare County Public Defender colleague Neil

14  Pereira or *Strickland* expert Phillip Cherney.

15              **b.       Failure to Provide Mental Health Experts with Social History**

16                   **Information Necessary to Secure a Competent Psychological**

17                   **Evaluation.**

18       As noted, to the extent Mr. Alexander considered presenting mental health evidence, he wanted

19  "clean" opinions, that is, based only on psychological testing, specifically excluding clinical interviews.

20  Adherence to this "strategy" led Mr. Alexander to make a conscious decision to provide no documents

21  to most of his experts and only a few document to Dr. Glenn.  At the evidentiary hearing, he testified

22  he didn't want either of his two choices of mental heath experts, Dr. Geshuri and Dr. Rienzi, to have

23  background information that would lead to admission of bad information about Ben-Sholom.  He also

24  testified that a clinical interview was not necessary for a psychologist to interpret test results.[80]  Ben-

25  Sholom points out that Mr. Alexander's idea that any psychologist could offer evidence of empirical test

26  results without a clinical interview was totally wrong.  The error was universally refuted by all the

27

28       [80] He later conceded, however, that with respect to Dr. Rienzi, he didn't know if she could have
     testified at the trial without referring to her clinical interview of Ben-Sholom.

mental health experts who testified at the evidentiary hearing, Dr. Wynbrandt, Dr. Rienzi, Dr. Geshuri, and Dr. Richmond.  Similarly, not giving his experts all relevant information, good and bad, totally defeated the purpose of a mental health examination. Mr. Pereira explained that Mr. Alexander's failure to learn the true facts about Ben-Sholom's background and his withholding information was contrary to the practice at the Tulare County Public Defender's Office at the time of Ben-Sholom's trial.  Mr. Cherney also testified that to be effective, the experts needed to have an understanding of Ben-Sholom's complete background, especially since, in his opinion, the damaging information about Ben-Sholom was mild when compared to the magnitude of the mitigating benefit.  Ben-Sholom argues, for instance, that Mr. Alexander should have (but did not) provide Dr. Rienzi with his Kings View records and information which would have corroborated his reports of severe emotional torment.  Maintaining that Mr. Alexander's omissions rendered his representation constitutionally incompetent, Ben-Sholom relies on *Bean v. Calderon*, 163 F.3d 1073, 1079 (1998), where trial counsel who retained mental health experts but provided them with none of the necessary background information to establish a diagnosis was found to have provided constitutionally inadequate representation at a penalty phase proceeding. Although two experts actually testified at Bean's penalty phase proceeding, neither had sufficient information upon which to base reliable opinions.  *Id.*  Because Mr. Alexander failed to verify Ben-Sholom's background information, he did not (and could not) provide what he didn't know to his experts.  Ben-Sholom labels this as a failure to develop a coherent strategy for presenting mitigation evidence.  This strategy left the jury without "the benefit of expert testimony to explain the ramifications of [Ben-Sholom's] experiences on [his] behavior" in circumstances where "lay people are unable to make a reasoned judgment alone."  *See Caro v. Calderon*, 165 F.2d 1223, 1227 (9th Cir. 1999).

The Warden's opposing view is that Mr. Alexander was an experienced defense attorney and his strategy of a "clean" opinion was therefore informed as well as sound.  In presenting such a "clean" opinion, social history information would have been extraneous and counter-productive, especially given Mr. Alexander's drive not to be making excuses to the jury. The Warden maintains that withholding damaging information from the experts had the added benefit of keeping it from the prosecutor, and ultimately the jury. With respect to Dr. Rienzi, he suggests that it would have been especially damaging if she had received copies of the other expert reports (presumably of Drs. Kleist and Geshuri).  Next, the

1    Warden refutes the notion that there was an actual policy in the Tulare County Public Defender's Office

2    at the time of Ben-Sholom's trial about turning over social history materials to mental health experts.

3    Rather, the Warden characterizes Mr. Pereira's testimony as describing his own *personal* practice.

4    Citing *McDowell v. Calderon*, 107 F.3d 1351, 1361 (9th Cir. 1997), the Warden claims Mr. Alexander

5    performed competently by not opening the door to damaging rebuttal.  He further dismisses the expert

6    opinion of Mr. Cherney as simply another lawyer utilizing a  "retrospectoscope" of 20-20 hindsight in

7    opining that Mr. Alexander's performance was not competent.  The Warden relies on *Odle v. Calderon*,

8    919 F. Supp. 1367, 1386-87 (N.D. 1996), for this proposition.

9         The Warden's view that Mr. Alexander's strategy was sound cannot be sustained.  Even if there

10   was no formal policy in the Tulare County Public Defender's Office to provide mental health experts

11   with social history material, Mr. Pereira's testimony is clear that this was the practice in the office at the

12   time of Ben-Sholom's trial.  Separately, Mr. Alexander's experience as a defense lawyer does not

13   engender confidence in his chosen mitigation case strategy since Ben-Sholom's case was his first penalty

14   phase case.  He was clearly wrong about the view that psychological testimony did not include a clinical

15   interview.

16        Next, contrary to the Warden's suggestion, there is no indication that Dr. Rienzi ever would have

17   been provided the negative reports of Drs. Kleist or Geshuri had she testified at trial.  Rather, the social

18   history material Ben-Sholom has described pertains to his *actual* background.  It could have been

19   obtained from his mother, his grandmother, his teachers, his counselors, and from him.  Eliminating the

20   negative reports of other experts from the equation leaves nothing of the Warden's reliance on

21   *McDowell*, 107 F.3d 1351, for avoiding damaging rebuttal.  Finally, the holding of district court in *Odle*,

22   919 F. Supp. 1367 (where the "retrospectoscope" language was mentioned), which discounted a federal

23   habeas claim that Odle had been incompetent to be tried in state court for capital murder, was reversed

24   on that very point.  *Odle v. Woodford*, 238 F.3d 1085, 1088-89 (9th Cir. 2000).  There is no persuasive

25   argument that Mr. Cherney's expertise as a *Strickland* expert should be discounted.  The problem with

26   Mr. Alexander's approach was that since he provided his experts with no substantiated background

27   information, they could not be sure how much of what Ben-Sholom told them during clinical interviews

28   was embellished, exaggerated, or true.  The resulting opinions were uninformed, incomplete, and

93dp05531.OFollEvidHrg.Ben.wpd                                    92

1    unfounded.  Ben-Sholom's reliance on *Bean*, 163 F.3d 1073, is not directly on point, but it is analogous.

2    The lack of verifiable, true information about Ben-Sholom's background disabled the experts from

3    giving the assistance for which they had been retained.  "[T]he collective failure to develop a penalty

4    phase presentation can only be characterized as a deficiency in trial preparation, not a strategic decision."

5    *Id*. at 1079.

6                    **c.      Failure to Request Expert Opinions about Statutory Mitigating**

7                    **Factors.**

8          Ben-Sholom's complaint that Mr. Alexander failed to obtain opinions from his consulting

9    experts about statutory mitigating factors complements his primary argument that Mr. Alexander's

10   investigation and preparation for the penalty phase trial was constitutionally deficient.  He claims Mr.

11   Alexander's failure to obtain usable opinions from his experts resulted in inadequate jury selection, both

12   in the juror questionnaire and voir dire, desultory, incoherent opening and closing statements at both

13   phases of the trial, and a penalty phase presentation that included no mental state evidence al all.

14         The Warden counters that Mr. Alexander did in fact solicit expert assistance to get an idea of

15   Ben-Sholom's state of mind at the time of the crime and to explore possible mental defenses.  Since so

16   much of the information contained in the reports was damaging Mr. Alexander's decision not to use the

17   experts was reasonable.

18         Ben-Sholom's complaint that Mr. Alexander failed to request specific opinions from his experts

19   about statutory mitigating factors adds very little to the analysis of his representational competence.

20   Since Mr. Alexander settled on a strategy not to provide his experts background information or to utilize

21   the statutory mitigating factors under § 190.3 subdivision (d) (extreme mental or emotional disturbance),

22   subdivision (g) (substantial domination), or subdivision (h) (impairment due to mental disease or defect),

23   it is not surprising that he didn't seek opinions on these factors.  The emphasis of Ben-Sholom's

24   argument about Mr. Alexander's failure to obtain expert opinions follows Mr. Cherney's testimony that

25   no overarching "theme" or plan existed  for explaining how and why an 18 year old boy would have

26   committed this crime.  The Court agrees that Mr. Alexander's trial preparation and his ill-conceived

27   strategy for limiting his case to Ben-Sholom's youth, the absence of uncharged criminal activity, and the

28

1   absence of prior felonies was ineffective given the wealth of mitigating evidence about Ben-Sholom's

2   compromised mental state, depression, and susceptibility to fantasy.

3       **d.    Failure to Present Non-Expert Testimony Supporting Possible**

4       **Statutory Mitigating Factors.**

5       Another consequence of the strategy which Mr. Alexander chose was that he didn't elicit

6   evidence from Ben-Sholom's mother in a sufficiently detailed manner and he didn't call other witnesses

7   who he claims were available to humanize Ben-Sholom, in particular, Anthony Casillas, Rabbi Barbara

8   Goldman-Wartell, and Debbie Marrujo Sloss.  Citing *Karis v. Calderon*, 283 F.3d 1117, 1135 (9th Cir.

9   2002), Ben-Sholom claims Mr. Alexander didn't even present humanizing mitigation evidence that was

10  available, and that as a result, the penalty proceedings were extremely truncated.

11      As noted in the summary of the penalty phase testimony, Ms. Marshall testified about her

12  unhappy marriage to Ben-Sholom's father as well as the physical abuse to which both she and Ben-

13  Sholom were subjected.  She was aware of Ben-Sholom's depression following his discharge from the

14  Army and heard him talk about wanting to become a mercenary, possibly to rescue MIAs, but didn't pay

15  much attention to it because she didn't find it realistic.  *See* Part IV.3.f.(1), *supra*.  The Court notes that

16  Ben-Sholom's grandmother also give a vivid account of the severe abuse Mr. Marshall inflicted on Ben-

17  Sholom.  *See* Part IV.3.f.(2), *supra*.  The Court considers testimony from Mr. Casillas in a different light.

18  He was not a lay witness, but a treating mental health professional with relevant information concerning

19  Ben-Sholom's troubled background.  The offer of what Rabbi Goldman-Wartell and Ms. Sloss would

20  have testified about is provided in their declarations to the EHT and discussed in the course of Mr.

21  Park's rebuttal testimony, *See* Part IV.A.6.b., *supra*.   Both offers describe sincerity, genuineness, and

22  lack of future dangerousness that would have been relevant to penalty proceedings.

23      The Warden points to the fact that Mr. Alexander called five lay witnesses, other than Ben-

24  Sholom himself, including Ben-Sholom's mother, Phyllis Marshall, his grandmother, Faye Muldworf,

25  a religious leader from the Jehovah's Witnesses, Isaac Hull, the mother of one of Ben-Sholom's friends,

26  Judy Mayora, and his Sea Scout leader, Henry Bethany.  The Warden defends Mr. Alexander's decision

27  not to expand Ms. Marshall's opportunity to testify since her credibility was questionable.  He asserts

28  that if Mr. Casillas had been called to testify, damaging rebuttal based on the Kings View records would

have been elicited on cross examination, including reports of Ben-Sholom's obstinacy and disobedience to this mother, his physical violence toward his mother, his threats to kill her and his father, and his diagnosis of ASPD.  In any event, the Warden notes that testimony elicited from Mr. Casillas at the evidentiary hearing revealed his ignorance about Ben-Sholom's abuse.  As to Rabbi Goldman-Wartell and Ms. Sloss, the Warden argues there is no indication anyone told Mr. Alexander about these witnesses.  In response to this point, Ben-Sholom replies, this "is precisely why investigation is necessary," and that in any event Mr. Alexander must have obtained orders permitting Rabbi Goldman-Wartell to visit Ben-Sholom at the County jail.

The Court already has determined Mr. Alexander was ineffective for not presenting favorable professional testimony, like that of Mr. Casillas, even though such testimony could have triggered reference to the negative aspects of Ben-Sholom's character.  Ben-Sholom does not contend that all of his mental processes and thoughts were mitigating.  In particular, his hatred and death wishes for his father were alarming to Mr. Casillas.  The problem is that Mr. Alexander never put the negative aspects of Ben-Sholom's character into the context of his impaired psychological state at the time of the crime. In any event, it is unlikely the content in the Kings View records to which the Warden refers would have been as damaging as the Warden maintains.  In the first place, while their were anti-social behaviors described by Ben-Sholom's mother when she met with Mr. Casillas, Mr. Casillas *never* concluded that Ben-Sholom had ASPD.  The Warden's contention to the contrary is a misstatement.  Rather, the records show that even the day after Ms. Marshall consulted Mr. Casillas about Ben-Sholom's obstinacy and her concern that he might become physically violent with her, Mr. Casillas described Ben-Sholom's mental state sympathetically, reporting that Ben-Sholom was "in a lot of pain and agony," in need of individual therapy.  In a later admission to Kings View, by another therapist, Ms. Marshall sought treatment for Ben-Sholom because he wanted his father dead and lashed out at her, threatening her with a kitchen knife because he didn't want her to stop him from killing his father.  But even this therapist was impressed not with the notion that Ben-Sholom might actually harm either of his parents, but rather that Ben-Sholom was an angry adolescent (15 years old at the time) who was *afraid* of his father.  There was never any substantiation that Ben-Sholom was physically violent toward his mother, only that his mother was concerned about the potential for physical violence.  The Court agrees that Mr. Alexander's strategy,

1  which kept him from consulting with and benefiting from Mr. Casillas's store of information, was ill-

2  advised.

3         In contrast, while the penalty phase testimony of Phyllis Marshall and her mother, Faye

4  Muldworf about the abuse perpetrated on Ben-Sholom by Mr. Marshall was perfectly appropriate, and

5  clearly mitigating, the problem was not the absence of additional sympathetic lay testimony, but the

6  testimony of a mental health expert to connect the abuse to Ben-Sholom's psychological condition and

7  his participation in the crime which he perceived as a "mission."  Unquestionably, the retrospectively

8  proffered testimony of Rabbi Goldman-Wartell and Ms. Sloss would have been humanizing.  Mr.

9  Alexander's representational ineffectiveness, however, did not hinge on his failure to find and present

10  more lay witnesses.  Excluding Mr. Casillas from the class of lay witnesses, the Court declines to fault

11  Mr. Alexander's performance because he failed to develop and present additional lay witness testimony.

12                  e.      **Failure to Present Expert Testimony to Explain Mitigating Factors**

13                          **and Concepts to the Jury.**

14         Ben-Sholom argues that by not presenting expert mental health testimony, Mr. Alexander's

15  efforts to humanize Ben-Sholom were foiled when the data and witnesses that would have helped the

16  jury understand him were withheld.  Citing *Beardslee v. Woodford*, 358 F.3d 560, 583 (9th Cir. 2004),

17  Ben-Sholom attributes this error to Mr. Alexander's failure "to understand basic psychiatric diagnoses"

18  and the concomitant failure "to make simple tactical decisions about effective defenses."  Because of

19  Mr. Alexander's omissions in developing a mitigation case, he harbored an "irrational" fear of Dr.

20  Richmond's potential rebuttal testimony.  His fear was irrational, Ben-Sholom maintains, because much

21  of the content of Dr. Richmond's impressions from his initial January 28, 1985 evaluation of Ben-

22  Sholom, his January 1, 2003 report for the Warden (Exhibit F to the EHT), and his evidentiary hearing

23  testimony, was favorable to a mitigation case.  Ben-Sholom points out that Dr. Geshuri's evidentiary

24  testimony also provided substantial support for a mitigation case.

25         The Warden counters Mr. Alexander did understand the pitfalls of introducing evidence that

26  would demonstrate Ben-Sholom's diagnosis of ASPD, which he argues was reached by Drs. Kleist,

27  Glenn, and Geshuri.  He claims Ben-Sholom's argument about psychiatric diagnoses misses the point

28  in any event because Mr. Alexander's strategy was to present "a uniformly mitigating penalty phase"

case in which he would only present mitigating factors to the jury, that is, the absence of uncharged violent criminal activity under § 190.3 factor (b), the absence of prior felony convictions under factor (c), Ben-Sholom youthful age under factor (i), and other sympathetic, humanizing evidence under the catchall factor (k).  The Warden discounts the fact that Ben-Sholom gleaned some positives from the testimony of Drs. Richmond and Geshuri, because overall, the reports of these doctors "remain more harmful than helpful to Ben-Sholom."  Included in Dr. Richmond's report was a description of Ben-Sholom's obsession with warfare, killing, and weapons, his cruelty to animals, his tantrums, lying, obstinacy, and disobedience, his threats to kill both parents while brandishing a knife at his mother, the burglary of his mother's home, his fighting, his equal role in planning and participating in the current offense, and denial of any coercion in his participation.  The Warden points out that Dr. Richmond's evidentiary testimony did not change the impressions in the report.  He felt Ben-Sholom's crying while in counseling was not inconsistent with ASPD, but was manipulative.  Nor did he find Ben-Sholom's friendship with Judy Mayora or his having pen-pals from prison inconsistent with ASPD.  Finally, Dr. Richmond totally discounted the notion that the crime was caused by PTSD (even though he conceded Ben-Sholom may have suffered from PTSD) and found Ben-Sholom's expressions of remorse to be insincere.

The additional element to Ben-Sholom's ineffective assistance of counsel claim introduced by the present argument pertains to Mr. Alexander's lack of understanding of the opinions and conclusions of Dr. Richmond.  It is not clear from Mr. Alexander's testimony whether his fear of Dr. Richmond's potential rebuttal shaped his ultimate strategy of omitting significant, but disturbing social history background, or if his decision to adhere to a "uniformly mitigating" or "clean" penalty phase led him to discount or ignore the mental state mitigation evidence, including from Dr. Richmond.  What is clear is that Mr. Alexander undertook no meaningful effort to correct exaggerated descriptions of Ben-Sholom's self-assessment, including his infliction of a head injury to another child at an elementary school playground and his training by paramilitary groups about jungle fighting and "silent kills."  Nor did Mr. Alexander attempt to develop the implausibility of Ben-Sholom's perceived "mission" of obtaining weapons from the Teague residence so he and his companions could join the Karen Liberation Army, with an interim assurance that they would be accepted in El Salvador to fight the Sandinistas.

1    The mitigating evidence apparent from Dr. Richmond's initial January 28, 1985 evaluation of Ben-

2    Sholom included the report of severe and sadistic abuse inflicted by his father, sadness, regret, and

3    remorse for killing Mrs. Teague (not just for foiling his plans to go to Burma), reports of past incidents

4    where he hurt himself as a child, recent accounts of intentionally overdosing on Inderal, jumping off the

5    Sequoia Mall, and playing "chicken" with diesel trucks on the highway,   the fact that he had

6    hypertension severe enough to warrant a prescription of Inderal, his depression 95% of the time, and his

7    reported feeling of detachment from reality.   All of this information, together with the very angry and

8    deeply troubled portrait Ben-Sholom presented to Dr. Kleist gave Mr. Alexander ample notice that Ben-

9    Sholom's mental state included elements of rage, acting out, and retreat to fantasy world.  Ben-Sholom's

10   character did not lend itself to "a uniformly mitigating" or "clean" penalty phase because there was

11   clearly anti-social behavior in his past.   But, as Mr. Cherney testified, the cause for that behavior,

12   including the merciless abuse inflicted by his father, the sense of abandonment by his mother, the

13   depression over losing his life-long dream of being in the Army, and his lack of identity, were mitigating

14   and could have been developed to explain why and how Ben-Sholom became involved in the unrealistic,

15   military mission that tragically ended Mrs. Teague's life.   Mr. Alexander's failure to expose the

16   foundation for Dr. Richmond's potential testimony was constitutionally ineffective.

17         Moreover, during the pre-penalty phase discussions (after the guilt verdict was rendered), Mr.

18   Alexander did meet with the trial judge and the prosecutor Mr. Walton to discuss limitations on potential

19   rebuttal testimony of Dr. Richmond.   He specifically requested that Dr. Richmond be precluded from

20   testifying about Ben-Sholom's account of injuring the child at the playground, about Ben-Sholom's

21   burglary of his mother's house, information about Ben-Sholom's drug use, anything about Ben-Sholom's

22   paramilitary training, and statements that he wanted his father dead.  *See* Part IV.A.3.d., *supra*.   In open

23   court, Mr. Walton agreed that in the event he called Dr. Richmond to testify, he would avoid these areas.

24   Mr. Walton further represented that if he did call Dr. Richmond to testify, he would "indicate" to Mr.

25   Alexander the areas of his proposed testimony.[81]   This commitment on the record undermines Mr.

26

27         [81] Mr. Cherney criticized Mr. Alexander for not moving in limine before jury selection to limit
     Dr. Richmond's anticipated testimony.  Mr. Alexander's failure to have done so is not significant given
28   Mr. Walton's representation in open court.

1   Alexander's testimony during the evidentiary hearing that he didn't know what Dr. Richmond would

2   say if called as a witness and that in his experience Mr. Walton was prone to change positions.  Mr.

3   Cherney's opinion that Mr. Alexander's fear of Dr. Richmond's potential rebuttal was irrational is well-

4   taken.

5       Mr. Alexander's reliance on factor (b), the absence of uncharged violent criminal activity and

6   factor (c), the absence of prior felony convictions does not redeem his representational competence.

7   First, there was no evidentiary basis supporting either of these factors.  Mr. Alexander could have, but

8   did not, ask for a stipulation that Ben-Sholom committed no prior acts of violence and had no prior

9   convictions, as he did to explain the medications Ben-Sholom prescribed for him at the Tulare County

10  Jail.  Second, and most significantly, sentencing factor (b) was not appropriate for Ben-Sholom, as he

11  did have prior threats of violence and anti-social behaviors in his background.  Because of the cruel,

12  tyrannical paternal abuse Ben-Sholom endured, he hated his father and hoped for release from the

13  sadistic treatment by death, either his father's or his own.  The portrait of Ben-Sholom Mr. Alexander

14  tried to present to the jury did not capture Ben-Sholom's character haunted by his tumultuous past.

15          f.      **Failure to Request Jury Instructions on Statutory Mitigating**

16                  **Factors.**

17      Relying on *United States v. Span*, 75 F.3d 1383 (9th Cir. 1996), Ben-Sholom argues that Mr.

18  Alexander was constitutionally ineffective for his failure to request proper jury instructions, specifically

19  under factors (d) (extreme mental or emotional disturbance), (g) (substantial domination), and (h)

20  (impairment due to mental disease or defect).  He claims that Mr. Alexander's failure to present lay and

21  expert testimony about Ben-Sholom's background and psychology was exacerbated by this failure to

22  request instructions that would have allowed the jury to apply concepts of mitigation to the evidence

23  supporting it.

24      The Warden argues that Mr. Alexander's failure to request instructions on the factor (d), (g), and

25  (h) sentencing circumstances cannot be considered incompetent representation because his choice of

26  instructions was consistent with his penalty phase strategy of diverting the jurors' attention away from

27  Ben-Sholom's state of mind during and the circumstances of the crime.  He mentions that Mr.

28  Alexander's strategy in this regard was informed by his concern the jurors would have laughed at or been

disgusted by any attempts to argue Ben-Sholom was substantially dominated by others and that the jurors might have viewed the substantial domination theory as aggravating because Ben-Sholom entered the Teague residence first and was the actual shooter. Finally, the Warden argues all of the mitigation which Mr. Alexander did present was considered under the catchall factor (k) instruction.

In *Span*, the court reversed the defendants' convictions for assaulting a federal officer because their attorney failed to offer proper self-defense instructions due to inadvertence and his misunderstanding of the law. 75 F.3d at 1385, 1389-90. In contrast, here, as the Warden points out, Mr. Alexander purposefully omitted expert testimony to substantiate Ben-Sholom's vulnerable mental state and he purposefully chose only jury instructions which were consistent with his vision of "a uniformly mitigating penalty phase." As discussed above, however, Mr. Alexander's strategy of not conducting a complete investigation into mental state mitigation and concomitantly withholding relevant expert testimony was not reasonable. *See* Part IV.B.1.a., *supra*. Despite the fact that Mr. Alexander had in mind, from the onset, that there was something wrong with Ben-Sholom mentally, he gave up trying to develop mental mitigating evidence because there were some anti-social behaviors mixed in with the sympathetic evidence. The problem with Mr. Alexander's representation was not in failing to request the factor (d), (g), and (h) instructions. None of them were well supported by the superficial evidence he presented. The problem was in not developing a mitigation case. Mr. Alexander's fear the jurors would have laughed at or been disgusted by the notion of substantial domination, in particular, is not compelling given his lack of experience in trying penalty phase cases. Mr. Pereira's testimony and Mr. Cherney's testimony both confirm this. "An uninformed strategy is not a reasonable strategy." *Correll v. Ryan*, ___ F.3d ___, ___ , 2008 WL 2039074, *20 (May 14, 2008); *see also, Reynoso v. Giurbino*, 462 F.3d 1108, 1112 (9th Cir. 2006) (a strategic decision predicated on inadequate investigation is not a reasonable strategy); *Silva*, 279 F.3d at 246 (counsel's performance "is not immunized from Sixth Amendment challenges simply by attaching to it the label of 'trial strategy,' . . . certain defense strategies may be so ill chosen that they may render counsel's overall representation constitutionally defective"); *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994) (defense counsel's tactical decisions are only appropriate where counsel has conducted "a reasonable investigation enabling him to make informed decisions about how best to represent his client").

**g.     Failure to Present a Cogent Penalty Phase Summation.**

Ben-Sholom maintains that Mr. Alexander's penalty summation was constitutionally deficient because it was too short and did not advocate forcefully for sympathy.  Yet, the standard for death penalty cases was in place even before Ben-Sholom's 1986 trial.  As pointed out by Mr. Cherney, in the Summer/ Fall of 1985, the *California Defender* published an article entitled "Building a Penalty Phase Argument," which among other things provided summation examples for arguing the concepts of pity, sympathy, and mercy.  *See* Exhibit 10 to EHT at page 3.  Mr. Alexander's summation did not conform to this norm and did nothing to inspire the jury to vote for a life verdict.  Mr. Cherney further criticized Mr. Alexander for not raising the issue of Ben-Sholom's remorse for the crime, contrasting the trial judge's finding on the (adverse) judgment modification ruling that Ben-Sholom's remorse was a factor in mitigation.  Separately Mr. Cherney criticized Mr. Alexander for not arguing Ben-Sholom's Inderal use and hypertension were mitigating factors during his summation.[82]  Echoing the opinion of Mr. Cherney, Ben-Sholom argues Mr. Alexander's summation was "pathetic."

The Warden disputes the value of Mr. Cherney's assessment of Mr. Alexander's summation, contending that *Strickland* requires much more than picking out ways, decades later, that counsel might have done a better job.  He then cites to *Pizzuto v. Arave*, 280 F.3d 949, 968 (9th Cir. 2002), for the proposition that brevity of a closing argument does not support a finding of ineffective counsel.  The Warden points out that although Mr. Alexander began his argument by mentioning sympathy, knowing his jurors he explained he wasn't merely asking for sympathy, but urged them to follow the law as well. The Warden contends this approach was consistent with Mr. Alexander's strategy of presenting a "uniformly mitigating" penalty phase.

He characterizes Ben-Sholom's argument that the summation should have been longer and more forceful, as non-cognizable under *Strickland*.  Citing to *Strickland*, he emphasizes the "highly deferential" review to be accorded to trial counsel's decisions and exhorts this Court to "indulge a strong

---

[82] Mr. Alexander mentioned that Ben-Sholom had hypertension and took Inderal in his penalty opening, and Ms. Marshall reiterated this information during her penalty phase testimony, but Mr. Alexander did not mention it on summation.

1  presumption" that Mr. Alexander's conduct fell "within the wide range of reasonable professional

2  assistance."  *See Strickland*, 466 U.S. at 689.

3          The Court's review of the opinions provided by the mental health experts, both pre-trial and in

4  these federal habeas proceedings leads to the inevitable conclusion that Mr. Alexander did have, as Mr.

5  Cherney testified, a strong case in mitigation based on Ben-Sholom's tortured youth and resulting

6  psychological problems, including PTSD, borderline personality disorder, identity fragmentation, major

7  depression, and a good measure of unresolved anger, plus hypertension and remorse.  In addition, the

8  Court accepts Mr. Cherney's opinion as a *Strickland* expert, knowledgeable about the standard of

9  professional performance at the time Mr. Alexander tried Ben-Sholom's case.  According to Mr.

10  Cherney, the entire trial presentation was confused and at cross purposes.  He opined that since Mr.

11  Alexander viewed a penalty phase a certainty, the guilt phase opening statement should have raised

12  penalty phase mitigation concepts, including Ben-Sholom's submission to following orders.  While Mr.

13  Alexander did explain the idea that Ben-Sholom and his companions perceived the entire crime as a

14  military mission with the ultimate purpose of going to Burma, he didn't argue that the mission was

15  fantasy, but instead told the jurors they would have to determine for themselves whether the military

16  purpose of the crime was reality or fantasy.  The importance of Ben-Sholom's unrealistic view of the

17  military mission was further negated during the guilt phase summation, when Mr. Alexander told the

18  jurors there was *no* evidence Ben-Sholom was so entrenched in a military mission so as not to know

19  what he was doing.  Mr. Cherney viewed the penalty phase opening statement inadequate for the lack

20  of explanation.  First, Mr. Alexander referenced Ben-Sholom's hypertension and Inderal use, but failed

21  to explain how those facts were mitigating and failed to mention these subjects again on summation.

22  He failed to mention that Ben-Sholom was dressed up in military clothing as part of the fantasy aspect

23  of the military mission (during the crime).  He also failed to mention Ben-Sholom's mental or emotional

24  state at the time of the crime, although he called Ben-Sholom's mother and grandmother to show that

25  Ben-Sholom had been subjected to abuse.[83]  Mr. Cherney further opined that the testimony of Sea Scout

26  _____

27      [83] Mr. Cherney opined that Judy Mayora was called to show that Ben-Sholom was just a regular
kid.  The Court does not read Ms. Mayora's testimony that simplistically, although clearly Mr.
28  Alexander could have expanded on her testimony that she believed, in hindsight, Ben-Sholom had been
abused.

leader Henry Bethany did nothing to explain the crime.  Eliciting Ben-Sholom's testimony was equally fruitless.  While Ben-Sholom discussed his ankle injury, he didn't mention that he sustained this injury on one of the occasions he ran away from home, and he didn't mention that his medical discharge from the Army, resulting from this ankle injury, triggered a major depression.  Mr. Cherney found that Ben-Sholom's testimony about reading science fiction and horror books was very damaging to the mitigation case, as these types of books can be associated with future dangerousness.  On the other hand, Ben-Sholom's testimony raised the issue of his remorse and substantial domination (following the order to kill Mrs. Teague "explicitly"), but Mr. Alexander mentioned neither subject during his statements to the jury.  The summation, as Ben-Sholom argues, was truncated and devoid of the weighty mitigation issues which could have been developed.  Although Mr. Alexander's choice of arguments presented to the jury, like his choice of instructions, was informed by his strategy of a "uniformly mitigating" or "clean" penalty phase, the omissions of his penalty phase development and presentation cannot be upheld as competent, even under the Court's deferential assessment required under *Strickland*.  The Court finds that Mr. Alexander's penalty phase performance was constitutionally ineffective.

## 2.    Prejudice.

Quoting *Wiggins*, 539 U.S. 510, Ben-Sholom argues that the mitigating evidence Mr. Alexander failed to discover and present was powerful since he (Ben-Sholom) had "the kind of troubled history" the Supreme Court has "declared relevant to assessing a defendant's moral culpability.  *Id*. at 534, 535.  Relying on *Douglas*, 315 F.3d at 1090, he argues the applicable test for penalty phase relief in the Ninth Circuit is whether the additional evidence, when considered in conjunction with the evidence presented, "could have invoked sympathy from at least one member of the [penalty phase] jury."  Ben-Sholom draws an analogy between his case and *Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir. 2001), because in that case, as here, counsel failed to develop and present available evidence about the defendant's "troubled background and his emotional [in]stability and what led to the development of the person who committed the crime. . . .  The jury was not given the opportunity to consider the disadvantaged background and the emotional and mental problems of the defendant in order to provide the individualized sentence required by the Constitution."  *Id*. at 878.  He points to a wealth of mitigating evidence readily available exposing his abusive background and compromised mental condition which

1   Mr. Alexander could have presented at the penalty phase.  He maintains the evidence was directly

2   relevant to designated mitigating factors under § 190.3, including factor (d), extreme mental or

3   emotional disturbance, factor (g), substantial domination of another, and factor (h), mental disease or

4   defect.  Even if the jury determined the evidence was not strong enough to meet the specific criteria of

5   these specific factors, the evidence should have been presented under the catchall factor (k).

6       The testimony of Mr. Casillas together with the Kings View records demonstrated that Ben-

7   Sholom benefitted from counseling and repeatedly sought help at Kings View.  Ms. Marshall explained

8   that Ben-Sholom was abused as toddler during the critically important time of toilet training, he was

9   subject to his father's sadistic abuse from the time he seven and a half to 17 years old, and his father

10  manually choked him when he was 17.  He changed schools 13 times between elementary and high

11  school.[84]  He had a history of nightmares, depression, and preoccupation with suicide.  He suffered from

12  extreme emotional and mental disturbances at the time of the crime, including PTSD, borderline

13  personality disorder, identity fragmentation, and major depression. He developed hypertension at 18

14  years old and received a prescription of Inderal, which can exacerbate depression. He was humiliated

15  and demeaned by his anti-Semitic father because he was Jewish.[85]

16      The Warden minimizes the mitigating nature of this mental state evidence because it presents

17  only one side of the coin and would have opened the door to damaging evidence contained in the reports

18  of Drs. Kleist, Glenn, and Geshuri, as well as the Kings View records and Dr. Richmond' potential

19  rebuttal testimony.  Again, the Warden points to Ben-Sholom's ASPD, his obsessions with military life,

20  violence, weapons and killing, his threats to kill both his parents while armed with a knife, his violence

21  towards animals and other people, his obstinacy and disrespect for this mother, his aggressive and

22  sadistic behaviors, his suspected malingering, and his manipulation of the experts.  Moreover if evidence

23

24      [84] Dr. Wynbrandt's case-in-chief testimony reported there were 11 school changes.  The fact of
25  13 school changes was acknowledged by the Warden's experts, Drs. Geshuri and Richmond.  Dr.
    Wynbrandt also referred to 13 school changes in his rebuttal testimony.

26      [85] Ben-Sholom also points to the additional lay testimony from Rabbit Barbara Goldman-Wartell
27  and Debbie Marrujo Sloss as having had additional capacity to humanize him.  In light of the Court's
    decision not to fault Mr. Alexander's representational performance because he failed to develop and
28  present lay additional lay witness testimony, the Court will not analyze Ben-Sholom's assertion of
    prejudice relative to these two witnesses.

1   of Ben-Sholom's social history had been presented, the factor (b) mitigation sentencing factor (absence

2   of uncharged violent criminal conduct) would have been nullified.

3        The Warden further claims that the mental expert evidence presented by Ben-Sholom was neither

4   persuasive nor credible.  Dr. Rienzi was merely a novice at the time of Ben-Sholom's trial, having been

5   certified within the preceding year.  She claimed that she suspected PTSD at the time of her initial

6   interview in November of 1985, with 60% certainty, and likewise that there was a 60% probability Ben-

7   Sholom was acting under the substantial domination of others when he committed the crime.  Following

8   her review of records supplied by Ben-Sholom's counsel in 1997, she was 90% confident of the PTSD

9   diagnosis and more than 60% certain he acted under the substantial domination of others.  The Warden

10  discounts her statement about PTSD because development of this theory was in its infancy in 1985,

11  limited to defendants who had experienced combat trauma.  He argues the difference in her impression

12  about substantial domination between 1985 and 1997 is negligible.

13       In the Warden's estimation, Dr. Wynbrandt's testimony would have been equally unhelpful at

14  the time of Ben-Sholom's trial.  First, as of 1985, he had never before testified in a criminal case.

15  Second, his examination of Ben-Sholom in 1995 was too remote for him to have gained an accurate

16  insight into Ben-Sholom's mental state at the time he shot Mrs. Teague.  Third, when he evaluated Ben-

17  Sholom, he omitted consideration of the circumstances surrounding the crime.  In contrast, Drs. Kleist,

18  Geshuri, and Richmond, who examined Ben-Sholom relatively contemporaneous with the crime, found

19  that Ben-Sholom had ASPD.[86]  Referring to the opinions of Drs. Richmond, Geshuri, and Kleist, the

20  Warden points out that all the doctors except for Rienzi and Wynbrandt noted that the murder of Mrs.

21  Teague was an operation equally planned and executed by Ben-Sholom as well as his co-perpetrators.[87]

22  The Warden then excerpts evidentiary hearing testimony from Drs. Wynbrandt and Richmond and

23  concludes that Dr. Richmond's testimony was straight forward and supported by proven facts while Dr.

24  Wynbrandt's was not the type which would have won confidence with Ben-Sholom jury.  The Warden

25

26       [86] The Warden also included Dr. Glenn opinion in this group.  The Warden is mistaken.  Dr. Glenn did not report or opine that Ben-Sholom had ASPD.

27       [87] The Warden includes Dr. Glenn in this group, but, Dr. Glenn did not render such an opinion. To substantiate the claim that Ben-Sholom was not substantially dominated by others, the Warden cites the opinions of Drs. Richmond, Geshuri, and Kleist, but not Glenn.

28

states that Dr. Wynbrandt's testimony was probably exactly what Mr. Alexander had in mind when he expressed concern about engendering derision or disgust among the jurors. In the Warden's view, everything Dr. Wynbrandt said was designed to show that Ben-Sholom was not fully responsible for his actions. The Warden's final argument is that the omission of mental state evidence was not prejudicial because presenting this type of evidence would have focused the jury's attention on the circumstances of the crime, the only aggravating factor in the penalty case. This argument reiterates the Warden's previous point about Mr. Alexander's professional competence, that deflecting the jury's focus from the circumstances of the crime was a reasonable strategy.

The Court has reviewed the testimony of all the experts and does not agree that Dr. Rienzi's testimony and Dr. Wynbrandt's testimony were or would have been unpersuasive. Even though Dr. Rienzi had only been recently certified as a psychologist at the time she could have testified at Ben-Sholom's trial, she was still well-educated and qualified. Her contemporaneous report as well as her testimony were sympathetic and she presented herself knowledgeable about relevant mental health issues. Although Dr. Wynbrandt may not have been available to testify at Ben-Sholom's trial, Ben-Sholom's point on federal habeas is that Mr. Alexander could have and should have retained a similarly qualified expert. As to the contrasting styles of testimony between Dr. Wynbrandt and Dr. Richmond, the Court does not share the Warden's scorn for Dr. Wynbrandt. Dr. Richmond was asked whether one of Ben-Sholom's statements caused him concern that he (Ben-Sholom) was dissociating. Dr. Richmond answered, clearly, no, because what was really happening was that Ben-Sholom's "training took over" during the crime. When Dr. Wynbrandt responded to a question about his impression that Ben-Sholom had PTSD in addition to depression, he referred to the DSM-III. From Dr. Wynbrandt's explanation of DSM diagnoses, the Warden concluded he was "not the type of witness which would win confidence with [Ben-Sholom's] jury." No explanation for this conclusion is offered. The Court finds both Dr. Richmond and Dr. Wynbrandt to be knowledgeable, qualified, well-spoken experts, although, as noted below, Dr. Richmond's conclusions were in part based on inaccurate foundations.

The Court agrees that Mr. Casillas's testimony was mitigating, given the circumstances of the crime and Ben-Sholom's abusive background. As a young teenager, Ben-Sholom tried to hide behind his extreme anger at his father, aloofness for others, sun glasses, a cowboy outfit, and his middle name

because his existence as Ryan Marshall was so painful.[88]  Yet young Ben-Sholom responded well to therapy, revealing his hurt and consistent efforts to escape an untenable home life (by running away) and seeking help from therapists at Kings View.  Although Ben-Sholom's intense hatred of his father was alarming,  when he expressed these sentiments in therapy, Mr. Casillas did not know about the severe paternal physical abuse.  Even without that knowledge, and given a report by Ms. Marshall of her fear Ben-Sholom might become violent with her, Mr. Casillas viewed Ben-Sholom sympathetically in his reports.  Mr. Casillas impression that Ben-Sholom's subjection to physical abuse was concealed from him additionally demonstrates the stress Ben-Sholom must have endured – to seek therapy but concealing a major factor in the need for therapy.  The Warden's consistent reliance on the Kings View record entry that Ms. Marshall reported Ben-Sholom threatened her with a kitchen knife after revealing that he wanted to kill his father and would kill her too if she got in the way is not availing.  First, the therapist, an intern at Kings View, who took that report was not called as a witness.  Second, the intern's report betrayed no concern that Ben-Sholom was doing anything other than venting (although the subject matter of his venting was serious) and that, in fact, Ben-Sholom was afraid of his father.  He also told this intern that he had considered suicide to gain release from the tyranny of his father.

Next, while Ms. Marshall's testimony about the traumatic four months during which she and Ben-Sholom lived with Mr. Marshall in Louisiana when he (Ben-Sholom) was 17 to 21 months old aids in giving a complete picture of Ben-Sholom's formative years, it does not stand out as independently and overwhelmingly mitigating to the crime.  In reaching this conclusion, the Court has considered the expert testimony of Drs. Rienzi, Geshuri, Wynbrandt, and Richmond that the toilet training period of a person's life, which roughly corresponds with the developmental period of separation and individuation, is a critical period.  The Court further accepts the conclusion of Dr. Rienzi that because of the abuse Ben-Sholom suffered during his toddlerhood, he did not develop a sense of self, the concession by Dr. Geshuri that punishment during the period of toilet training could create damage for

---

[88] His later, post-conviction decision to legally change his name from Ryan Michael Marshall to Chay'im Ben-Sholom further suggests his desire to be someone other than himself.

1   life if not corrected,[89] the impression of Dr. Wynbrandt that Mr. Marshall's abuse of his son during this

2   period produced borderline personality disorder, and the admission by Dr. Richmond that Mr. Marshall's

3   taking a bottle out of Ben-Sholom's mouth during this period could have contributed to Ben-Sholom's

4   insecurity and distrust.

5        The brutal whims Mr. Marshall inflicted on Ben-Sholom when he was seven and a half until he

6   was 17, however, is quite compelling. While Mr. Alexander did elicit some of this information from Ms.

7   Marshall and Mrs. Muldworf at the penalty phase trial, the depth and breadth of the evidence paled in

8   comparison with the understanding the mental health experts added.  As Mr. Cherney testified, the

9   penalty case Mr. Alexander presented never explained the context of the abuse Ms. Marshall described.

10  Another aspect of Ben-Sholom that was poorly developed was his hypertension and Inderal prescription.

11  Although there was a stipulation that Ben-Sholom received Inderal during his detention in the Tulare

12  County Jail and Ms. Marshall testified that he had a prescription for Inderal since July 1984 for his high

13  blood pressure, there was no testimony about how unusual it was for an 18 year boy to suffer from such

14  severe hypertension so as to require anti-hypertensive medication.  Nor did Mr. Alexander argue Ben-

15  Sholom's hypertension was mitigating under the catchall factor (k).  Since Ben-Sholom's hypertension

16  was glossed over and no experts testified, there was certainly no evidence presented that a known side-

17  effect of Inderal was depression in some patients.  Besides his abuse and hypertension, there were

18  several indications Ben-Sholom contemplated suicide from his elementary school days up to four months

19  preceding the crime.  He reported that he harbored suicidal thoughts as young as nine or ten and actually

20  cut his wrist (perhaps accidentally) contemporaneous with these thoughts.  In July 1981, when he was

21  15, he reported to a therapist that he had considered suicide to secure release from his father's abuse.

22  After his discharge from the Army, he jumped from the Sequoia Mall, played "chicken" with diesels on

23  the freeway, and overdosed on his prescription of Inderal.  The jury knew none of this information.

24

25

26      [89] Since Ms. Marshall left Mr. Marshall when Ben-Sholom was 21 months old and returned to
    California to live with her mother and brother, Dr. Geshuri concluded that there was no damage on

27  account of the abuse, since Ben-Sholom was returned to safety.  Dr. Wynbrandt pointed out, however,
    that life in the home of Ben-Sholom's grandmother was unstable, since Ben-Sholom's uncle suffered

28  from schizophrenia and there were many babysitters.

Ben-Sholom's long history of self-destructive behavior, depression, and stress in the years preceding the crime would have presented compelling evidence of mitigation. The combined import of the unstable and tormented upbringing and expert testimony explaining the psychological impact would have made for a compelling mitigating case. Dr. Rienzi found that Ben-Sholom suffered from PTSD, a fragmented sense of self, dissociation, and generally, a history of psychological torture. Dr. Wynbrandt opined that Ben-Sholom suffered from PTSD, borderline personality disorder, identity fragmentation, major depression, dissociative disorder, and committed the crime while under the substantial domination of others. Dr. Wynbrandt believed these conditions developed as the result of the abuse inflicted on Ben-Sholom, including the four month period when Ben-Sholom was a toddler in Louisiana, the later persistent abuse after Ben-Sholom's parents married, the instability in his education, his suicidal ideation, his magical way of thinking, and his desire to belong to a cause.

The Warden's contention that mental health evidence would have revealed aggravating factors as through the testimony of Drs. Richmond and Geshuri is tempered by the fact that both of these experts conceded that Ben-Sholom's troubled background could have supported a diagnosis of PTSD. In Dr. Geshuri's case, most of his opinions rendered in 1985 and later on behalf of the Warden in his 2002 report were negated. With regard to Ben-Sholom's exaggerated accounts of his bad acts, which Dr. Geshuri accepted as true, he admitted that it is not always prudent to rely on the personal history of a client referred by counsel where the client suffers from mental illness. He testified that his initial 1985 ASPD diagnosis did not factor in Ben-Sholom's hypertension because it wasn't reported. He also didn't know Ben-Sholom had attempted suicide four months before the crime with an Inderal overdose, cut his wrist at age nine or ten, had suicidal thoughts since age ten, played "chicken" with diesels on the freeway, had been in counseling at Kings View as a teenager, was depressed 95% of the time, suffered from insomnia, was forced to convert to Jehovah's Witnesses, was subjected to hateful anti-Semitism by his father, was choked by his father, experimented with homosexuality, or expressed remorse for the crime five days after the crime. Although Dr. Geshuri did note that Ben-Sholom changed schools 13 times from elementary school to high school, Dr. Geshuri did not give this fact much significance in 1985. During his evidentiary hearing testimony, however, Dr. Geshuri testified that all of the foregoing facts were significant in that they could have caused stress, anger, fear, impairment to Ben-Sholom's

sense of self, and impairment to his emotional stability.  He (Dr. Geshuri) stated that he didn't believe Mr. Alexander gave him a clear reference question and he conceded that he missed a lot of important events in Ben-Sholom's life.  On the other hand, Dr. Geshuri's ASPD diagnosis was based in part on Ben-Sholom's fictional representation that he had amassed a large store of weapons "obtained by burglaries and other means" and that he (Ben-Sholom) viewed himself as a world-class mercenary.  Dr. Geshuri's opinion that Ben-Sholom was unimpaired when he joined the mission to obtain weapons from the Teague residence was in part based on his own (Dr. Geshuri's) experience as an Israeli soldier.  The Court accepts Dr. Wynbrandt's assessment that this "counter-transference" diminishes the force of Dr. Geshuri's opinion.

In his 2002 report, Dr. Geshuri acknowledged that the abuse Ben-Sholom suffered may have caused PTSD, but he discounted this condition as affecting his mental state at the time of the crime because there was no indication of PTSD in any of the Kings View records and he felt the crime was a well-planned operation.  This belief was moderated when he learned that Kings View therapist, Mr. Casillas, didn't believe PTSD was in use as a diagnosis at the time Ben-Sholom was undergoing counseling.  Dr. Geshuri's understanding of the well-planned manner in which the crime was carried out also led him to reject the notion that Ben-Sholom was substantially dominated at the time of the crime.  Then, he learned that Dr. Richmond wrote in his January 2003 report that Ben-Sholom displayed a histrionic personality disorder.  This revelation is significant because one of the traits of histrionic personality disorder is being suggestible or easily influenced by others.  Dr. Geshuri agreed that an easily influenced person could go along with something voluntarily and still be considered to be "influenced."  Dr. Geshuri's impression that Ben-Sholom had ASPD also was altered during the course of his examination at the evidentiary hearing.  He felt that Ben-Sholom's active participation in counseling at Kings View might have undercut the ASPD.  He felt that Ben-Sholom's responsibility in pursuing administrative remedies to allow him to wear his yarmulke in the prison visiting area was inconsistent with the usual irresponsibility associated with ASPD.  Although he seemed unimpressed about Ben-Sholom's preparation of a San Quentin prisoner resource directory as demonstrative of sympathy and concern for others (inconsistent with ASPD) because people with ASPD "remit" when the enter their 30's, Dr. Geshuri was no longer certain about Ben-Sholom's manipulation of the system when he learned

that the prisoner resource directory was prepared when Ben-Sholom was in his 20's.  Dr. Geshuri didn't necessarily believe that Ben-Sholom's correspondence with pen-pals mitigated his selfishness or dispelled the ASPD diagnosis.

Dr. Richmond's evidentiary hearing testimony did not concede as much as Dr. Geshuri's, but did remit to a less emphatic position than presented in his January 2003 report.  Based on his 1985 examination of Ben-Sholom and numerous records, he concluded Ben-Sholom's psychiatric condition at the time of the offense indicated a severe personality disorder, which included ASPD, borderline personality disorder, histrionic personality disorder, and narcissistic personality disorder.  One of the hallmarks of Dr. Richmond's impression of Ben-Sholom was that genetics, particularly with respect to his father, played a key role in shaping the person Ben-Sholom became at the time of the crime.  On the other hand, with respect to PTSD, Dr. Richmond did find there was "more than sufficient cruelty and abuse to contribute to this disorder," although the most he conceded was that Ben-Sholom may have suffered from PTSD and he didn't think that it contributed to Ben-Sholom's participation in the crime.  Although Dr. Richmond rejected the idea that Ben-Sholom committed the crime while under the substantial domination of others, he did concede that one of the traits of histrionic personality disorder is being suggestible or easily influenced by others or circumstances.  Similarly, he testified narcissistic personality disorder is a condition associated with being overly trusting of strong authority figures who are seen as having the ability to magically solve problems.  Nonetheless, Dr. Richmond thought Ben-Sholom's plan to join the Karen National Liberation Army was a real possibility, that he (Ben-Sholom) actually may have had the mercenary training he talked about, and that paramilitary groups had heard of him and contacted him when he got into trouble.[90]  The fact that Ben-Sholom, in fact, never underwent mercenary training or any training as a jungle fighter undermines the foundation for Dr. Richmond's opinions.  As much as Dr. Richmond minimized the importance of Dr. Wynbrandt's examination of Ben-Sholom ten years after the crime, Dr. Wynbrandt was actually able to sort out which of Ben-Sholom's stated experiences were truth and which were made up.  Dr. Wynbrandt reported that the "brotherhood of mercenaries" Ben-Sholom described in his confessions and early mental health

_____

[90] As noted above, Dr. Richmond accepted Ben-Sholom's statement that "training took over" when he discounted the notion Ben-Sholom may have been dissociating during the crime.

examinations amounted to nothing more than target practice and building a fort with friends (including John Calhoun) by the river.  Understanding Ben-Sholom's capacity to over-dramatize and exaggerate, Dr. Wynbrandt testified it was totally unrealistic for Ben-Sholom to have thought paramilitary mercenary groups would have been interested in him when he got into trouble.  His miscreant-type behavior included burglarizing his mother's house, drug use, running in and out of traffic, jumping off the roof of the Sequoia Mall, and getting into fights.  Dr. Richmond also testified that the nightmares Ben-Sholom reported suggested emotional trauma and his adolescent death wish for his father suggested extreme anger.  Further, he admitted that Ben-Sholom's hypertension could have been a symptom of stress, although he discounted the diagnosis as only supported by a single blood pressure reading. Contrary to Dr. Richmond's understanding about Ben-Sholom's hypertension diagnosis, there were three blood pressure readings by the treating physician.  Given this set of facts it is appropriate to credit Dr. Richmond's statement that Ben-Sholom's hypertension could have been a symptom of stress.  Like Dr. Geshuri, Dr. Richmond found insignificant Ben-Sholom 13 school changes because children of military families experience numerous moves and adjust well.  Dr. Richmond's dismissal in this regard was troubling to Dr. Wynbrandt because unlike children of military families, Ben-Sholom's frequent moves were unplanned and disorganized.  The Court agrees that comparing Ben-Sholom's frequent school changes to the education of military children, where schools are geared to receive these children, is ill-conceived.  Rather, the Court credits Dr. Richmond's opinion that frequent school changes could have impacted Ben-Sholom's establishment of identity.  Dr. Richmond appeared unmoved in his evidentiary hearing testimony about Ben-Sholom having overdosed on Inderal, running in and out of traffic, jumping off the Sequoia Mall, reporting depression 95% of the time, and having suicidal thoughts since he was nine or ten years old.  At most, he testified, these facts *could* have meant Ben-Sholom was depressed in the years and months prior to the crime.  Both Dr. Wynbrandt and Dr. Rienzi, however, saw these factors as very important symptoms of long-term mental struggles.  The fact that Dr. Richmond ascribed little import to them is not dispositive in the prejudice analysis.  Dr. Richmond also didn't see any of the acts which Ben-Sholom's litigation team claims undermined ASPD as compelling.  He disagreed that Ben-Sholom initiated counseling at Kings View and he found Ben-Sholom's continued connection with Kings View was for purposes establishing a counter-authority when he didn't like what was going on

at home.  Dr. Richmond's impression of Ben-Sholom's Kings View experience, however, is in stark contrast to the contemporaneous impressions of Ben-Sholom's therapist, Mr. Casillas.  Mr. Casillas was impressed that Ben-Sholom was engaged in his therapy and was really trying to figure out what to do.[91]  Next, Dr. Richmond found Ben-Sholom's relationships with Judy Mayora and his pen-pals were self-serving and consistent with the manner in which people with ASPD move in and out of relationships.  Dr. Richmond found the relationships superficial and warned that Ben-Sholom's motives must be examined.  In fact, both Dr. Wynbrandt and Mr. Park did examine the character of the relationships Ben-Sholom had with his pen-pals and post-incarceration instructors.  Both found that Ben-Sholom demonstrated genuineness, true friendship, responsibility, persistence, and commitment.  Dr. Richmond also rejected the notion that Ben-Sholom showed empathy by the manner in which he shot Mrs. Teague (so as not to cause her pain).  Dr. Richmond believed Ben-Sholom avoided inflicting pain because he hated people, like his father, who inflicted pain.  Dr. Wynbrandt strongly disagreed.  At first, Dr. Richmond also testified that he didn't believe Ben-Sholom's statements of remorse for killing Mrs. Teague were sincere.  When Dr. Richmond reviewed Ben-Sholom's statement at his second custodial interview, that he felt very bad about the shooting and wouldn't have committed the offense if he had a second chance, Dr. Richmond conceded Ben-Sholom did show true remorse, but added that people with ASPD can express remorse when the have to deal with the consequences of their behavior.

Regarding whether Ben-Sholom was acting under the substantial domination of others when he killed Mrs. Teague, the evidence shows that Ben-Sholom was impelled by internal forces of histrionic personality disorder and narcissistic personality disorder.  As Dr. Wynbrandt explained and both Dr. Richmond and Dr. Geshuri confirmed, people with these disorders are easily influenced and overly trusting.  It's not that John Calhoun or Chris Seaman exerted untoward pressure or physical dominance over Ben-Sholom to pull the trigger that ended Mrs. Teague's life; it was that Ben-Sholom perceived a hierarchal structure to the mission because of the conditioning he endured as a child and teenager.  Evidence that Ben-Sholom endured physical abuse on a regular basis from age seven and a half to age 17, observed his mother being routinely physically and emotionally abused, was programed to comply

---

[91] These impressions were made contemporaneous with Ben-Sholom's adolescent counseling. *See* Exhibit 10 to the Petition.

with senseless orders, including in the middle of the night, was relentlessly emotionally and psychologically demeaned, including with anti-Semitic epithets, had to change schools once or twice a year, experienced isolation from being left alone as a youngster, was choked by his father at age 17, suffered from hypertension, had an anti-hypertensive medication prescribed with known depressive side effects, and experienced life-long depression, with early suicidal ideation, as well as recent acute depression after being discharged from the Army, contributed to form the young man who embraced membership in a military-type organization with an unrealistic goal of joining the Karen Liberation Army in Burma, via El Salvador. *See Allen v. Woodford*, 395 F.3d 979, 1007 (9th Cir. 2005) (humanizing evidence "portrays a person whose moral sense was warped by abuse, drugs, mental incapacity, or disease or who acted out of passion, anger or other motive unlikely to reoccur").

Upon reweighing the evidence, both that adduced at trial and at the evidentiary hearing, *see Williams*, 529 U.S. at 397-98, the Court is satisfied that when considering the totality of the evidence, at least one member of Ben-Sholom's penalty phase jury would have voted for life without the possibility of parole had Mr. Alexander presented mental state evidence through the testimony of mental health experts. *See Williams*, 592 U.S. at 397-98; *Douglas*, 315 F.3d at 1090. This conclusion is strengthened by the fact that the penalty verdict following the paltry mitigation evidence presented was not an instant victory for the prosecution. The deliberations began with a vote favoring life by eight to four and deliberations were protracted, lasting nearly 17 hours in contrast to the two and one half hours from beginning to end of the actual penalty phase case. The state of these deliberations suggest a close case. *See Hamilton v. Vasquez*, 17 F.3d 1149, 1163 (9th Cir. 1994), *disapproved on other grounds, Calderon v. Coleman,* 525 U.S. 141 (1998); *Sandoval v. Calderon*, 241 F.3d 765, 779 (9th Cir. 2001).

While the Court is not convinced that the specific sentencing factors of extreme mental or emotional disturbance under factor (d), substantial domination of another under factor (g), and mental disease or defect under factor (h), were crucial to a life verdict, they were relevant. The substantial domination factor (g), in particular was supported by the evidence that Ben-Sholom perceived himself to be a soldier of low rank following orders when he shot Mrs. Teague. *See* Part A.1., *supra*, reviewing the substance of Ben-Sholom's custodial interviews. Without the crucial explanatory expert mental health opinions, however, Ben-Sholom's subjective beliefs were not compelling. On the other hand, the

1   argument that Mr. Alexander reasonably ignored the persuasive force of this mitigating evidence in

2   hopes that the jurors' focus would be deflected from the aggravating circumstances of the crime is not

3   well taken.  Nor was Mr. Alexander's reliance on factor (b), the absence of uncharged violent criminal

4   activity, and factor (c), the absence of prior felony convictions, compelling in the absence of an

5   evidentiary basis or any cogent argument.  If Mr. Alexander had omitted those factors, but introduced

6   the mitigating evidence available at the time of Ben-Sholom's trial, as presented in this habeas action,

7   there is a reasonable probability the penalty phase verdict would have been different.  *Strickland*, 466

8   U.S. at 694.  Like the defendant in *Bean*, 163 F.3d 1073 (9th Cir. 1998), Ben-Sholom was sentenced to

9   death by a jury that had no understanding of the "indisputably sadistic treatment" inflicted upon him as

10  a child.  *Bean*, 163 F. 3d. at 1081.  Nor was the jury aware of well-established psychological criteria for

11  Ben-Sholom's mental state at the time of the crime.

12      Claim 19 is granted.

13  **V.      Trial Error for Failure to Instruct, Sua Sponte, on the Substantial Domination Sentencing**

14  **Factor under Penal Code § 190.3(g) (Claim 16).**

15      In the October 5, 2001 order, the Court stated:

16      The Court's determination to grant Ben-Sholom an evidentiary hearing on Claim 19 and
        concomitant decision to resolve the penalty phase challenges on evidence potentially
17      more favorable than was adduced at trial [ ] renders the resolution of Claim 16, as
        pleaded, superfluous. Since the Court will consider evidence in excess of that considered
18      by Ben-Sholom's jury, it simply is not necessary to speculate about how the jury might
        have responded to the trial evidence had the omitted instruction been read.

19

20  Part X.B. at p. 193.

21      The Court has now found with respect to Claim 19 that substantial mitigating evidence could

22  have been developed and presented to Ben-Sholom's jury to persuade at least one member to vote for

23  life without the possibility of parole.  This evidence includes Ben-Sholom susceptibility to being

24  influenced by and trusting others, desperately wanting to belong to a cause, and magical thinking, all

25  relevant to the notion that he acted under the substantial domination of others, even though no one was

26  exerting physical force over him.  Even with the presentation of this evidence, the Court declined to find

27  a separate instance of ineffective assistance of counsel for Mr. Alexander's failure to request the factor

28

(g) instruction.  Accordingly the trial court did not err in failing to raise the factor (g) substantial domination sentencing factor sua sponte.

Claim 16 is denied on the merits.

## VI.    Juror Misconduct for Prejudging the Penalty (Claim 22).

Claim 22 of the Petition alleges that Juror Kenneth Richard Gildez committed juror misconduct for prejudging the penalty proceedings, in that he made up his mind to vote for the death penalty as soon as he heard the tape recording of Ben-Sholom's confessions during *guilt* proceedings.

### A.    Summary of the Relevant Facts.

The facts relevant to the prejudging claim are derived from the trial proceedings, pre-evidentiary hearing offers of proof, and from the evidentiary hearing itself.

#### 1.    Trial Proceedings.

During  voir dire, Mr. Gildez confirmed that he felt "the death penalty is appropriate in certain circumstances." RT-3: 463.  He explained he would not automatically impose the death penalty, but his decision "would depend on the facts." *Id*.: 465.  He further gave his assurance that he would consider all sentencing factors before reaching a decision on the appropriate sentence. *Id*.: 466-72.  During the course of the guilt phase proceedings Mr. Gildez and all the jurors were admonished repeatedly not to form any opinion until the case was submitted for a decision.  RT-11: 1905 (initial admonition after being sworn in); 1934 (lunch recess, Monday, February 3, 1986); *id*.: 1989 (mid-afternoon recess, February 3, 1986); *Id*.: 2034 (evening recess, February 3, 1986); RT-12: 2069 (mid-morning recess, Tuesday, February 4, 1986); *id*.: 2101 (lunch recess, February 4, 1986); *id*.: 2158 (mid-afternoon recess, Tuesday, February 4, 1986); *id*.: 2203 (evening recess, February 4, 1986); RT-13: 2270 (lunch recess, Wednesday, February 5, 1986).  After the guilty verdicts and special circumstance findings were entered, the trial judge further admonished the jurors they still hadn't "finished all segments of this trial," and were not to "discuss testimony or evidence or law or the subject matter of this case with anybody until after we finally conclude next week with the penalty phase." *Id*.: 2346.

#### 2.    Pre-Evidentiary Hearing Offers of Proof.

In Ben-Sholom's offer of proof for his evidentiary hearing request, he presented a declaration executed August 15, 1988 over Mr. Gildez's signature.  This declaration was prepared by defense

investigator Irene Zupko after she interviewed Mr. Gildez earlier in the year (1988).  In pertinent part, Mr. Gildez stated with respect to the penalty determination:

> On the first ballot, I was somewhat surprised that many of the female jurors voted for life without the possibility of parole instead of death.  My own mind was made up to vote for death as soon as I heard the well thought out manner in which the crime was planned; I would have voted against death if the evidence showed that the killing was accidental.

The critical statement from this excerpt is "My own mind was made up to vote for death *as soon as I heard* the well thought out manner in which the crime was planned."  (Emphasis added.)

In light of Mr. Gildez's statement that he made up his mind to vote for death when he "heard" the "well thought out manner in which the crime was planned," and given that evidence of how "the crime was planned" was adduced during the presentation of Ben-Sholom's confession at guilt proceedings, the Court determined that further inquiry should be made as to *when* Mr. Gildez actually decided to vote for death.  The Court further determined this statement was neither totally ambiguous nor conclusive.

On December 6, 2001, the Warden's attorneys and an investigator conducted an interview of Mr. Gildez to explore this issue.  Over Ben-Sholom's objections, the Court determined the Warden could file Mr. Gildez's supplemental declaration, which was so filed on September 27, 2002.  *See* Order Denying Petitioner's Motion to Preclude Evidence, filed April 26, 2002, document 328.  In his second declaration, admitted on behalf of the Warden and executed on September 17, 2002, Mr. Gildez addressed the issue of when he made his penalty decision to vote for the death penalty and whether he truthfully answered voir dire questions and followed the trial court's admonitions.  *See* Exhibit A to EHT.  Mr. Gildez confirmed that he truthfully answered voir questions and followed the trial court's admonitions not to form an opinion until the case was submitted for a penalty decision.  With respect to the critical statement, that he made up his mind to vote for death as soon as he heard the well thought out manner in which the crime was planned, he affirmed this referred to "a discussion of what occurred during the penalty phase deliberations," and during those deliberations, "the jury reviewed all the facts which had been presented during both phases of the trial."  During penalty deliberations, Mr. Gildez "listened to and recalled the evidence of how the crime was planned."  He stated that his consideration of this evidence "became the determinative factor in [his] penalty decision."  He conceded that the

1  interpretation of the emphasized statement by Ben-Sholom was understandable, but nonetheless

2  incorrect.  He stressed that he maintained an open mind about the appropriate penalty until the case was

3  submitted to the jury for a penalty determination.

### 3.   Evidence Adduced at the Evidentiary Hearing.

5       On direct examination, Mr. Gildez confirmed that the prior to his meeting with members of the

6  Warden's litigation team, he was informed the primary concern was "the point in time" he determined

7  Ben-Sholom[92] "deserved the death penalty for what he had done." EHT-3: 378.  He understood from the

8  initial contacts that the purpose of the meeting with the Warden's litigation team was to clarify this issue.

9  *Id*.: 379-80. Mr. Gildez did not remember which witnesses testified at the guilt phase proceedings and

10 which testified at the penalty phase proceedings.  *Id*.: 390. In response to questioning by Ben-Sholom's

11 counsel Ms. Milrod, he recalled that in his mind, the evidence which established Ben-Sholom's guilt was

12 his taped confession.  *Id*.: 391.

13      The Court sustained an objection to further questions testing Mr. Gildez's recollection about the

14 state trial proceedings. *Id*.: 391-407.  Instead, the Court suggested that Ms. Milrod's direct examination

15 focus on the reason the two declarations Mr. Gildez executed were inconsistent by questioning him

16 about the intervening interview with the Warden's litigation team.  *Id*. 407-12.

17      The circumstances of his signing of the first declaration (prepared by Ms. Zupko) include that

18 he initially thought she was working for the prosecution arm of the government.  At some later point,

19 however,  perhaps contemporaneous with signing the declaration, Ms. Zupko informed him that she was

20 working for Ben-Sholom's appellate counsel. *Id*.: 412-18.  Mr. Gildez may have suspected she was

21 working for the defense prior to that, and he certainly knew it afterwards, but he wasn't sure when his

22 suspicions solidified into a conclusion.  *Id*.: 419.  When Ms. Zupko presented him with the 1988

23 declaration for his signature, he read it through and satisfied himself that it was not false or misleading.

24 *Id*.: 426.

25      During the December 2001 interview with the Warden's litigation team, Mr. Gildez learned that

26 if in fact he made the determination to vote for the death penalty during the guilt phase, "that could be

27 _____

28    [92] Mr. Gildez knew Ben-Sholom as Ryan Marshall.  All questions regarding the trial proceedings
referred to Ben-Sholom by this birth name, Ryan Marshall or Mr. Marshall.

considered as prejudice," and if that occurred, "[i]t might have influenced the outcome of the penalty

phase." *Id*.: 428.  He derived this understanding from information conveyed to him by the Warden's

counsel Deputy Attorney General J. Robert Jibson. *Id*.: 429-30.  Mr. Gildez also understood from Mr.

Jibson that if he (Mr. Gildez) executed the second declaration, he might not be called to give live

testimony. *Id*.: 431.  During the interview with the Warden's litigation team, Mr. Gildez explained what

he meant in the first declaration by his statement as to when he determined to vote for the death penalty,

and he did so before conversing any further with or receiving prompting from Mr. Jibson.  *Id*.: 436-37.

He explained:

> So the wording is not necessarily mine, although some of the words are words that I said.
> But the – what I mean by that is we're talking about this declaration, the guilt phase of
> the trial had already been decided.  We're now in the penalty phase and we're talking
> about voting for – or doing the ballot for the penalty.

*Id*.: 437-38.  He further clarified that the context of his making up his mind was after the first ballot

during penalty deliberations.  *Id*.: 438.  Although the penalty phase was not the first time Mr. Gildez

heard how the crime was committed, it was the first time he considered the appropriate penalty, because

that is what he was instructed to do.  *Id*.: 438-39.

On cross examination, Mr. Gildez confirmed that Mr. Jibson did not put words in his (Mr.

Gildez's) mouth or tell him that the Warden's litigation team needed to get a particular result in the case.

*Id*.: 442.  What Mr. Gildez understood after his initial conversation with Mr. Jibson in December 2001

was that the Court had a concern and saw an ambiguity in the first declaration. *Id*.: 444.  After reviewing

the second declaration,  Mr. Gildez did not discern a conflict between it and the first declaration.  *Id*.:

445.

On direct examination Ms. Zupko stated that she identified herself to Mr. Gildez as an

investigator for the California Appellate Project when she first met Mr. Gildez.  EHT-4: 587.  She gave

him her business card and him (as she told all jurors she interviewed) that she was working for Michael

Snedeker, Ben-Sholom's appellate attorney. *Id*.: 588.  Mr. Gildez signed the declaration and didn't ask

Ms. Zupko to make any changes to it.  Nor did he express to her any surprise that she worked for the

defense.  *Id*. 591-92.  On cross examination, Ms. Zupko stated her objective in talking with Mr. Gildez,

as with talking to any juror, was to inquire about the process of deliberations. *Id*.: 593.  She did not tell

1   Mr. Gildez or any juror she interviewed she was trying to get the verdict overturned, because that was

2   not her job.  She categorically denied any deception.  *Id*.: 594-95.

3       **B.    Analysis.**

4       The legal principles applicable to Claim 22 are the same now as they were when the Court issued

5   the October 5, 2001 order.  "The bias or prejudice of even a single juror" violates a criminal defendant's

6   "right to a fair trial."  *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) (en banc).  "Actual bias

7   against a defendant on a juror's part is sufficient to taint an entire trial."  *Green v. White*, 232 F.3d 671,

8   676 (9th Cir. 2000).  The presence of juror bias is a structural error not subject to harmless error analysis.

9   *Dyer*, 151 F.3d at 973, n. 2 (quoting *United States v. Allsup*, 566 F.2d 68, 71 (9th Cir. 1977); *see Brecht*

10  *v. Abrahamson*, 507 U.S. 619, 629 (1993) (structural errors infect the integrity of the entire trial process).

11      The question to be resolved at the evidentiary hearing was whether the "bias" shown by Mr.

12  Gildez's first, 1988 declaration is the type of bias which deprived Ben-Sholom of his due process rights

13  to a fair trial.  *See Dyer*, 151 F.3d at 973 (quoting *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th

14  Cir. 1977).  The Warden endeavored to clarify this matter by submitting a second declaration over Mr.

15  Gildez's signature in September 2002.  The issue was further clarified at the evidentiary hearing.

16      Mr. Gildez clarified that when he said he decided the death penalty was appropriate when he

17  learned of the well thought out manner in which the crime was committed, he was referring to penalty

18  deliberations.  In fact he did not make up his mind to vote for the death penalty during guilt proceedings,

19  because, as he testified at the evidentiary hearing, this would have been in contravention to the explicit

20  instructions and admonitions from the trial judge.  Even though Mr. Gildez first heard evidence of the

21  well thought out manner in which the crime was planned during guilt proceedings when Ben-Sholom's

22  custodial statement was presented, he didn't at the time decide the penalty.

23      While it cannot be disputed that there is a contradiction between the first declaration and the

24  subsequent testimony (in the second declaration and the evidentiary hearing testimony), the Court is

25  satisfied that the alleged prejudging did not occur.  Where Mr. Gildez's first declaration recites "as soon

26  as I heard," subsequent testimony has clarified the intent was "when I considered" the well thought out

27  manner in which the crime was planned.  It cannot be disputed that Ben-Sholom's custodial statements

28  describing the circumstances of the offense were proper factors for Mr. Gildez to consider in making his

1  individual penalty determination.  During closing argument, Mr. Walton urged the jurors to consider the

2  evidence presented during the guilt phase, emphasizing the circumstances of the crime.

3      Claim 22 is denied on the merits for lack of factual support.

4  **VII.   Juror Misconduct for Receipt and Consideration of Extrinsic Evidence (Claim 23).**

5      In Claim 23, Ben-Sholom alleges a second form of juror misconduct against Mr. Gildez,

6  interjecting extraneous and incorrect information for the jury's consideration during penalty

7  deliberations.  That extraneous, incorrect information was that Ben-Sholom likely had a criminal record

8  as a juvenile and that the reason so little evidence was presented about Ben-Sholom's juvenile record

9  was that juvenile records are sealed.  The misconduct has already been determined to have occurred.

10 *See People v. Marshall*, 50 Cal. 3d 907, 949-50 (1990), as summarized in Part XII.B.2. of the October

11 5, 2001 order.

12      Prior to the evidentiary hearing, Ben-Sholom attempted to augment the extraneous evidence

13 argument of Claim 23 to include information juror Portia Bordeaux received from her law enforcement

14 husband.  Specifically, Mr. Bordeaux purportedly told his wife, during her service on Ben-Sholom's

15 jury, that life without the possibility or parole actually didn't mean without parole.  In her declaration,

16 Ms. Bordeaux averred that this information influenced her vote for the death penalty.  Prior to receipt

17 of that information from her husband, she had been a "hold-out" for a sentence of life without parole,

18 but afterwards, she voted for the death penalty.  Prior to the commencement of the evidentiary hearing,

19 on January 31, 2003, the Court excluded the testimony, since it was not contemplated by the allegations

20 of Claim 23.  The order was without prejudice to further argument, which was presented on February

21 5, 2003.  Prior to receipt of live testimony, on February 7, 2003, the Court again ruled that Ms.

22 Bordeaux's testimony would be excluded.  As stated on the record, *see* EHT-4: 584-85, Claim 23 is not

23 alleged broadly enough to include evidence of additional extraneous information apparently received

24 and considered by juror Bordeaux.  Rather, Claim 23 alleges that juror Gildez volunteered information

25 about Ben-Sholom's juvenile record and shared that with the other jurors.

26      The only issue left to decide is whether Mr. Gildez's alleged misconduct in this regard had a

27 "substantial and injurious effect or influence in determining the jury's verdict." *Sassounian v. Roe*, 230

28 F.3d 1097, 1008 (9th Cir. 2000) (quoting *Brecht*, 507 U.S. at 623).  In making his argument to the Court

1   in advance of the October 5, 2001 order, Ben-Sholom focused on sentencing factors § 190.3(b) (absence

2   of uncharged violent criminal activity) and (c) (absence of prior felony convictions), arguing that Ben-

3   Sholom's juvenile records would have been inadmissible under either factor.

4          In light of the extensive analysis concerning Mr. Alexander's failure to present a persuasive

5   mitigation case, inquiry into the inadmissibility of Ben-Sholom's juvenile records is superfluous.  Ben-

6   Sholom's right to a constitutional penalty trial was violated because of Mr. Alexander's constitutionally

7   ineffective representation.  Further, the presentation of mitigating evidence in these proceedings includes

8   key evidence of Ben-Sholom's suicidal and patricidal thoughts.  As the Court has observed, Ben-

9   Sholom's case was not a particularly suitable case for a mitigation under factor (b).  In any event,

10  because of the complete alteration in the state of the evidence that would have been presented to the jury

11  had Mr. Alexander performed competently, Mr. Gildez's misconduct is moot and Claim 23 is denied

12  on that basis.

13  **VIII.   Disproportionality of the Death Sentence (Claim 27).**

14         The last claim reserved until after the evidentiary hearing was that portion of Claim 27 pertaining

15  to intra-case proportionality.  The inquiry for this remaining issue is whether Ben-Sholom's death

16  sentence was disproportionate in comparison with the circumstances of the crime and the mitigation

17  evidence presented in this habeas proceeding.  *See* Part XIII., October 5, 2001 order, at p. 216.  The

18  Court declines to make this determination in light of the grant of Claim 19.  Claim 27 is denied as moot.

19  **IX.      Challenge to Fair-Cross Section Requirement (Claim 14).**

20         In Claim 14 of the Petition, Ben-Sholom alleged a Sixth Amendment violation regarding the

21  proportion of Hispanics selected for jury service in Tulare County at and around the time of his trial.

22  This claim is governed by *Duren v. Missouri*, 439 U.S. 357 (1979).  To establish a prima facie violation

23  of the fair-cross section requirement Ben-Sholom must show:

24         (1) that the group alleged to be excluded is a "distinctive" group in the community; (2)
           that the representation of this group in venires from which juries are selected is not fair
25         and reasonable in relation to the number of such persons in the community; and (3) that
           this underrepresentation is due to the systematic exclusion of the group in the jury
26         selection process.

27  *Id*. at 364.

28

In reviewing this claim and request for an evidentiary hearing, the Court considered the offer of proof from sociologist J. Dennis Willigan, Ph.D.   Dr. Willigan constructed a statistical model to estimate the adult Hispanic population in Tulare County, generally, and in jury venires during the years 1985 and 1986.  Based on data obtained from the Census Bureau, Dr. Willigan calculated 21.69% for the proportion of Hispanics in the general population.  Separately, after adjusting this figure for the "known" undercount of Hispanics by census takers, he arrived at 26.14% figure.  He also determined that Tulare County jury venires during the relevant period were only 10.96% Hispanic.  Using the high and low figures for the Hispanic population proportion in the County, he calculated high and low absolute disparity figures of 15.18% (26.14% - 10.96%) and 10.73% (21.69% - 10.96%).  The 15.18% figure is statistically significant for meeting the second prong of the *Duren* test.  *See United States v. Rodriguez-Lara*, 421 F.3d 932, 944 (9th Cir. 2005) (absolute disparities of 15.4% and 14.1% in collected cases found to be sufficient to meet the second prong in *Duren*).  It is not certain whether the 10.73% figure is sufficient.  *See id.* (underrepresentation of a distinctive group where the absolute disparity is 7.7% or lower is insufficient under the second *Duren* prong).  The Court expressed concern about the process Dr. Willigan employed to arrive at his statistical figures as it appeared he utilized a statistical model rather than reviewing actual juror lists.  The Court also found troubling that the actual proportion of Hispanics in Ben-Sholom's venire was as high 18.61% .[93]  Rather than base its decision to deny further evidentiary development for failure to make out a prima facie case on the second, *Duren* prong, however, the Court proceeded to the third *Duren* prong.

Relying on *United States v. Footracer*, 189 F.3d 1058 (9th Cir. 1999), the Court concluded that Ben-Sholom had not made a sufficient showing for "systematic exclusion."  Since the October 5, 2001 order was drafted, the *Footracer* opinion was withdrawn, 252 F.3d 1059 (9th Cir. 2001), and an unpublished disposition of the case has been filed in its stead.  *See* 16 Fed.Appx. 595 (9th Cir. 2001).  Accordingly, the Court's reliance on *Footracer* is no longer valid.  Nonetheless, Ben-Sholom still has not made out a prima facie case under the third *Duren* prong, as he has not alleged what procedures

---

[93] This finding was made after the Court's review of the 231 names on Ben-Sholom's venire. Based on review of names (nominal review) it appeared to the Court that 43 of those persons may be Hispanic.  That amounts to 18.61% (43 ÷ 231 = .186147).

1   Tulare County utilized to systematically exclude Hispanics.   Rather, he has relied solely on Dr.

2   Willigan's findings that the differences between the proportion of Hispanics in the general population

3   and the proportion of Hispanics in the jury venires were attributable to many, many standard deviations:

4   56 standard deviations respecting the low, 10.73% absolute disparity figure, and 68 standard deviations

5   for the high, 15.18% absolute disparity figure.

6          This showing is insufficient under controlling precedent.

7          A showing that a jury venire underrepresents an identifiable group is, without more, an
       insufficient showing of systematic exclusion under the third prong of the *Duren* test.   If
8      underrepresentation by itself were sufficient to support a holding of unconstitutionality,
       the second and third prong of *Duren* would effectively collapse into one inquiry.

9

10  *Randolph v. California*, 380 F.3d 1133, 1141 (9th Cir. 2004).  Just as the petitioner in *Randolph* could

11  not prevail with respect to a challenge to the Fresno County jury selection process, Ben-Sholom cannot

12  satisfy the third *Duren* prong "because he has failed to present any evidence that the underrepresentation

13  of Hispanics is due to the system [Tulare] County uses to assemble the venire." *Id*.  Nothing is alleged

14  at all about the process by which jurors are selected for Tulare County venires.

15         Claim 14 is denied on the merits.

16  **X.     Order.**

17         Having considered all the pleadings, records, submitted evidence, and arguments of the parties,

18  the Court rules as follows.

19         The Warden's request for judicial notice of the *Frierson* order and *Baranyi* Transcript is granted.

20         Ben-Sholom's request to expand the record to include the supplemental declaration of Karen

21  Froming, Ph.D., defense trial exhibit photographs, and the original of the declaration of Mavis Gilbert

22  is granted.

23         Claim 19 is granted.  A writ of habeas corpus shall issue directing the State of California to

24  vacate and set aside the death sentence in *People v. Ryan Michael Marshall*, Tulare County Superior

25  Court Case No. 23087, unless within 90 days of the entry of judgment herein, the State of California

26  initiates proceedings to retry Ben-Sholom's sentence.  In the alternative, the State of California shall

27  re-sentence Ben-Sholom to life without the possibility of parole.

28

1     All other claims presented in the Petition are denied.  Claims 14, 16, and 22 are denied on the

2  merits pursuant to this order.  Claims 23 and 27 are denied as moot pursuant to this order.  All other

3  claims are denied pursuant to the October 5, 2001 order.

4     The Clerk is directed to enter judgment forthwith.

5     IT IS SO ORDERED.

6

7  Dated:____July 11, 2008____                      ____/s/ Anthony W. Ishii___
                                                       Anthony W. Ishii
8                                                   United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28