UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

CHAY'IM BEN-SHOLOM a.k.a. Ryan Michael Marshall,

Petitioner,

vs.

ROBERT L. AYERS, JR., as Warden of San Quentin State Prison,

Respondent.

Case No. 1:93-CV-05531 AWI

DEATH PENALTY CASE

ORDER GRANTING IN PART AND DENYING IN PART PETITIONER'S REQUEST FOR A CERTIFICATE OF APPEALABILITY

This matter is before the Court on the request of Petitioner Chay'im Ben-Sholom ("Ben-Sholom"), for a certificate of appealability ("COA"). The request is supported by a memorandum of points and authorities filed on August 27, 2008. Respondent Robert L. Ayers, Jr., as Warden of San Quentin State Prison (the "Warden") has not filed a response to the COA request and has informed the Court he does not intend to do so.

## I. Background.

On July 11, 2008 the Court issued an order granting relief on Claim 19 of Ben-Sholom's Petition, finding ineffective assistance of trial counsel, Roger Alexander, during the penalty proceedings. All other claims were denied, including those arising from Ben-Sholom's conviction of first degree murder and the death eligibility special circumstance findings.[1] On August 6, 2008, Ben-Sholom filed a notice of appeal as to all claims in the Petition except Claim 19. On August 15, 2008, the Court granted Ben-

[1] Ben-Sholom's other penalty phase claims were denied as moot or on the merits.

Sholom's request for the Court to defer ruling on a COA, giving him up to and including August 28, 2008 within which to file his memorandum of points and authorities in support of the COA request. Ben-Sholom now limits his request for a COA to Claims 1 through 14, 18, 30, and 32. He submits his COA request on the record as to Claims 2, 4 through 13, 30, and 32, but submits additional points and authorities as to Claims 1, 3, 14, and 18.

**II. Record-Based COA Request.**

Taking into account that the standard for granting a COA "is relatively low," *Jennings v. Woodford*, 290 F.3d 1006, 1010 (9th Cir. 2002); *Beardslee v. Brown*, 393 F.3d 899, 901-02 (9th Cir. 2004) and that Ben-Sholom "need not show that he should prevail on the merits" *see Barefoot v. Estelle*, 463 U.S. 880, 893, n. 4 (1983), the Court denies his request for a COA as to Claims 2, 4 through 13, and 32. As to these claims, Ben-Sholom has failed to meet the threshold requirement of showing that reasonable jurists could debate whether the claims should have been resolved differently or that the issues presented deserve encouragement to proceed further. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). The COA request is granted as to Claim 30.

**A. Claims 2, 4, 5, 6, 7, 8, 9, and 10.**

Claims 2 and 4 through 10 challenge the voluntariness of Ben-Sholom's confessions. Claims 2, 5, 6, and 7 were dismissed in part on August 26, 1998 in response to the Warden's motion for judgment on the pleadings and the remaining grounds were denied on the merits in the October 5, 2001 order addressing Ben-Sholom's evidentiary hearing motion and merits resolution of record based claims. Claims 4, 8, 9, and 10 were dismissed with prejudice, in their entirety, in the August 26, 1998 order. After carefully reviewing the record and Ben-Sholom's arguments leading to the August 26, 1998 and October 5, 2001 orders, the Court found that although Ben-Sholom was young, tired, and somewhat vulnerable to police questioning tactics, his custodial statements were not coerced or otherwise invalid. There was no unconstitutional police misconduct warranting relief. The Court finds that the merits denial of these claims is not subject to debate by reasonable jurists.

**B. Claims 11 and 12.**

Claims 11 and 12 challenge Ben-Sholom's delayed arraignment because the delay afforded authorities the opportunity to develop further incriminating evidence against him. Finding that Ben-

Sholom's allegations failed to satisfy the "colorable claim" requirement, *see Jones v. Wood*, 114 F.3d 1002, 1010 (9th Cir. 1997), the Court denied Ben-Sholom's request for an evidentiary hearing and denied Claims 11 and 12 on the merits in the October 5, 2001 order. The standard for determining availability of an evidentiary hearing stated in *Jones*, 114 F.3d 1002, is reiterated in *Earp v. Ornoski*, 431 F.3d 1158, 1167 (9th Cir. 2005). The Court's denial of Claims 11 and 12 is not subject to debate by reasonable jurists that the issues presented deserve further encouragement.

**C. Claim 13.**

Claim 13 challenges Ben-Sholom's conviction and death sentence as improperly influenced by the fact that the victim was Caucasian. In the August 26, 1998 order, the Court found the allegations of discrimination insufficient because they were supported only by statistics. *See McClesky v. Kemp*, 481 U.S. 279, 292 (1987). To permit Ben-Sholom to plead the required element of a discriminatory purpose, the Court granted him leave to amend. On September 18, 1998, Ben-Sholom notified the Court he declined to amend Claim 13 and the claim thereafter was dismissed for failure to state a claim on September 21, 1998. The decision to dismiss Claim 13 under these circumstances is not subject to debate by reasonable jurists.

**D. Claim 30.**

Claim 30 challenges the 1978 California Death Penalty Statue because Ben-Sholom claims it fails to narrow the class of defendants who are eligible for the death penalty. Paragraphs 20 through 25, which allege that the circumstances of the crime sentencing factor under California Penal Code § 190.3(a) is applied in an arbitrary manner, was stricken on April 3, 1998. The remaining allegations were found not to meet the "colorable claim" requirement for an evidentiary hearing and were denied on the merits in the October 5, 2001 order. The discussion of Claim 30 was substantial, spanning from page 111 through 153 of the order.

The Court first rejected the Warden's argument that the failure to narrow claim is barred by *Teague v. Lane*, 489 U.S. 288 (1989). Next the Court validated the reliability of the statistical data offered by Ben-Sholom's experts, Steven F. Shatz and Nina Rivkind, both in terms of determining the scope of death eligible offenses (that is first degree murder) and their qualifications. The Court found legally unavailing Ben-Sholom's triple counting and relative culpability challenges to the felony murder

death eligibility special circumstance provision of the Statute. *See Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988) (holding that the a death eligibility aggravating circumstance which duplicated one of the elements of the crime did not make the death sentence constitutionally infirm); *Tison v. Arizona*, 481 U.S. 137, 157 (1987) (holding that reckless indifference to human life by engaging in dangerous activity, in addition to intentional killing, may satisfy the mens rea necessary for capital punishment). The Court found unsupported Ben-Sholom's challenge to the 1978 Death Penalty Statute based on the high affirmance rate of death sentences by the California Supreme Court. Next, Ben-Sholom's suggestion that the over-inclusiveness of the Statute could be cured by adding procedural safeguards to sentence selection was rejected as irrelevant to the narrowing process. Nonetheless, the Court found the class of first degree murderers to be very broad under the California scheme, much broader than Louisiana's death penalty law discussed in *Lowenfield*, 484 U.S. 231. The Court also noted the Warden did not present an argument addressing Ben-Sholom's chief complaint, that the death eligibility special circumstances under Penal Code § 190.2 fail to narrow the pool of first degree felony murderers who should be death eligible. Analyzing this challenge, the Court found the affirmation by the Supreme Court in *Pulley v. Harris* 465 U.S. 37, 57 (1984) of the 1977 predecessor to the 1978 Death Penalty Statute to be persuasive. And although the 1978 Statute is more comprehensive and establishes death eligibility in a greater number of circumstances than did its 1977 predecessor, the addition of the "intent to kill" requirement applicable to Ben-Sholom's case by operation of *Carlos v. Superior Court*, 35 Cal. 3d 131, 134, (1983), *overruled by People v. Anderson*, 43 Cal. 3d 1104, 1115 (1987), rendered application of the 1978 Statute analogous to the 1977 law upheld by the Supreme Court in *Pulley v. Harris*.

Because the argument, discussion, and analysis was multifaceted and complex, the Court grants a COA as to Claim 30. Although the Court of Appeals may affirm after full consideration of the issue, the merits of the claim could be considered debatable among reasonable jurists.

**E. Claim 32.**

In Claim 32 Ben-Sholom complains that the California Supreme Court failed to address four of his substantive claims either on direct review or on state habeas corpus proceedings. The Court dismissed Claim 32 in the August 26, 1998 order on the grounds that Ben-Sholom did not state a valid

liberty interest arising from the California Supreme Court's alleged omissions under the California Constitution, because the state Constitution does not require disposition of every "corollary legal issue" that may be raised in an appeal. *People v. Rojas*, 118 Cal. App. 3d 278, 289 (1981); *see also People v. Kelley*, 40 Cal. 4th 106, 110 (2006). Separately, the Court reviewed the claims Ben-Sholom alleged were omitted from consideration by the California Supreme Court and found Ben-Sholom's contention factually unsubstantiated. Comparing the allegedly omitted claims with the text of the California Supreme Court opinion, the Court concluded that each claim had been addressed. For that reason Claim 32 additionally was denied on the merits in the August 26, 1998 order. This decision is not subject to debate by reasonable jurists.

## III. COA Request Based on Additional Argument.

Ben-Sholom offers additional argument with respect to the denial of relief on Claims 1, 3, 14 and 18. Under applicable principles, the Court finds a COA is not appropriate based on any of the arguments Ben-Sholom presents. Nonetheless, the Court grants a COA as to that portion of Claim 18 relative to Ben-Sholom's mental state at the time of the offense.[2]

### A. Claims 1 and 3.

Claims 1 and 3 both challenge Ben-Sholom's confessions, Claim 1 on the grounds that authorities improperly persuaded him to withdraw his invocation of the right to counsel and Claim 3 on the grounds that authorities did not tape record the *Miranda* advisement and ensuing colloquy. Claim 1 was dismissed in part on August 26, 1998 in response to the Warden's motion for judgment on the pleadings and the remaining allegations were denied on the merits on October 5, 2001. Claim 3, in its entirety, was dismissed with prejudice in the August 26, 1998 order. In rendering these decisions, the Court carefully considered the allegations of police manipulation and questioning techniques that were intended to give and did give Ben-Sholom the impression speaking to authorities was in his best interests because his co-perpetrators identified him as the "triggerman" and/ or that he had to speak to authorities before he could obtain commissary items at the jail. The Court further considered the allegation that authorities sought to avoid scrutiny by not tape recording the advisements (although they did tape record

---

[2] This portion of Claim 18 was not addressed in Ben-Sholom's present points and authorities.

the confessions), and then gave misleading testimony about the advisements before the trial court at the suppression hearing.

In his present points and authorities Ben-Sholom claims the Court misread and misstated the record of the suppression hearing so as to give unwarranted credence to the testimony of the interrogating officers. The Court has now re-reviewed the state trial court's written ruling denying Ben-Sholom suppression motion and finds no misreading or misstatement in the October 5, 2001 order. In his original points and authorities supporting Claim 1,[3] Ben-Sholom argued that the trial court did not mention either of his co-perpetrators in the written ruling. Pointing to a statement in the trial court ruling recounting that the officers testified the co-perpetrators said Ben-Sholom was the triggerman, the Court found Ben-Sholom's contrary assertion to be factually incorrect. Ben-Sholom now claims the Court was incorrect to make this finding because although the trial court ruling does contain a reference to the co-perpetrators identifying Ben-Sholom as the triggerman, "there is no indication that the trial court actually believed [the officer] made this false statement." This is not a significant point. The trial court need not have stated whether it believed or disbelieved officers told Ben-Sholom what the co-perpetrators told them. The pertinent inquiry before the trial court, as before this Court, was and is the colloquy between Ben-Sholom and the Tulare County authorities, not between his co-perpetrators and the authorities. During the suppression motion hearing, Ben-Sholom testified that the *Miranda* admonition was given to him off tape and that he additionally understood his rights and waived them. Although Ben-Sholom may have felt some pressure to speak to the authorities, his will was not constitutionally overborne.

Ben-Sholom's related argument as to Claim 3 also is unavailing. In his argument opposing the Warden's motion for judgment on the pleadings Ben-Sholom acknowledged that while he does not claim the existence of a general obligation to tape record *Miranda* advisements, under the circumstances of this case, the failure to preserve the advisements infringed his due process rights. Because Ben-Sholom admitted at the suppression motion hearing that he received, understood, and waived his rights pursuant to the *Miranda* admonition, albeit off tape, the failure to preserve the admonition and colloquy is not

[3] These points and authorities were filed on April 1, 1999.

meaningful to the due process argument. The COA request as to Claims 1 and 3 is denied. The Court's prior decisions regarding these claims are not subject to debate by reasonable jurists.

**B. Claim 14.**

In Claim 14 Ben-Sholom challenges the entire trial because he claims his Sixth Amendment right to a jury representing a fair cross section of the community was violated by the alleged systematic underrepresentation of Hispanics in the Tulare County jury pool. To make out a prima facie case on a challenge to the fair-cross section requirement Ben-Sholom must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to the systematic exclusion of the group in the jury selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).

In the October 5, 2001 order, the Court found the first requirement satisfied, expressed skepticism as to whether the second requirement was satisfied, and denied an evidentiary hearing for lack of a colorable claim because the third requirement was not satisfied. The extant case authority at the time the October 5, 2001 order was drafted was *United States v. Footracer*, 189 F.3d 1058 (9th Cir. 1999), which held the third *Duren* prong, underrepresentation due to systematic exclusion, required a showing that the jury selection process treated the distinctive group differently. *Id*. at 1061. Although Ben-Sholom attempted to distinguish *Footracer*, the Court found it dispositive. The Ninth Circuit has since withdrawn *Footracer*. 252 F.3d 1059 (9th Cir. 2001).

Accordingly, the Court again addressed Claim 14 in the July 11, 2008 order. This time pointing to Ben-Sholom's failure to allege what procedures were actually utilized in Tulare County to systematically exclude Hispanic venire persons, the Court again found the lack of a colorable claim on the third *Duren* prong and denied relief. *See Randolph v. California*, 380 F.3d 1133, 1141 (9th Cir. 2004).

In his present points and authorities, Ben-Sholom argues that although the second and third *Duren* prongs are not interchangeable, the statistical showing made in support of the second prong establishes the third prong as well. This follows, he argues, because implicit in a significant absolute disparity between jury eligible Hispanic jurors and jurors selected on 1985 and 1986 venires, is the

"overwhelming likelihood of a <u>system</u> of selection that does not include enough members of the excluded group." (Emphasis in original.) He argues that he has always been confident he could describe the Tulare County selection process to show systematic exclusion, but was precluded from making this showing because the Court denied his request for an evidentiary hearing in the October 5, 2001 order. He claims a COA should be granted because the Court denied him the opportunity to further develop the claim he would have accomplished by eliciting evidence from Tulare County jury selection officials.

In the September 18, 1998 Amendment to the Petition re-alleging Claim 14, Ben-Sholom recites no facts relative to the actual procedure utilized to select juror in Tulare County in 1985 and 1986:

> The underrepresentation in Tulare County venires was due to systematic exclusion of jury eligible Hispanics in the jury-selection process. The method of selection used to generate the Tulare County jury venires during these years failed to yield a fair cross-section of the adult citizen population. . . . [¶] The absence of such a large number of jury-eligible Hispanics shows that the juror venire selection process was gravely flawed and not neutral toward the inclusion of otherwise juror eligible adult citizen Hispanics.

Amendment ¶¶ 5, 6.

In his request for an evidentiary hearing, Ben-Sholom offered a detailed declaration of social demographer J. Dennis Willigan, Ph.D. to show statistical disparities between jury eligible Hispanics and Hispanics called to serve on Tulare County juries. Ben-Sholom stated that he would "supplement Dr. Willigan's testimony as necessary with testimony from Tulare County court officials relating to jury selection procedures in that county in the mid-1980s." Petitioner's Request for Evidentiary Hearing filed Oct. 22. 1999, p. 28. In the order authorizing the filing of an evidentiary hearing, the Court provided Ben-Sholom guidance as to what information should be included in the evidentiary hearing request:

> Since all claims alleged in the Petition have been thoroughly briefed by both parties, Ben-Sholom's request for an evidentiary hearing need only present (1) the legal justification for an evidentiary hearing under *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir.), *cert. denied, sub nom. Woodford v. Caro*, ___ U.S. __, 119 S. Ct. 2414 (1999), as informed by *Townsend v. Sain*, 372 U.S. 293, 313 (1963), modified by *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 8 (1992) and (2) *an offer of proof describing the specific evidence sought to be elicited, with reference to declarations already part of the Court's file or such additional declarations as Ben-Sholom deems appropriate.*

Sept. 16 1999 Order, p. 2 (italics added).

At no time has Ben-Sholom ever offered or even alleged what the jury selection procedures were in Tulare County at the relevant time. The Court noted this in the October 5, 2001 order. *See* Oct. 5,

2001 order, p. 99. ("No offer of proof has been provided for the Jury Commissioner's (or representative's) testimony.") Although his earlier failure to allege those procedures was not the basis for the denials, alleging the procedures is crucial to determining systematic exclusion. In *Duren*, the petitioner was able to point to the selection process which systematically excluded women from petit juries in a pre-trial, motion, a motion for new trial, and on direct appeal, that is the Missouri State Constitution. *See* 439 U.S. at 360. Duren did present statistics showing disparities, but the fact that women who requested an exemption from jury service were granted an exemption, no questions asked, as permitted under state law, was key to the holding. Ben-Sholom has failed to allege the method which excludes Hispanics in his amended pleading and failed to offer the evidence he would present at the requested evidentiary hearing. The opportunity for doing so has now passed.

In any event, as discussed at length in the October 5, 2001 order, and briefly reiterated in the July 11, 2008 order, the Court is troubled by the fact that in Ben-Sholom's venire the percentage of jurors with apparent Hispanic surnames was 18.61 percent. Through his statistical models, Dr. Willigan found that the percentage of Hispanics on Tulare County jury venires in 1985 and 1986 was only 10.96 percent. While it true that the Court did not afford Ben-Sholom the opportunity to explore the disparity between the Court's estimate of Hispanics on Ben-Sholom's venire and Dr. Willigan's estimate, the 7.65 percent difference is significant.

The request for a COA at to Claim 14 is denied. Ben-Sholom has neither pleaded the elements of a prima facie case under *Duren* nor offered to prove the third systematic exclusion prong. The denial of Claim 14 is not subject to debate among reasonable jurists.

**C. Claim 18.**

Claim 18 alleges that trial counsel, Mr. Alexander, provided constitutionally deficient representation at the guilt phase of Ben-Sholom's trial for failure to develop a mental state defense to first degree murder and failure to raise the issue of Ben-Sholom's competence to stand trial. Ben-Sholom's present points and authorities focus exclusively on Mr. Alexander's alleged ineffective assistance for not raising the issue of Ben-Sholom's competence to stand trial.

The totality of the evidence before the Court following the evidentiary hearing describes Ben-Sholom's horribly abusive, conflicted, and disappointing upbringing which produced a young man who

was mentally compromised and vulnerable. The abuse, perpetrated by Ben-Sholom's father, was pervasive and unrelenting, involving both psychological cruelty and severe physical abuse. Ben-Sholom had a history of nightmares, depression, and preoccupation with suicide. He developed hypertension at 18 years old and received a prescription of Inderal after his life-long dream of joining the Army fizzled when he was medically discharged. Evidence was presented that Inderal can exacerbate depression At the time of the crime, he suffered from PTSD,[4] borderline personality disorder,[5] identity fragmentation, and major depression. He believed that he was involved in a "military mission" with the ultimate purpose of obtaining weapons he and his companions would use as members of the Karen Liberation National Army in the country of Burma (now Myanmar). Of the three co-perpetrators, Ben-Sholom perceived himself as the lowest ranking participant, designated to take orders, which he followed without question. This includes the order to kill the victim.. The evidence before the Court supports the notion that although Ben-Sholom's co-perpetrators did not exert untoward pressure or physical dominance over him to shoot the victim, he perceived a hierarchal structure to the mission because of the conditioning he endured as a child and teenager.

Ben-Sholom requested an evidentiary hearing to support his claim of ineffective assistance of counsel regarding Mr. Alexander's failure to develop mental state evidence that could have been presented as a mental defense. In his points and authorities supporting the Petition and the evidentiary hearing request he argued that because of his background and resulting mental decompensation, he lacked the capacity to make rational, considered choices or to exercise meaningful judgment, and that if the jury had been exposed to additional mental state evidence, he would not have been convicted of first degree murder. In the October 5, 2001 order, the Court rejected Ben-Sholom's request for further evidentiary development because he failed to identify a viable guilt phase strategy. The extent and scope of the evidence developed at the evidentiary hearing regarding sentencing mitigation, however, could

---

[4] Ben-Sholom's experts concluded he suffered from PTSD unquestionably. The Warden's experts opined that he may have suffered from PTSD based on the childhood cruelty, although they did not embrace that PTSD was a factor affecting Ben-Sholom at the time of the crime.

[5] A component to borderline personality disorder is histrionic personality disorder, which includes being suggestible or easily influenced by others. One of the Warden's experts conceded that a person who is easily influenced could voluntarily go along with someone and still be considered "influenced."

subject the Court's earlier denial of mental state defense development to debate among reasonable jurists, even though the Court of Appeals may affirm after full consideration of the issue. The COA request is granted as to that portion of Claim 18 relative to Mr. Alexander's failure to develop and present evidence of mental state defenses to Ben-Sholom's first degree murder conviction.

The Court does not extend this ruling to the earlier decision in the October 5, 2001 order to foreclose further evidentiary development concerning Ben-Sholom's competence to be tried. In the present points and authorities, Ben-Sholom takes issue with this decision because it was based primarily on the strength of Mr. Alexander's sworn statement that Ben-Sholom's behavior did not warrant a competence inquiry under Penal Code § 1368. Ben-Sholom asks for a COA regarding this ruling because he claims Mr. Alexander's impression is unsupported by the record. The Court does not agree. The support for Mr. Alexander's impressions is the fact that he routinely conversed with Ben-Sholom and observed Ben-Sholom's behavior. That Mr. Alexander conceded he had a difficult time connecting with Ben-Sholom and that Ben-Sholom was an unreliable historian who exaggerated his abilities does not detract from the impression that Ben-Sholom was possessed of sufficient present ability to consult with Mr. Alexander with a reasonable degree of rational understanding. *See Boag v. Raines*, 769 F.2d 1341, 1343 (9th Cir. 1985); *Williams v. Woodford*, 384 F.3d 567, 608 (9th Cir. 2004). Nor does the Court's finding in the July 11, 2008 order that Mr. Alexander failed to pursue a constitutionally competent strategy at the penalty phase proceedings detract from his ability to assess the mental competence of his client. The request for a COA is denied as to that portion of Claim 18 relative to Ben-Sholom competence to stand trial.

IT IS SO ORDERED.

Dated: September 4, 2008

/s/ Anthony W. Ishii
Anthony W. Ishii
United States District Judge